Patrick Bearup 136226
<u>Name and Prisoner/Booking Number</u>

ASPC-F - Central
<u>Place of Confinement</u>

PO Box 8200
<u>Mailing Address</u>

Florence, AZ 85132 - 8200
<u>City, State, Zip Code</u>

**(Failure to notify the Court of your change of address may result in dismissal of this action.)**

☑ FILED ____ LODGED
____ RECEIVED ____ COPY

DEC 1 6 2019

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Patrick W. Bearup ,
(Full Name of Plaintiff)

                    Plaintiff,

v.

(1) Charles Ryan ,
(Full Name of Defendant)

(2) Corizon Medical ,

(3) Denise Weston ,

(4) Kevin Curran ,

                    Defendant(s).

☑ Check if there are additional Defendants and attach page 1-A listing them.

**CV-19-5828-PHX-SPL (MHB)**

CASE NO. _____

(To be supplied by the Clerk)

**CIVIL RIGHTS COMPLAINT**
**BY A PRISONER**

☒ Original Complaint
☐ First Amended Complaint
☐ Second Amended Complaint

JURY TRIAL DEMANDED

### A. JURISDICTION

1. This Court has jurisdiction over this action pursuant to:
    ☒ 28 U.S.C. § 1343(a); 42 U.S.C. § 1983
    ☐ 28 U.S.C. § 1331; *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971).
    ☐ Other: _____.

2. Institution/city where violation occurred: Central Unit in Florence, Arizona .

**550/555**

Defendants Continued

(5) Rodney Carr

(6) Captain D. Walker

(7) Captain Williams

(8) Tracey Moore

(9) Denise Beckler

(10) Lt. Darras

(11) Adam Perkins

(12) Trina Randall

(13) Diane Miller

(14) Jason Monson

(15) Jessica Todd

(16) Sharon Kary

(17) Kyle Henry

(18) John Doe

(19) Sgt. Ramos

(20) David Shinn

(21) Marianne Powell

(23) Centurion Medical

(24) These Defendants are being sued in both their personal and official capacities

(25)

## B. DEFENDANTS

1. Name of first Defendant: <u>Charles Ryan</u>. The first Defendant is employed
as: <u>Director of Prison</u> at <u>Central Office (Retired)</u>.
<div align="center">(Position and Title)         (Institution)</div>

2. Name of second Defendant: <u>Corizon Medical</u>. The second Defendant is employed as:
as: <u>Vendor for Az Dept of Corrections</u> at <u>Florence Complex, Central Unit (Fired)</u>
<div align="center">(Position and Title)         (Institution)</div>

3. Name of third Defendant: <u>Denise Weston</u>. The third Defendant is employed
as: <u>Nurse for Corizon Medical</u> at <u>Florence Complex, Central Unit</u>.
<div align="center">(Position and Title)         (Institution)</div>

4. Name of fourth Defendant: <u>Kevin Curran</u>. The fourth Defendant is employed
as: <u>Complex Warden</u> at <u>Florence Complex (Promoted)</u>.
<div align="center">(Position and Title)         (Institution)</div>

If you name more than four Defendants, answer the questions listed above for each additional Defendant on a separate page.

## C. PREVIOUS LAWSUITS

1. Have you filed any other lawsuits while you were a prisoner? ☑ Yes ☐ No

2. If yes, how many lawsuits have you filed? **3**. Describe the previous lawsuits:

   a. First prior lawsuit:
      1. Parties: <u>Patrick Bearup</u> v. <u>Az Dept. of Corrections</u>
      2. Court and case number: <u>ukn</u>
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) <u>released from custody.</u>

   b. Second prior lawsuit:
      1. Parties: <u>Patrick Bearup</u> v. <u>Joe Arpaio</u>
      2. Court and case number: <u>ukn</u>
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) <u>dismissed, suit paperwork lost via mail</u>

   c. Third prior lawsuit:
      1. Parties: <u>Patrick Bearup</u> v. <u>Charles Ryan et al.</u>
      2. Court and case number: <u>CV15-2299-PHX-DLR(MHB)</u>
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) <u>settled</u>

If you filed more than three lawsuits, answer the questions listed above for each additional lawsuit on a separate page.

## B. Defendants Continued

5. Name of Fifth Defendant: Rodney Carr  The Fifth defendant is employed as: Unit Assistant Deputy Warden at Florence Complex, Central Unit (promoted)

6. Name of Sixth Defendant: Captain D. Walker  The Sixth defendant is employed as: Unit Security Captain at Florence Complex, Central Unit. (Promoted)

7. Name of Seventh Defendant: Captain Williams  The Seventh defendant is employed as: Unit Operations Captain at Florence Complex, Central Unit (promoted)

8. Name of Eighth Defendant: Tracey Moore  The Eighth defendant is employed as: Nurse for Corizon Medical at Florence Complex, Central Unit (fired)

9. Name of Ninth Defendant: Denise Beckler  The Ninth defendant is employed as: A.D.O.N. for Corizon Medical at Florence Complex, Central Unit

10. Name of Tenth Defendant: Lt. Darras  The Tenth defendant is employed as: Shift Lieutenant at Florence Complex, Central Unit

11. Name of Eleventh Defendant: Adam Perkins  The Eleventh defendant is employed as: F.H.A. For Corizon and Centurion Medical at Florence Complex, Central Unit. (Fired)

12. Name of Twelfth Defendant: Trina Randall  The Twelfth defendant is employed as: A.F.H.A. for Corizon and Centurion Medical at Florence Complex, Central Unit

13. Name of Thirteenth Defendant: Diane Miller  The Thirteenth defendant is employed as: Administrative Service Office for Office of Publication Review, Arizona Department of Corrections

2-A

## B. Defendants Continued

14. Name of Fourteenth Defendant: Jason Monson The Fourteenth defendant is employed as: Deputy Warden at Florence Complex, Central Unit

15. Name of Fifteenth Defendant: Jessica Todd The Fifteenth defendant is employed as: D.O.N. for Corizon Medical at Florence Complex, Central Unit

16. Name of Sixteenth Defendant: Sharon Kavy The Sixteenth defendant is employed as: Health Care Provider for Centurion Medical at Florence Complex, Central Unit

17. Name of Seventeenth Defendant: Kyle Henry The seventeenth defendant is employed as: A.D.O.N. for Centurion Medical at Florence Complex, Central Unit

18. Name of Eighteenth Defendant: John Doe The Eighteenth defendant is employed as: Legal Access Monitor for Az Dept. of Corrections, Florence Complex, Central Unit

19. Name of Nineteenth Defendant: Sgt. Ramos The Nineteenth defendant is employed as: Florence Complex Mail Room Sargent

20. Name of Twentieth Defendant: David Shinn The twentieth defendant is employed as: The New Director of Arizona Department of Corrections

21. Name of Twenty-first Defendant: Marianne Powell The twenty-first defendant is employed as: Health Care Provider for Centurion Medical at Central Unit, Florence Complex

22. Name of Twenty-second Defendant: Centurion Medical The twenty-second defendant is employed as vendor for Arizona Dept. of Corrections at Florence Complex, Central Unit

# D. CAUSE OF ACTION

## COUNT I

1. State the constitutional or other federal civil right that was violated: Religious Land Use and Institutionalized Person Act (RLUPIA) (42 USC 2000cc)

2. **Count I.** Identify the issue involved. Check **only one.** State additional issues in separate counts.
   - ☐ Basic necessities
   - ☐ Disciplinary proceedings
   - ☐ Excessive force by an officer
   - ☐ Mail
   - ☐ Property
   - ☐ Threat to safety
   - ☐ Access to the court
   - ☒ Exercise of religion
   - ☐ Other: _____
   - ☐ Medical care
   - ☐ Retaliation

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count I. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

On April 2nd, 2018 at 1209 hrs. I was called to the Central Unit Yard office, but escorted to medical and placed in a holding cage. Captain Walker and Captain Williams were present and I was advised that Complex Warden Kevin Curran sent them an e-mail telling them to use force to inject me with a P.P.D. Test. I repeatedly advised ADC staff about my Sincerely held religious belief, my Kosher observance, and this occurring during my Holy Week of Passover. Captain Walker advised me that I did not have a choice, no least restrictive means or chest x-ray would be provided and I would be restrained, have a taser used on me, and then be injected with a P.P.D. test fluid. I advised staff that violence is not necessary, I would object, but not be violent. Nurse Denise Weston arrived, I advised her of my beliefs, objections, and the need to name her in litigation if she does this willful violation. She hesitated, looked to Captain Walker, who nodded for her to proceed. Nurse Weston then injected my left arm with a foreign animal by-product, that is not Kosher, contains proteins from Biblically unclean animals, and thus making me ritually unclean for Passover. A Biblical Feast I have observed yearly since I became Messianic. On April 2nd, 2018 I filed an informal, on April 3rd, 2018 CoIII Taylor responded. On April 3rd, 2018 I filed a formal grievance. On April 4, 2018 I gave ADC staff the R.L.U.P.I.A. guidelines. On April 13, 2018 ADW Rodney Cover denied my grievance. On April 16, 2018 I filed a grievance appeal to Director Charles Ryan. On April 20, 2018 Director Ryan denied my claim. On July 17, 2018 I filed a notice of claim with the Office of the Attorney General and ADC Risk Management.[2]

① ② See Appendix

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).

I was forced, under threat, to allow an injection into my body of an Un-Kosher protein during the Holy Week of Passover. This made me unclean according to my sincerely held religious belief and the harm is irreparable, as this harm occurs during a ritually clean time and I was therefore made unclean for Passover.

5. **Administrative Remedies:**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution? ☒ Yes ☐ No
   b. Did you submit a request for administrative relief on Count I? ☒ Yes ☐ No
   c. Did you appeal your request for relief on Count I to the highest level? ☒ Yes ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

3

# COUNT II

1. State the constitutional or other federal civil right that was violated: <u>Religious Land Use and Institutionalized Person Act (RLUIPA) (42 U.S.C. 2000 cc)</u>

2. **Count III.** Identify the issue involved. Check **only one.** State additional issues in separate counts.
   ☐ Basic necessities        ☐ Mail        ☐ Access to the court        ☐ Medical care
   ☐ Disciplinary proceedings        ☐ Property        ☑ Exercise of religion        ☐ Retaliation
   ☐ Excessive force by an officer        ☐ Threat to safety        ☐ Other: _____

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count III. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

<u>On March 22, 2019 Nurse Tracey Moore, directed by Jessica Todd and Lt. Darras, forced me to receive a P.P.D. injection, against my will. I advised Nurse Moore and Lt. Darras that the P.P.D. test is not Kosheut and the injection violates my civil rights, that I am on a corticosteroid, that can produce false positive/negitive results, that the P.P.D. test contains items against my faith to ingest/inject, that I noticed (prison medical) months prior that I will forego all P.P.D. tests due to my sincerely held religious beliefs, I showed Arizona Revised Statute 36-734 that permits religious objections to T.B. testing, and I offered a least restrictive means of the F.P.A. approved Quantiferon TB gold blood test. After this, I was ignored and ADC staff and contractor acted with evil intent, outside of Arizona and Federal law, as they ignored my pleas and forced me to receive an unclean injection. I grieved this issue through full exhaustion.</u>

<u>①②③④ See Appendix</u>

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).
   <u>I was forced to be injected with an un-kosher protein, made with items that violate my sincerely held religious belief and the harm is irreparable. The forced injury was harm to my spiritual and emotional walk with my God.</u>

5. **Administrative Remedies.**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution? ☑ Yes  ☐ No
   b. Did you submit a request for administrative relief on Count II? ☑ Yes  ☐ No
   c. Did you appeal your request for relief on Count II to the highest level? ☑ Yes  ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____
   _____

**If you assert more than three Counts, answer the questions listed above for each additional Count on a separate page.**

4

# COUNT III

1. State the constitutional or other federal civil right that was violated: Religious Land Use and Institution-alized Person Act (RLUIPA) (42 USC 2000cc)

2. **Count II.** Identify the issue involved. Check **only one.** State additional issues in separate counts.

☐ Basic necessities ☐ Mail ☐ Access to the court ☐ Medical care
☐ Disciplinary proceedings ☐ Property ☒ Exercise of religion ☐ Retaliation
☐ Excessive force by an officer ☐ Threat to safety ☐ Other: _____

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count II. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

On April 6, 2018 my wife mailed me non-nude photographs of a personal nature. On April 10, 2018 Diane Miller refused to allow me access to my photos citing an extremely vague policy that my photos encourage sexual or hostile behavior. On April 10, 2018 I wrote an appeal of that decision. On April 15, 2018 I wrote an informal grievance for censorship and violation of my sincerely held religious belief and R.L.U.I.P.A. On April 16, 2018 C.III Taylor denied my Informal. On April 17, 2018 I wrote the grievance over R.L.U.I.P.A. not being followed or is a least restrictive means provided. On April 25, 2018 Diane Miller refused my appeal to receive my photographs. On April 27, 2018 ADC maintained my photos. On May 17, 2018 D.W. Montaño denied my grievance. On May 23, 2018 I filed an appeal to Director Charles Ryan. On June 16, 2018 The Director denied my request. The issue at hand is the denial by ADC to allow myself and my legally married spouse to exchange intimate communications via photography. I have a sincerely held religious belief that I am to provide for my wife's needs in all areas of marriage. Photography is the least restrictive means for an incarcerated husband and a free wife to be one and express our love as our religion demands. ADC cannot prove how my communication with my wife is somehow illegal, if our communication/relationship is sexual, nor that it could ever encourage hostile behavior. Therefore, this illegal censorship needlessly hinders my religious rights and my expression thereof. By allowing this policy to occur, staff have acted with evil intent to violate my expressed rights.

_____

①②③④ See Appendix

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).
Director Ryan has effectively chilled my and my wife's Religiously Mandated expressions of intimacy. Thus causing harm to our marriage and future.

5. **Administrative Remedies.**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution? ☒ Yes ☐ No
   b. Did you submit a request for administrative relief on Count III? ☒ Yes ☐ No
   c. Did you appeal your request for relief on Count III to the highest level? ☒ Yes ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

5

## D. CAUSE OF ACTION

### COUNT IV

1. State the constitutional or other federal civil right that was violated: The Fourteenth Amendment Equal Protection for Similarly situated inmates.

2. **Count I.** Identify the issue involved. Check **only one**. State additional issues in separate counts.
   - ☐ Basic necessities
   - ☐ Mail
   - ☐ Access to the court
   - ☐ Medical care
   - ☐ Disciplinary proceedings
   - ☐ Property
   - ☐ Exercise of religion
   - ☐ Retaliation
   - ☐ Excessive force by an officer
   - ☐ Threat to safety
   - ☒ Other: Policy violation

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count I. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

On July, 15, 2017, resulting from a settlement agreement in Bearup v. Ryan CV15-2299-PHX-DLR, I was moved from Maximum security to Close custody at the Central Unit. I am currently classified as Close Custody, and am to be afforded the same treatment as all other Close Custody inmates, according to the 14th Amendment and ADC policy, specifically D.O. 909 Attachment A.

Since moving to Central Unit, it was realized that this once Maximum Custody Yard had several local policies denying certain things to the unit's inmate populations. Several of these issues have been corrected. However, ADC continues to sell tobacco products to all other Close Custody yards in the prison system except Central Unit where I am housed. ADC has failed to cite any reason according to the Turner Test to deny equal protection for this policy established liberty interest. I have sought on several occasions to resolve this issue. I have spoken directly to Director Charles Ryan and his Regional Director Ernest Trujillo, the men who set the policy denying tobacco to Central Unit, when it was maximum custody. On August 12, 2019 D.W. Jason Monson denied equal protection. Therefore, the prison has decided to treat me differently than it does all other similarly classified inmates, outside of Central Unit without any valid reason, or legitimate security concern. ADC has recently updated policy, Notification 19-26 yet they did not remove Central Unit's classification with other Maximum units. I have exhausted all remedies.

⑥⑦ See Appendix

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).

ADC has shown bias and treated me differently, with no valid security interest, from what their own policy demands. Thus depriving me of property and equal protection under the law.

5. **Administrative Remedies:**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution? ☒ Yes ☐ No
   b. Did you submit a request for administrative relief on Count IV? ☒ Yes ☐ No
   c. Did you appeal your request for relief on Count I to the highest level? ☒ Yes ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not.

6

## COUNT V

1. State the constitutional or other federal civil right that was violated: <u>The Eighth Amendment Freedom</u>
<u>from Cruel and Unusual Punishment, Fourteenth Amendment Equal Protection for Similary situated inmates</u>.

2. **Count II.** Identify the issue involved. Check **only one**. State additional issues in separate counts.
   - ☐ Basic necessities
   - ☐ Mail
   - ☐ Access to the court
   - ☐ Medical care
   - ☐ Disciplinary proceedings
   - ☐ Property
   - ☐ Exercise of religion
   - ☐ Retaliation
   - ☐ Excessive force by an officer
   - ☒ Threat to safety
   - ☐ Other: _____

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count II. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

<u>On July 9, 2019 it was realized that Central Unit does not have a functional fire monitor/alarm system. A grievance resulted.¹ On July 19, 2019 D.W. Jason</u>
<u>Monson refused to correct the dangerous situation, alleging that staff can somehow perform this function, even though they are historically understaffed.</u>
<u>On August 6, 2019 Director Charles Ryan claims that since Central Unit is a 24 hour a day facility, there is no reason to have a functional fire alarm. If this</u>
<u>were true, 24 hour Wal-Marts could by-pass these safety regulations. The director also alleges that fire walks are conducted every thirty minutes, which does not</u>
<u>occur. Therefore, Jason Monson and Director Charles Ryan knowingly and willingly, are endangering my life by not having the currently installed, but</u>
<u>non-functional, fire alarm system fixed. A clear violation of the 8½ Amendment.</u>

<u>⁰ see Appendix</u>

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).

<u>My life is daily endangered for harm of fire, with no supervision system or alarm. Thus, ADC is violating the 8½ Amendment</u>
<u>Cruel and Unusual Punishments</u>

5. **Administrative Remedies.**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?    ☑ Yes    ☐ No
   b. Did you submit a request for administrative relief on Count **V**?    ☑ Yes    ☐ No
   c. Did you appeal your request for relief on Count **V** to the highest level?    ☑ Yes    ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

# COUNT VI

1. State the constitutional or other federal civil right that was violated: The Eighth Amendment Freedom from Cruel and Unusual Punishment, Fourteenth Amendment Equal Protection for similarly situated inmates.

2. **Count III.** Identify the issue involved. Check **only one.** State additional issues in separate counts.
   - ☐ Basic necessities
   - ☐ Mail
   - ☐ Access to the court
   - ☐ Medical care
   - ☐ Disciplinary proceedings
   - ☐ Property
   - ☐ Exercise of religion
   - ☐ Retaliation
   - ☐ Excessive force by an officer
   - ☒ Threat to safety
   - ☐ Other: _____

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count III. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

On July 18, 2019 I submitted an informal grievance¹ concerning excessive in cell heat that violated the Parsons v. Ryan stipulated agreement.² As an inmate who takes heat-sensitive medications, I am to be given relief from temperatures that exceed 85° F. During the monsoon season, the in cell heat index temperatures can rise above 100°. I have suffered from dehydration, migraines, dizziness, nausea, and several other heat-related issues. The prison is denying equal protection, as it has air conditioning in two of the buildings that house inmates on Central Unit (CB-3, CB-4) And per the Joint Committee on Capital Review dated June 13, 2019, were supposed to have a purposed upgrade plan for all Arizona prisons by October 1, 2019³, ADC ignored this document, as I questioned the excessive heat. ADC is also violating the prohibition of cruel and unusual punishment, as I am forced to suffer in silence, as I cannot rely on staff to walk, or even realize if I pass out in my cell. I did advise DW Jason Monson about my concerns. On July 22, 2019 he denied my request to correct this issue. On August 12, 2019 Director Charles Ryan also refused my request to correct the unequal and dangerous treatment."

① ② ③ ④ See Appendix

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).

ADC with callous disregard to my health and safety, has caused me to suffer through temperatures well above a reasonable set standard, policy, and a previous settlement. Harm daily occurs as ADC ignores the pleas from myself and others. Direct results are illness, body negative responses, and possible long term harm.

5. **Administrative Remedies.**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution? ☒ Yes ☐ No
   b. Did you submit a request for administrative relief on Count VI? ☒ Yes ☐ No
   c. Did you appeal your request for relief on Count VI to the highest level? ☒ Yes ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

**If you assert more than three Counts, answer the questions listed above for each additional Count on a separate page.**

8

## D. CAUSE OF ACTION

### COUNT VII

1. State the constitutional or other federal civil right that was violated: 42 U.S.C.A § 12188, The 8th Amendment (cruel and Unusual Punishment)

2. **Count I.** Identify the issue involved. Check **only one**. State additional issues in separate counts.
   - ☐ Basic necessities
   - ☐ Disciplinary proceedings
   - ☐ Excessive force by an officer
   - ☐ Mail
   - ☐ Property
   - ☐ Threat to safety
   - ☐ Access to the court
   - ☐ Exercise of religion
   - ☐ Other: _____
   - ☒ Medical care
   - ☐ Retaliation

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count I. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

   On July 11, 2019 I saw the Unit Health Care Provider, Sharon Kory, I advised her of my chronic back pain, along with prior failed treatments. Sharon Kory did not heed my input and basicly refused to treat my chronic back pain. On July 19, 2019, A.D.O.N. Kyle Henry denied allowing me back pain relief from a T.E.N.S. unit or medical mattress, wrongly asserting that central unit does not allow this treatment. On July 24, 2019 A.F.H.A. Trina Randall also denied my plea for treatment. I am not trying to dictate treatment, rather to work with medical to resolve the issues. However, the medical personal cited above, seem to be just interested in costs savings, even though I offered to purchase my own specialized medical items, as prison policy allows. Therefore, medical is violating the ban on cruel and unusual punishment and 42 U.S.C.A § 12188, by offering ineffective treatment, which is no treatment at all. On August 23, 2019 I submitted a written request to A.D.O.N. K. Henry, as per the July 29, 2019 directive by A.F.H.A. T. Randall, to again deal with my growing pain issues. K. Henry denied my request. On August 26, 2019 I was again seen by a Health Care Provider (Ms. Powell) on October 8, 2019, who according to my medical need ordered a T.E.N.S. unit. This T.E.N.S. unit was later denied by an unknown ADC employee, even though it is medically necessary and allowed per the ADC Health Services Technical Manual[4] In a further grievance, T. Randall had my T.E.N.S. Order changed by an unknown Provider, as H.C.t. Powell later advised me on 10-30-19 that she stands by her order and will defend it to ADC and Centurion.

   ① ② ③ ④ see Appendix

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).
   I suffer daily due to a spinal issue, ADC and their medical employees act in clear violation of Federal and Constitutional law and acted with deliberate indifference to the medical necessary treatments, or respond reasonably to the needs. Making me needlessly be in pain, and to possibly worsen in condition.

5. **Administrative Remedies:**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution? ☒ Yes ☐ No
   b. Did you submit a request for administrative relief on Count VII? ☒ Yes ☐ No
   c. Did you appeal your request for relief on Count VII to the highest level? ☒ Yes ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

9

## D. CAUSE OF ACTION

### COUNT V III

1. State the constitutional or other federal civil right that was violated: _Religious Land Use and Institutionalized Person Act (R.L.U.P.I.A.) (42 USC 2000 cc)_

2. **Count I.** Identify the issue involved. Check **only one.** State additional issues in separate counts.
   - ☐ Basic necessities
   - ☐ Mail
   - ☐ Access to the court
   - ☐ Medical care
   - ☐ Disciplinary proceedings
   - ☐ Property
   - ☒ Exercise of religion
   - ☐ Retaliation
   - ☐ Excessive force by an officer
   - ☐ Threat to safety
   - ☐ Other: _____

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count I. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

_In violation of R.L.U.P.I.A. The Arizona Department of Corrections (ADC) refused to allow me access to items for my Holy Day (Rosh Hashanah) observations. (September 30, 2019) There was no least restricted means offered, only an outright ban. Even though for 2017 and 2018 I received all needed items. For donation approval. On August 30, 2019 I wrote Senior Chaplain Miser about ADC's denial of apples to be donated for my religious event. I was later advised that Central Office made the decision. On September 18, 2019 I wrote Ken Herman, The Pastoral Activities director at Central Office concerning the ban. On October 18, 2019 Mr. Herman responded that I would be advised once the Religious Advisory Review Committee reviews my claim. (A basic dismissal). On September 18, 2019 I filed an informal resolution for the denial. On October 3, 2019 I filed the formal grievance. Dw Joshua Monson did not approve my request. On November 13, 2019 I wrote an appeal to Director David Shinn_

ⓒⓓⓓⓔ _See Appendix_

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).
_ADC violated RLUPIA by not even considering a least restrictive means, other than their outright ban on allowing me to properly observe my Holy Day. The harm was that I was unable to properly observe my holy day as my religion mandates, thus harming my spiritual and emotional walk with my God._

5. **Administrative Remedies:**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution? ☒ Yes ☐ No
   b. Did you submit a request for administrative relief on Count V III ☒ Yes ☐ No
   c. Did you appeal your request for relief on Count VIII to the highest level? ☒ Yes ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

## COUNT I X

1. State the constitutional or other federal civil right that was violated: <u>The 1st, 4th, 5th, 6th, and 14th Amendments</u>

2. **Count II.** Identify the issue involved. Check **only one.** State additional issues in separate counts.
   - ☐ Basic necessities
   - ☐ Mail
   - ☒ Access to the court
   - ☐ Medical care
   - ☐ Disciplinary proceedings
   - ☐ Property
   - ☐ Exercise of religion
   - ☐ Retaliation
   - ☐ Excessive force by an officer
   - ☐ Threat to safety
   - ☐ Other: _____

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count II. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

<u>In clear violation of the 1st, 4th, 5th, 6th, and 14th Amendments ADC acted in reckless disregard, by knowingly and willingly opening up my clearly marked legal mail outside of my presence and reading the contents. On October 4, 2019 I received opened legal mail through the regular mail system. I advised staff and requested an incident report. On October 5, 2019 I filed an informal grievance, the COII denied my request, on October 10, 2019 I filed the formal grievance D.W. Jason Monson denied relief. On November 13, 2019 I filed an appeal to Director David Shinn</u>

<u>On October 25, 2019[1] I wrote the final Clerk of Court concerning the State law for communication with the Court. On October 30, 2019[2] the Clerk responded affirming to me that I was following the law correctly, specifically Az Rules of Court Rule 2.2 g(4)" ADC staff also violated their own policy for this intrusion, specifically D.I. 333 (902.11, 1.4.2.1, 1.5, and 1.6) Where even suspect legal mail needs to be approved before opening by ADC[3] General Counsel. Had they noticed him, he would have advised Complex Mail Sgt. Ramos that I have issues before the final Court. This issue is not isolated, As ADC staff recently opened more legal mail to another inmate in my housing unit, and have previously opened numerous legal letters and searched legal boxes while I was not present. To make matters worse, the response by D.W. Jason Monson shows the evil intent of staff, who wrongly believe they can read legal mail because my "case is a matter of public record and can be read by the public". This has effectively chilled my communications with my Legal Team and the Clerk of the Courts, a notice reflecting this was sent to my lawyers by e-mail through my Power of Attorney on November 15, 2019. In the Director's response, ADC admitted to wrong doing, but the harm still exists.</u>

<u>① ② ③ ④ See Appendix</u>

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).
<u>ADC invaded my access to the court by acting with clear evil intent to discover what actions I am seeking from the court. The harm is an agent of the state learning strategy of my actions in the court.</u>

5. **Administrative Remedies.**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution? ☒ Yes ☐ No
   b. Did you submit a request for administrative relief on Count I X ☒ Yes ☐ No
   c. Did you appeal your request for relief on Count I X To the highest level? ☒ Yes ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

## COUNT X

1. State the constitutional or other federal civil right that was violated: <u>The 4th Amendment and 8th Amend-</u>
<u>ment</u>.

2. **Count III.** Identify the issue involved. Check **only one**. State additional issues in separate counts.
   ☐ Basic necessities      ☐ Mail      ☐ Access to the court      ☐ Medical care
   ☐ Disciplinary proceedings      ☒ Property      ☐ Exercise of religion      ☐ Retaliation
   ☐ Excessive force by an officer      ☐ Threat to safety    ☐ Other: _____

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count III. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

<u>In violation of the 4th Amendment ADC employee Jason Monson illegally seized my personal property and refuses to follow ADC policy and return my</u>
<u>property. On July 19, 2019', as directed by Unit Property Sargent Arndt, I sent two pair of personal custom insoles out for repair. I followed</u>
<u>the current property policy D.O. 909 2.4.3. On September 24, 2019 I received notice that ADC contraband my returned insoles. While I followed</u>
<u>Sgt. Arndt's instructions, Jason Monson advised me that he required me to obtain a DO 909-7 form signed by medical, which I did on</u>
<u>September 30, 2019. Unknown at the time, Jason Monson conspired with Adam Perkins, to have Perkins refuse all inmates on Central Unit the</u>
<u>ability to retain or repair personal medical property. On October 16, 2019 I filed my informal. On October 19, 2019 I filed my grievance</u>
<u>On November 6, 2019 Jason Monson ignored the grievance claim and refused to resolve, on November 7, 2019 I filed an appeal to Director</u>
<u>David Shinn. On November 10, 2019 to try to resolve, I wrote Complex Warden Jetting Van Winkle</u>

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).
<u>ADC illegally seized my personal property without due process, or valid security interests. Thus denying</u>
<u>me pain relief and causing me to walk in pain throughout the day</u>

5. **Administrative Remedies.**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?      ☒ Yes    ☐ No
   b. Did you submit a request for administrative relief on Count X      ☒ Yes    ☐ No
   c. Did you appeal your request for relief on Count X To the highest level?      ☒ Yes    ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

**If you assert more than three Counts, answer the questions listed above for each additional Count on a separate page.**

12

## E. REQUEST FOR RELIEF

State the relief you are seeking:
Plaintiff seeks compensatory and punitive damages in amount to be determined at trial, injunctive relief, and any and all other appropriate relief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  11-17-19
DATE

SIGNATURE OF PLAINTIFF

(Name and title of paralegal, legal assistant, or
other person who helped prepare this complaint)

(Signature of attorney, if any)

(Attorney's address & telephone number)

## ADDITIONAL PAGES

All questions must be answered concisely in the proper space on the form. If you need more space, you may attach no more than fifteen additional pages. But the form must be completely filled in to the extent applicable. If you attach additional pages, be sure to identify which section of the complaint is being continued and number all pages.

1 Patrick Bearup 136226
2 ASPC-F-Central
3 PO Box 8200
4 Florence, AZ 85132-8200
5
6                    In The United States District Court
7                      For The District of Arizona
8
9  Patrick W. Bearup,            Case No. _____
        Plaintiff,
10
11 vs.                           Appendices of Exhibits
12
13 Charles Ryan et al.
14                               Honorable _____
15
16  The Plaintiff, Patrick W. Bearup hereby submits to this Court this Appendices of Exhibits in support
17
18  of the claims one through ten of the Civil Rights Complaint by a Prisoner.
19
20
21
22
23
24
25
26                                              Prepared by: Patrick Bearup
27
28

Count 1

Exhibit A

Grievance Exhaustion and support
pages 1-10


# ARIZONA DEPARTMENT OF CORRECTIONS
## INMATE GRIEVANCE APPEAL RESPONSE

| Log # | Inmate Name | ADC# | Case # | Complex | Unit |
|-------|-------------|------|--------|---------|------|
| 315 | Bearup | 136226 | A01110018 | Florence | Central |

In your grievance filed at Central Unit, you claim you were forced to submit to Tuberculosis testing which is against your religious beliefs. Your resolution is to stop forced-testing, receive monetary damages in the amount of $20,000.00 and to use chest x-rays as a less intrusive option.

Your grievance has been reviewed at Central Office and the Deputy Warden's response is affirmed. Corizon personnel were within Department Policy in administering Tuberculosis testing. It is recommended you review Department Order 1102.05, TUBERCULOSIS – SCREENING, MANAGEMENT AND CONTACT INVESTIGATION, to be better informed of Department Policy in reference to submitting to testing. Your resolution is denied.

No further action is warranted in this matter.

cc: Warden, Florence Complex

RK

_R. Kepney_
**Appeals Officer**

_CRGlynn for_
**Charles L. Ryan, Director**

_04/20/2018_
**Date**

Page 1 of 1

The inmate may appeal the Warden's, Deputy Warden's or Administrator's decision to the Director by requesting the appeal on this form.

**PLEASE PRINT**

| Inmate's Name *(Last, First, M.I.)* | ADC No. | Date |
|---|---|---|
| Bearup, Patrick W. | 136226 | 4-13-18 |

| Institution | Case Number |
|---|---|
| ASPC-F - (Central) A72 | A01-110-018 |

TO: Director Ryan

I am appealing the decision of DW. Montano _____ for the following reasons:

The DW response is flawed, as #1. The (PPD) TB Test does NOT show if TB is active or latent therefore it is USELESS to prevent the spread, as latent TB is NOT transmittable and therefore poses NO health risk - NOR compelling governmental intrest. #2. I do NOT under the Religious Land Use and Institutionalized Person Act (RLUIPA) need to explain or provide any information to "prove" my sincerely held religious belief. RLUIPA is clear (see 2/m letter dated 4-4-18) That I merely must avow my belief and I have met the burden required by law. This brings to light the legal argument. Under RLUIPA, I am not subject to the "Turner Test", rather I must only see to two prongs, Proing one has been disproven above, as ADOC cannot allege a compelling government intrest

| Inmate's Signature | Date | Grievance Coordinator's Signature | Date |
|---|---|---|---|
| | 4-13-18 | | 4/16/18 |

| Response To Inmate By: | Location |
|---|---|
| | |

| Staff Signature | Date |
|---|---|
| | |

DISTRIBUTION:
INITIAL:  White & Canary - Grievance Coordinator
          Pink - Inmate
FINAL:    White - Inmate
          Canary - Grievance File

②

Pg 1 of 2

802-3
7/13/09

ARIZONA DEPARTMENT OF CORRECTIONS

Inmate Grievance - GF Supplement

5-B-20

Rel. by        Taylor
Title          ____
Badge #        11655
Date           4/16/18

| Inmate Name (Last, First M.I.) | ADC Number | Institution/Facility | Case Number |
|---|---|---|---|
| Bearup, Patrick W. | 136226 | (Central) A22 | A01-110-018 |

for a test that fails to meet the requirements for ACTIVE TB testing. Second, ADOC failed to provide a least restrictive means to test for TB. A least restrictive means could have been: chest x-ray, urine test (developed by George Mason University) blood tests, sputum collection, or a TB breathalyser (from Rapid Biosensor Systems). I clearly, on several occasions requested a least restrictive means to meet my sincerely held religious belief, but was refused! ADOC and Corizon also have clearly established a practice of adhering to my sincerely held belief, by not forcing me to take a P.P.D. test/injection of foreign protein, for the previous FOUR requests Corizon staff made, those I refused on Religious Belief! So ignorance of my belief cannot be used now! I will provide a notarized statement to prevent further harm that is irreparable! Especially since the PPD protein is NOT KOSHER and made me religiously unclean!

My resolutions stands! 1. Cease all forced TB testing by P.P.D./injection when a religious objection occurs. 2. Pay damages in the amount of $20,000.ºº (more if forced to litigate) 3. Allow chest x-ray (or other least restrictive means cited above) instead of P.P.D. injections.

Let this serve as a "Notice of Claim", if my offer is refused!

Attached Inform(s), CO III response, I/m Ltr/Hr dated 4-4-18, Grievance, Dr Response Grievance Appeal, Supplement, Notarized Statement.

| Signature | Date |
|---|---|
|  | 4-13-18 |

INITIAL DISTRIBUTION - Committee Recommendation - All copies to Grievance Advisory Committee
FINAL DISTRIBUTION - White and Pink - Inmate, Canary - Grievance File

INITIAL DISTRIBUTION - GF Supplement - White and Canary - Grievance Coordinator, Pink - Inmate
FINAL DISTRIBUTION - White - Inmate, Canary - Grievance File

Pg 2 of 2

802-7
7/13/09

Exhibit A.          Griev. # A01-110-018



**ARIZONA DEPARTMENT OF CORRECTIONS**

**Inmate Letter**

Requests are limited to one page and one issue. NO ATTACHMENTS PERMITTED. Please print all information.

5-8-20

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | INSTITUTION/UNIT | DATE (mm/dd/yyyy) |
|---|---|---|---|
| Bearup, Patrick W. | 136228 | Central ATZ | 4-4-18 |

| TO | LOCATION |
|---|---|
| CO II Taylor for Griev. Coord. | CBS |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

Sir, as per our conversation, I can offer the following:

Sincere desire to engage in a religious exercise

"RLUIPA's definition of religious exercise includes any exercise of religion, regardless of whether that exercise is compelled by, or central to, a system of religious belief. 42 U.S.C. § 2000cc-5(7)(A)(2004). Not only does this definition provide that "any" religious exercise is protected, it also makes explicit that this protection is not limited to practices that are required by the individual's religion. This definition makes explicit that once the inmate demonstrates that he sincerely desires to engage in an exercise that is religious in nature, whether such exercise is "central" (or fundamental) to a particular religion is irrelevant to the analysis." — Therefore, I fully expressed my sincerely held religious view to staff and was ignored.

| INMATE SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
| | 4-4-18 |

Have You Discussed This With Institution Staff?  ☒ Yes  ☐ No

If yes, give the staff member's name:  CO II Taylor  (4)

*Note: Using profanity, insulting, obscene, or abusive language and/or addressing staff with inappropriate names or making inappropriate remarks in this written correspondence (or verbal communication to staff concerning this correspondence), will not be tolerated and may result in no response to the correspondence and/or discipline pursuant to Department Order 803, Inmate Disciplinary Procedure.*

Distribution:  Original – Master File

916-1

To Whom It May Concern:

I hereby declare that, I, _Patrick W. Bearup_ , withhold my consent on Tuberculosis screening on the grounds that such testing is in violation of my United States of America Constitutional 1st Amendment Right to religious freedom. It would be a violation of my religious beliefs to knowingly contaminate the body with inorganic and/or organic substances, such as the mycoplasma antigens, that can cause injury, illness, or other harm to my well-being.

- The Tuberculin Purified Protein Derivative (Mantoux skin test). Tubersol™ determines that a person has been previously exposed to or had a previous infection by M. tuberculosis or a variety of non-tuberculosis bacteria. A positive reaction may also represent an allergic reaction to the components of the test. **It cannot tell whether a person has active tuberculosis disease.**

- Tubersol™ contains Tween 80™ as preservatives. A very recent study (December, 2005) discovered that Tween 80™, also known as polysorbate 80, can cause anaphylaxis, a potentially fatal reaction characterized by a sharp drop in blood pressure, hives, and breathing difficulties in persons previously exposed. Researchers concluded that the anaphylactic reaction was not a typical allergic response caused by histamines and IgE antibodies, but it was caused by a serious disruption that had occurred within the immune system. **REF:** Coors, Esther A, et. al."Polysorbate 80 in medical products and nonimmunologic anaphylactoid reactions." Annals of Allergy, Asthma and Immunology. 95 (2005): 593-599.

I further assert the following:

- There is no tuberculosis epidemic in _Florence, Arizona_ [city] to warrant the mandate of such testing

- There is no tuberculosis crisis at the _CB5 Central Unit_ to warrant the mandate of such testing

- Symptoms commensurate with tuberculosis are known to be:

  1. Coughing up blood/ Chest infection

  2. Severe weight loss

  3. Night sweats

  4. Constant exhaustion

  5. Loss of appetite

I, _Patrick W. Bearup_ have not exhibited any of these of symptoms. There is no reason to suspect that I may be infected with Tuberculosis.

The CDC reports the following persons represent these high-risk categories for contracting TB:



- Those coming into close contact with persons known or suspected to have TB

- Foreign-born persons from areas where TB is common: Asia, Africa, or Latin America

- Elderly persons (over 65 yrs.)

- Health care worker who serves high risk patients—AIDS, TB, indigent

- Healthcare worker in close contact with medically underserved, low income populations

- I am not an Intravenous Drug Abuser

I, Patrick W. Bearup do not fall into any of these categories. The chance that I may be infected with Tuberculosis is minute and thus, provides no basis to suspect I may be infected with Tuberculosis.

Overall, I am a healthy adult who poses no serious, infectious health threat to others. My overall good health has been confirmed during visits to my primary physician and other healthcare givers.

I have included these assertions to show that by not being tested for Tuberculosis, I pose no threat to the health and well-being of others here at
The Florence Central Unit .

Sincerely,

Notary Public:

Karen Stowe

Signature Date

4/13/18                    AZ Oct. 1, 2021

City, Maricopa          State My Commission expires

OFFICIAL SEAL
KAREN D STOWE
Notary Public - Arizona
MARICOPA COUNTY
My Commission Expires
OCTOBER 1, 2021

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Informal Complaint Resolution

5-B-20

Complaints are limited to one page and one issue.

Please print all information.

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | INSTITUTION/UNIT | DATE (mm/dd/yyyy) |
|---|---|---|---|
| Bearup, Patrick W. | 136226 | Central   A72 | 4-2-18 |

| TO | LOCATION |
|---|---|
| CO III Taylor | CB5 |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

On the above date at appx. 1209 hrs Corizon staff Weston, supported by Complex Warden Curran's (mail) to Capt. Walker, I was forced, under threat of use of force, to violate my constitutionally protected rights of Religion (1st Amend) and in violation of the Religious Land Use and institutionalized person ACT (RLUIPA)

At 1208 hrs, I advised Corizon staff that I objected to being injected with a virus. I recommended a "least restrictive means" ie, x-ray of the chest, to accomplish a security interest Corizon and the State alleges.

I have the right under my "sincerely held religious belief" to not be injected with any virus, blood, serum etc. Therefore, Corizon knowingly and willingly violated my Federally protected rights. As Corizon was supported by ADOC staff, they too are responsible for ADOC's Agent's criminal acts.

Harm cannot be undone, as a Messianic Kosher observant person, not only was the virus "unclean", It was also NOT shown to be produced in a KASHRVT facility or blessed to be used by Orthodox followers of my faith. According to my religious belief, diet, and Biblical mandate.

Resolution 1. Cease and desist ALL forced tuberculosis testing, by virus injection, when a religious objection occurs. 2. Pay damages in the amount of $20,000.00 to myself for making me "religiously unclean" during my Feast of Unleavened Bread 3. Allow chest x-rays instead of virus injections as a "least restrictive means". Thankyou

| INMATE SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
|  | 4-2-18 |

⑦

Have you discussed this with institution staff?   ☑ Yes   ☐ No

If yes, give the staff member name: Lt Wood, Capt. Walker, Capt. Williams, Lt.?? Corizon medical staff

Distribution:   INITIAL: White and Canary or Copies – Grievance Coordinator; Pink or Copy – Inmate
FINAL: White – Inmate; Canary – Grievance Coordinator File

802-11
6/25/14

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Inmate Informal Complaint Response**

*For Distribution: Copy of Corresponding Inmate Informal Complaint Resolution must be attached to this response.*

| Inmate Name *(Last, First M.I.)* | ADC Number |
|---|---|
| Bearup | 136226 |
| Institution/Unit | |
| ASPC-Florence \ Central Unit | |

| From | Location |
|---|---|
| COIII Taylor | CB-5 Programs - Able \ Baker \ Fox \ George |

I am in receipt of your informal complaint dated 04/02/18 received 04/02/18. You raise a concern regarding T.B. testing that you were forced to participate in and it being against your religious beliefs. Your purposed resolution is to stop all T.B. testing when religious objections occur, receive monetary damages and to allow chest x-rays instead of injections for T.B. testing.

I have reviewed your complaint in its entirety. I have determined at this time that your concerns are beyond my scope of authority to address or resolve. You are encouraged to continue your complaint to the next level of resolution.

| Staff Signature | Date |
|---|---|
| | 4/3/18 |

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance

RECEIVED BY Taylor

TITLE CO III

BADGE NUMBER 1655

DATE (mm/dd/yyyy) 4/3/18

Note: You may appeal the Grievance Coordinator's decision to the Warden/Deputy Warden/Administrator by filing form 802-3, within 10 calendar days of receipt of this notice

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | DATE (mm/dd/yyyy) |
|---|---|---|
| Bearup, Patrick W. | 136226 | 4-3-18 |

| INSTITUTION/FACILITY | CASE NUMBER |
|---|---|
| ASPC-F-(Central) 1472 | A01-110-018 |

TO: GRIEVANCE COORDINATOR

**Description of Grievance** (To be completed by the Inmate)

ADOC, under threat of force, forced me to take a TB injection that is against my religious beliefs. (See informal for full details) As a non-viral injection could have occurred in order to satisfy any State Law requiring a yearly T.B. check of inmates — (chest x-ray) — Therefore, ADOC and Corizon staff knowingly and willingly violated my religious practice, as I advised numerous staff and nurses of my sincerely held beliefs.

Attached Informal, CO III Response

**Proposed Resolution** (What informal attempts have been made to resolve the problem? What action(s) would resolve the problem?)

1. cease all forced T.B. testing by viral injection, when a religious objection occurs
2. Pay damages in the amount of $20,000.00
3. Allow chest x-rays instead of virus injections as "least restrictive means"

Tried to resolve w/ ADOC and Corizon staff

| Inmate's Signature | Date | Grievance Coordinator's Signature | Date |
|---|---|---|---|
| | 4-3-18 | | 4-6-18 |

**Action taken by** Documentation of Resolution or Attempts at Resolution.

| Staff Member's Signature | Badge Number | Date |
|---|---|---|
| | 9 | |

DISTRIBUTION: INITIAL: White and Canary or Copies – Grievance Coordinator; Pink or Copy - Inmate
FINAL: White – Inmate; Canary – Grievance File

802-1
12/12/13

ARIZONA DEPARTMENT OF CORRECTIONS

# Inmate Grievance Response

| Inmate Name (Last, First M.I.)<br>BEARUP, PATRICK | ADC Number<br>136226 | Institution/Facility<br>ASPC-F/Central | Case Number<br>A01-110-018 |
|---|---|---|---|

In your grievance dated April 3, 2018 and received by this office on April 5, 2018; you state that you feel that your religious practice was violated due to being required to do your yearly PPD test for Tuberculosis screening.

Your proposed resolution is that all PPD testing cease when there is religious objection, pay you damages in the amount of $20,000, and allow chest x-rays instead of PPD injections.

To address your complaint, I have reviewed the documentation you have provided with your grievance, which includes you Inmate Letter (916-1), Inmate Informal Complaint Resolution (Form 802-11), and Inmate Informal Complaint Response (Form 802-12) from COIII Taylor. Contact was also made with the Chaplaincy regarding your issue.

D.O. 1102.05 Tuberculosis-Screening, Management and Contact Investigation- Indicates that inmates receive Purified Protein Derivative (PPD) tests annually to prevent the spread of infectious disease within the inmate population.

You have not provided any information that suggests that annual PPD testing is now a burden on your faith. I consider this issue resolved.

If you are not satisfied with this response, you may appeal my decision to the Director within (5) workdays of receipt.

Ruben Montano, Deputy Warden

D. Can for D.W. Montano

Date

4/9/18

INITIAL DISTRIBUTION – Committee Recommendation – All copies to Grievance Advisory Committee
FINAL DISTRIBUTION – White and Pink – Inmate, Canary – Grievance File

INITIAL DESTRIBUTION - GF Supplement – White and Canary – Grievance Coordinator, Pink – Inmate
FINAL DISTRIBUTION – White – Inmate, Canary – Grievance File

(10)

802-7P
2/14/00

REC 4-23-18

Count 1

Exhibit B

Form 1102-4

1 page

# ARIZONA DEPARTMENT OF CORRECTIONS

## Involuntary Tuberculosis Test

| INMATE NAME *(Last, First M.I.) (Please print)* | ADC NUMBER | INSTITUTION/UNIT |
|---|---|---|
| | | |

I, _____ , acknowledge and understand that I have been offered the opportunity to voluntarily submit to a tuberculosis test. I hereby decline and refuse to submit to a tuberculosis test for the following reason:

I understand that the tuberculosis test is required by the Arizona Department of Corrections and that my refusal to submit to the tuberculosis test will result in the test being administered involuntarily.

| INMATE'S SIGNATURE | | DATE *(mm/dd/yyyy)* |
|---|---|---|
| WITNESS NAME *(Last, First M.I.) (Please print)* | SIGNATURE | DATE *(mm/dd/yyyy)* |
| WITNESS NAME *(Last, First M.I.) (Please print)* | SIGNATURE | DATE *(mm/dd/yyyy)* |

1102-4
1/11/13



# DEPARTAMENTO DE CORRECIONES DE ARIZONA

## Preuba de la Tuberculosis Involuntario

| NOMBRE DEL PRESO *(Last, First M.I.) (Please print)* | NÚMERO DE ADC | INSTITUCIÓN/UNIDAD |
|---|---|---|
| | | |

Yo, _____ , reconozco y entiendo que se me han ofrecido la oportunidad de A someterse voluntariamente a un test de tuberculosis. Por la presente decadencia y se niegan a someterse a u examen de tuberculosis por la siguiente razón:

Entiendo que la prueba de tuberculosis es requerida por el Departamento Correccional de Arizona y que mi negativa a someterse a la tuberculosis prueba dará lugar a la prueba se administra involuntariamente.

| FIRMA DEL PRESO | | FECHA *(mes/día/año)* |
|---|---|---|
| NOMBRE DEL TESTIGO *(Último, primero M.I.) (Por favor imprima)* | FIRMA | FECHA *(mes/día/año)* |
| NOMBRE DEL TESTIGO *(Último, primero M.I.) (Por favor imprima)* | FIRMA | FECHA *(mes/día/año)* |

①

1102-4
1/11/13

Count ___1___

Exhibit ___C___

Notice of Claim

1 page

# NOTICE OF CLAIM
## AGAINST THE STATE OF ARIZONA

Claim must be filed in accordance with A.R.S. § 12-821.
Please type or print legibly. Press hard when completing information.
All blanks MUST be completed.

## CLAIMANT INFORMATION

Claimant's Name: Patrick W Deering 134226

Address: Unit 5200          City: Florence          State: AZ    Zip: 85132

Phone # (Home): _____ Work: _____ Date of Birth: 04-02-1977

## FACTS

| DATE OF OCCURRENCE | TIME OF OCCURRENCE | LOCATION OF OCCURRENCE |
|---|---|---|
| April 2nd, 20 18 | Appx 1:00 am/pm | Central Unit Florence Complex |

Identify the circumstances under which the damage or injuries were sustained, the cause thereof and the nature and extent of the damages and/or injuries. List the State agency if known. You may attach additional pages if necessary.

Nurse Watson and one Doctor at ADOC State Prison
(under threat of violence by staff) injected me with an unknown
animal protein (non-kosher) during my Holy Week of _____
_____ sincerely held religious belief.
She, and ADOC staff denied my least restrictive means
of a oral 8 mg. Thus making me unclean for Passover and
causing irreparable harm.

Amount of Claim $ _____

In order for a claim to be valid, ARS 12-821.01(A) requires the claimant to include a specific amount for which the claim can be settled. The statute requires the claim be filed with the State of Arizona within **180 days** after the cause of action accrues.

Claimant Signature: _____    Date: 7-11-18

Mail as follows:

Original:    Office of the Attorney General
             1275 W. Washington
             Phoenix, AZ 85007

Canary:   Risk Management
          100 N. 15th Ave., Suite 301
          Phoenix, AZ 85007

NOTE: All supporting documents (Estimates, Bills, etc.) should be included with the canary copy to Risk Management.

Attorney General - White    Risk Management - Canary    Claimant - Pink

Count    2

Exhibit    A

Alvesco Corticosteroid Paperwork
4 double sided pages

females) of whom 206 were adolescents 12-17 years of age. The primary efficacy endpoint in four of the six trials was the mean change from baseline in pre-dose $FEV_1$ at endpoint (last observation). $FEV_1$ was measured prior to the morning dose of study medication (at the end of the 24-hour dosing interval for once daily administration, and at the end of the 12-hour dosing interval for twice daily administration). In one of the six trials, the primary endpoint was the change from baseline in the average of the pre-dose $FEV_1$ at Weeks 12 and 16, and in another trial, reduction of oral corticosteroid use was the primary efficacy endpoint. Additional efficacy variables were asthma symptoms, use of albuterol for rescue, AM PEF, nighttime awakenings, and withdrawal due to asthma worsening.

The two once daily dosing trials were identically designed and were conducted to evaluate the efficacy of ALVESCO 80, 160, and 320 mcg given once daily in the morning for 12 weeks in patients with mild to moderate asthma maintained on inhaled bronchodilators and/or corticosteroids. The results of these trials, along with other trials that explored twice daily dosing, indicate that once daily dosing is not the optimum dosing regimen for ALVESCO.

Four trials were designed to evaluate the efficacy of ALVESCO administered twice daily in patients with asthma who were previously maintained on bronchodilators alone, patients who were previously maintained on inhaled corticosteroids, and patients who were previously maintained on oral corticosteroids.

*Patients Maintained on Bronchodilators Alone*
The efficacy of ALVESCO was studied in a randomized, double-blind, placebo-controlled trial in 691 patients with mild-to-moderate persistent asthma (mean baseline percent predicted $FEV_1$ of 72%) previously using reliever therapy (bronchodilator therapy alone). In this trial, patients were treated with ALVESCO 160 mcg once daily in the morning for 16 weeks, ALVESCO 80 mcg twice daily for 16 weeks, or ALVESCO 80 mcg twice daily for 4 weeks followed by ALVESCO 160 mcg once daily in the morning for 12 weeks or placebo for 16 weeks. Compared to placebo, all ALVESCO doses showed statistically significant improvement at Week 16 in AM pre-dose $FEV_1$. However, the increase in AM pre-dose $FEV_1$ in the patients treated with ALVESCO 80 mcg twice daily was statistically greater than that observed in patients treated with ALVESCO 160 mcg administered once daily. Compared to placebo, increases in AM pre-dose $FEV_1$ were 0.12 L or 5.0% for ALVESCO 160 mcg once daily, 0.24 L or 10.4% for ALVESCO 80 mcg twice daily, 0.13 L or 5.9% for ALVESCO 80 mcg twice daily for 4 weeks followed by ALVESCO 160 mcg once daily. Other measures of asthma control, AM PEF, and reduction of asthma worsening also showed improvement in all the ALVESCO treatment groups compared to placebo but the improvement was greatest with the ALVESCO 80 mcg twice daily treatment arm. Discontinuations from the study for lack of efficacy were lower in the ALVESCO treatment groups compared to placebo. Fewer patients receiving ALVESCO experienced asthma worsening than did patients receiving placebo. The AM pre-dose $FEV_1$ results are shown in Figure 1 below.

Figure 1: A 16-Week Double-Blind Clinical Trial Evaluating ALVESCO Administered Once Daily, Twice Daily, or Twice Daily Initially for 4 Weeks Followed by Once Daily for 12 Weeks, in Adult and Adolescent Patients with Mild-to-Moderate Asthma Previously Maintained on Bronchodilators Alone:



Mean Change from Baseline in $FEV_1$ (L) prior to AM dose

*Patients Previously Maintained on Inhaled Corticosteroids*
The efficacy of ALVESCO in asthma patients previously maintained on inhaled corticosteroids was evaluated in two randomized, double-blind, placebo-controlled trials of 12-weeks treatment duration. In one trial, asthmatic patients with mild to moderate persistent asthma (mean baseline percent predicted $FEV_1$ of 75%), previously maintained on controller therapy (predominantly inhaled corticosteroids) were treated with ALVESCO 160 mcg once daily in the morning, ALVESCO 80 mcg twice daily or placebo.

The AM pre-dose $FEV_1$ results are shown in Figure 2 below.

Figure 2: A 12-Week Double-Blind Clinical Trial Evaluating ALVESCO Administered Once and Twice Daily in Adult and Adolescent Patients with Mild-to-Moderate Asthma Previously Maintained on Inhaled Corticosteroids



Mean Change from Baseline in $FEV_1$ (L) prior to AM dose

Statistically significant increases in AM pre-dose $FEV_1$ compared to placebo were seen at 12 weeks for ALVESCO 160 mcg once daily (0.14 L or 5.7%) and ALVESCO 80 mcg twice daily (0.19 L or 7.5%). Asthma symptoms scores, AM PEF, and reduction for rescue albuterol remained relatively stable in the ALVESCO treatment groups compared to slight worsening in the placebo. Compared to placebo, fewer patients receiving ALVESCO experienced worsening of asthma.

In the other trial, 237 patients with moderate to severe persistent asthma (mean baseline percent predicted $FEV_1$ of 54%) were treated with ALVESCO 160 or 320 mcg twice daily for 12 weeks. The AM pre-dose $FEV_1$ results are shown in Figure 3 below.

Figure 3: A 12-Week Double-Blind Clinical Trial Evaluating ALVESCO Administered Twice Daily in Adult and Adolescent Patients with Severe Asthma



Mean Change from Baseline in $FEV_1$ (L) prior to AM dose

Compared to placebo, both ALVESCO doses showed statistically significantly more improvement in pre-dose $FEV_1$ (0.11 L or 8.6% and 0.18 L or 11.8%). Other measures of asthma control, AM PEF, symptoms, and need for rescue albuterol also showed improvement compared to placebo. Compared to placebo, fewer patients treated with ALVESCO experienced worsening of asthma.

Patients treated with ALVESCO were less likely to discontinue study participation due to asthma deterioration.

*Patients Previously Maintained on Oral Corticosteroids*
In a 12-week double-blind clinical trial, 140 patients with severe persistent asthma (mean $FEV_1$ at baseline 53% predicted) who had failed prior efforts to eliminate oral prednisone use and had established their lowest effective prednisone dose were randomized to ALVESCO given by inhalation aerosol at doses of 320 or 640 mcg twice daily or placebo. The average prednisone dose at baseline was approximately 12 mg/day. Compared to patients on placebo whose prednisone requirements increased by 4%, those treated with ALVESCO 320 mcg and 640 mcg twice daily significantly reduced their prednisone requirements by 47% and 62%, respectively. At the same time, patients on ALVESCO maintained asthma control as reflected by lung function, symptoms, and need for rescue albuterol. A significantly larger percentage of patients on ALVESCO were able to reduce oral prednisone use by 50% or more as compared to placebo (84% and 77% of the patients treated with 320 mcg and 640 mcg, respectively, twice daily as compared with 33% of patients on placebo). There was no statistically significant difference observed with ALVESCO 640 mcg twice daily compared to ALVESCO 320 mcg twice daily.

*Pediatric Patients Less than 12 Years of Age*
Two identically designed randomized, double-blind, parallel, placebo-controlled clinical trials of 12-weeks treatment duration were conducted in 1018 patients aged 4 to 11 years with asthma but efficacy was not established. In addition, one randomized, double-blind, parallel, placebo-controlled clinical trial did not establish efficacy in 992 patients aged 2 to 5 years with asthma. Clinical trials have not been conducted in pediatric patients less than 2 years of age [see Pediatric Use (8.4)].

**16   HOW SUPPLIED/STORAGE AND HANDLING**
ALVESCO is available in the following strengths and canister presentations.

| Micrograms per Actuation | Number of Actuations per Canister | Canister Weight | Canister per Box | NDC Number |
|---|---|---|---|---|
| ALVESCO 80 mcg | 60 | 6.1 g | 1 | 70515-711-01 |
| ALVESCO 160 mcg | 60 | 6.1 g | 1 | 70515-712-01 |

ALVESCO 80 mcg Inhalation Aerosol is supplied with a brown plastic actuator with a red dust cap. Each actuation of the inhaler delivers 80 mcg of ciclesonide from the actuator.

ALVESCO 160 mcg Inhalation Aerosol is supplied with a red plastic actuator with a red dust cap. Each actuation of the inhaler delivers 160 mcg of ciclesonide from the actuator.

ALVESCO canisters are for use with ALVESCO Inhalation Aerosol actuators only. The actuators are fitted with a dose indicator and should not be used with other inhalation aerosol medications. The correct amount of medication in each actuation cannot be assured from the canister labeled to contain 50 actuations when the dose indicator display window shows zero even though the canister is not completely empty. The canister should be discarded when the dose indicator display window shows zero.

Store at 25°C (77°F).

Excursions between 15° and 30°C (59° and 86°F) are permitted (see USP). For optimal results, the canister should be at room temperature when used. Keep out of reach of children.

**CONTENTS UNDER PRESSURE**
Do not puncture. Do not use or store near heat or open flame. Exposure to temperatures above 49°C (120°F) may cause bursting. Never throw canister into fire or incinerator.

**17   PATIENT COUNSELING INFORMATION**
See FDA-Approved Patient Labeling accompanying this product.

**17.1   Oral Candidiasis**
Patients should be advised that localized infections with Candida albicans occurred in the mouth and pharynx in some patients. If oropharyngeal candidiasis develops, it should be treated with appropriate local or systemic (i.e., oral) antifungal therapy while still continuing treatment with ALVESCO therapy, but at times therapy with the ALVESCO inhaler may need to be temporarily interrupted under close medical supervision. Rinsing the mouth after inhalation is advised.

**17.2   Status Asthmaticus and Acute Asthma Symptoms**
Patients should be advised that ALVESCO is not a bronchodilator and is not intended for use as rescue medication for acute asthma exacerbations. Acute asthma symptoms should be treated with an inhaled, short-acting beta₂-agonist such as albuterol. The patient should be instructed to contact their physician immediately if there is deterioration of their asthma.

**17.3   Immunosuppression**
Patients who are on immunosuppressant doses of corticosteroids should be warned to avoid exposure to chickenpox or measles and, if exposed, to consult their physician without delay. Patients should be informed of potential worsening of existing tuberculosis, fungal, bacterial, viral, or parasitic infections, or ocular herpes simplex.

**17.4   Hypercorticism and Adrenal Suppression**
Patients should be advised that ALVESCO may cause systemic corticosteroid effects of hypercorticism and adrenal suppression. Additionally, patients should be instructed that deaths due to adrenal insufficiency have occurred during and after transfer from systemic corticosteroids. Patients should taper slowly from systemic corticosteroids if transferring to ALVESCO.

**17.5   Reduction in Bone Mineral Density**
Patients who are at an increased risk for decreased BMD should be advised that the use of corticosteroids may pose an additional risk and should be monitored and where appropriate, be treated for this condition.

**17.6   Reduced Growth Velocity**
Patients should be informed that orally inhaled corticosteroids, including ALVESCO, may cause a reduction in growth velocity when administered to pediatric patients. Physicians should closely follow the growth of children and adolescents taking corticosteroids by any route.

**17.7   Use Daily for Best Effect**
Patients should be advised to use ALVESCO at regular intervals, since its effectiveness depends on regular use. Maximum benefit may not be achieved for four weeks or longer after starting treatment. The patient should not increase the prescribed dosage but should contact their physician if symptoms do not improve or if the condition worsens. Patients should be instructed not to stop ALVESCO use abruptly. Patients should contact their physician immediately if use of ALVESCO is discontinued.

**17.8   How to Use ALVESCO**
Patients should use ALVESCO only with the actuator supplied with the product. When the dose indicator display window shows a red zone, approximately 20 inhalations are left, and a refill is required. Discard the inhaler when the indicator shows zero.

Manufactured for:
Covis Pharma
Zug, 6300 Switzerland
Made in the United Kingdom



100296

---

## Patient Information
## ALVESCO® [əel-ˈves-kou]
### (ciclesonide)
### Inhalation Aerosol

**Note: For Oral Inhalation Only**

Do not use your ALVESCO Inhalation Aerosol near heat or an open flame.

Read this Patient Information leaflet before you start using ALVESCO Inhalation Aerosol and each time you get a refill. There may be new information. This information does not take the place of talking with your healthcare provider about your medical condition or your treatment. If you have any questions about ALVESCO Inhalation Aerosol, ask your healthcare provider or pharmacist.

**What is ALVESCO Inhalation Aerosol?**

ALVESCO Inhalation Aerosol is a prescription medicine used for the control and prevention of asthma in adults and children 12 years of age and older.

ALVESCO Inhalation Aerosol contains ciclesonide, which is a man-made (synthetic) corticosteroid. Corticosteroids are natural substances found in the body and reduce inflammation. When you inhale ALVESCO Inhalation Aerosol it may help to control and prevent your symptoms of asthma by reducing your airway inflammation.

ALVESCO Inhalation Aerosol is not for the relief of acute bronchospasm. ALVESCO Inhalation Aerosol is not a bronchodilator and does not treat sudden symptoms of an asthma attack such as wheezing, cough, shortness of breath, and chest pain or tightness. Always have a fast-acting bronchodilator medicine (rescue inhaler) with you to treat sudden symptoms.

It is not known if ALVESCO Inhalation Aerosol is safe and effective in children 11 years of age and younger.

**Who should not use ALVESCO Inhalation Aerosol?**

Do not use ALVESCO Inhalation Aerosol:
• to treat status asthmaticus or other sudden symptoms of asthma. ALVESCO Inhalation Aerosol is not a rescue inhaler and should not be used to give you fast relief from your asthma attack. Always use a rescue inhaler such as albuterol, during a sudden asthma attack.
• If you are allergic to ciclesonide or any of the ingredients in ALVESCO Inhalation Aerosol. See the end of this Patient Information leaflet for a complete list of ingredients in ALVESCO Inhalation Aerosol.

**What should I tell my healthcare provider before using ALVESCO Inhalation Aerosol?**

Before you use ALVESCO Inhalation Aerosol tell your healthcare provider if you:
• have or have had eye problems such as increased ocular pressure, glaucoma, or cataracts.
• have any infections including tuberculosis or ocular herpes simplex.
• have not had or been vaccinated for chicken pox or measles.
• are pregnant or plan to become pregnant. It is not known if ALVESCO Inhalation Aerosol will harm your unborn baby. Talk to your healthcare provider if you are pregnant or plan to become pregnant.
• are breastfeeding or plan to breastfeed. It is not known if ALVESCO Inhalation Aerosol passes into your breast milk. Talk to your healthcare provider about the best way to feed your baby if you are using ALVESCO Inhalation Aerosol.

Tell your healthcare provider about all the medicines you take, including prescription and non-prescription medicines, vitamins and herbal supplements.

Know the medicines you take. Keep a list of them to show your healthcare provider and pharmacist when you get a new medicine.

**How should I use ALVESCO Inhalation Aerosol?**
• Read the Instructions for Use at the end of this leaflet for specific information about the right way to use ALVESCO Inhalation Aerosol.
• Use ALVESCO Inhalation Aerosol exactly as your healthcare provider tells you to use it. Do not take more of your medicine, or take it more often than your healthcare provider tells you.
• You must use ALVESCO Inhalation Aerosol regularly. It may take 4 weeks or longer after you start using ALVESCO Inhalation Aerosol for your asthma symptoms to get better. Do not stop using ALVESCO Inhalation Aerosol even if you are feeling better, unless your healthcare provider tells you to.
• If your symptoms do not improve or get worse, call your healthcare provider.
• Your healthcare provider may prescribe a rescue inhaler for emergency relief of sudden asthma attacks. Call your healthcare provider if you have:
   • an asthma attack that does not respond to your rescue inhaler or
   • you need more of your rescue inhaler than usual.
• If you use another inhaled medicine, ask your healthcare provider for instructions on how to use it while you use ALVESCO Inhalation Aerosol.

**What are the possible side effects of ALVESCO Inhalation Aerosol?**

ALVESCO Inhalation Aerosol may cause serious side effects, including:
• Thrush (Candida), a fungal infection of your nose, mouth, or throat. Tell your healthcare provider if you have discomfort or pain in your throat, have hoarseness in your voice or have any redness or white colored patches in your mouth or throat. Rinse your mouth after you use your ALVESCO Inhalation Aerosol.
• Immune system problems that may increase your risk of infections. You are more likely to get infections if you take medicines that may weaken your body's ability to fight infections. Avoid contact with people who have contagious diseases such as chicken pox or measles while you use ALVESCO Inhalation Aerosol. Symptoms of an infection may include:
   • fever
   • pain
   • aches
   • chills
   • feeling tired
   • nausea
   • vomiting

- **Adrenal insufficiency.** Adrenal insufficiency is a condition in which the adrenal glands do not make enough steroid hormones. Your healthcare provider will follow you closely if you take steroids by mouth and are having them decreased (tapered) or you are being switched to ALVESCO Inhalation Aerosol. People have died while steroids are being decreased and when people have been switched from steroids by mouth to inhaled steroids like ALVESCO. If you are under stress, such as with surgery, after surgery or trauma, you may need steroids by mouth again.

  Call your healthcare provider right away if you have the following symptoms of adrenal insufficiency:
  - tiredness
  - weakness
  - dizziness
  - nausea that does not go away
  - vomiting that does not go away

- **Decreased bone mass (bone mineral density).** People who use inhaled steroid medicines for a long time may have an increased risk of decreased bone mass which can affect bone strength. Talk to your healthcare provider about any concerns you may have about bone health.

- **Slowed or delayed growth in children.** A child's growth should be checked regularly while using ALVESCO Inhalation Aerosol.

- **Eye problems such as glaucoma and cataracts.** If you have a history of glaucoma or cataracts or have a family history of eye problems, you should have regular eye exams while you use ALVESCO Inhalation Aerosol.

- **Increased wheezing (bronchospasm)** can happen right away after using ALVESCO Inhalation Aerosol. Stop using ALVESCO Inhalation Aerosol and use an inhaled fast-acting bronchodilator (rescue inhaler) right away.

Tell your healthcare provider right away so that a new medicine can be prescribed to control your asthma.

The most common side effects with ALVESCO Inhalation Aerosol include:
- headache
- swelling of nose and throat (nasopharyngitis)
- swelling of the sinuses (sinusitis)
- throat pain
- upper respiratory infection
- joint pain (arthralgia)
- nasal congestion
- pain in arms, legs, and back

Tell your healthcare provider about any side effect that bothers you or that does not go away.

These are not all of the possible side effects with ALVESCO Inhalation Aerosol. For more information, ask your healthcare provider or pharmacist.

Call your healthcare provider for medical advice about side effects. You may report side effects to FDA at 1-800-FDA-1088.

**How should I store ALVESCO Inhalation Aerosol?**
- Store ALVESCO Inhalation Aerosol at room temperature between 59°F to 86°F (15°C to 30°C).
- Do not puncture the ALVESCO Inhalation Aerosol canister.
- *Do not* store the ALVESCO Inhalation Aerosol canister near heat or a flame. Temperatures above 120°F (49°C) may cause the canister to burst.
- Do not throw the ALVESCO Inhalation Aerosol canister into a fire or an incinerator.
- Safely throw away medicine that is out of date or no longer needed.
- Keep ALVESCO Inhalation Aerosol clean and dry at all times.

Keep ALVESCO Inhalation Aerosol and all medicines out of reach of children.

*General Information About the Safe and Effective use of ALVESCO Inhalation Aerosol*

Medicines are sometimes prescribed for purposes other than those listed in a Patient Information leaflet. Do not use ALVESCO Inhalation Aerosol for a condition for which it is not prescribed. Do not give ALVESCO Inhalation Aerosol to other people, even if they have the same symptoms that you have. It may harm them.

This Patient Information summarizes the most important information about ALVESCO Inhalation Aerosol. If you would like more information, talk with your healthcare provider. You can ask your pharmacist or healthcare provider for information about ALVESCO Inhalation Aerosol that is written for health professionals.

For more information, go to www.alvesco.us/.

**What are the ingredients in ALVESCO Inhalation Aerosol?**

Active ingredient: ciclesonide
Inactive ingredients: propellant HFA-134a and ethanol

## Instructions for Use
## ALVESCO® [ael-'ves-kou]
## (ciclesonide)
## Inhalation Aerosol

Read this Instructions for Use for ALVESCO Inhalation Aerosol before you start using it and each time you get a refill. There may be new information. This leaflet does not take the place of talking to your healthcare provider about your medical condition or treatment.

**Note: For Oral Inhalation Only**

Do not use your ALVESCO Inhalation Aerosol near heat or an open flame.

**The parts of your ALVESCO Inhalation Aerosol**

ALVESCO Inhalation Aerosol comes as a canister that fits into an actuator with a dose indicator. Do not use the actuator with a canister of medicine from any other inhaler. Do not use your ALVESCO Inhalation Aerosol canister with an actuator from any other inhaler. (See Figure A.)



Figure A - Inhaler

**Priming your ALVESCO Inhalation Aerosol for use**
- Remove your ALVESCO Inhalation Aerosol from its package.
- Before you use ALVESCO Inhalation Aerosol for the first time or if you have not used your medicine for 10 days in a row, you will need to prime your ALVESCO Inhalation Aerosol unit.
- Remove the plastic cap. Look at the dose indicator on top of the inhaler. Make sure that the dose indicator display window pointer is before the "60" inhalation mark before you use your ALVESCO Inhalation Aerosol for the first time.
- Hold the actuator upright. Spray 3 times into the air away from the face, by pressing down fully onto the center of the dose indicator button. (See Figure B)



Figure B

- Check the dose indicator display window after the priming sprays and before the first use to make sure it shows that there are 60 sprays left in your ALVESCO Inhalation Aerosol unit. If there are not 60 sprays left in your ALVESCO Inhalation Aerosol after the first use priming spray, return it to the pharmacy.
- Make sure the canister is firmly placed in the mouthpiece each time you use your ALVESCO Inhalation Aerosol.
- You do not need to shake your ALVESCO Inhalation Aerosol unit before you use it.

**Using Your ALVESCO Inhalation Aerosol**

Step 1. Remove the cap from the mouthpiece. (See Figure C)



Figure C

Step 2. Hold the actuator upright, between your thumb, forefinger, and middle finger with the mouthpiece pointing towards you. (See Figure D)



Figure D

Step 3. Breathe out as fully as you comfortably can. Close your lips around the mouthpiece, keeping your tongue below it. (See Figure E)



Figure E

Step 4.
- While breathing in deeply and slowly, press down on the center of the dose indicator with your finger. Press down fully on the center until it stops moving in the actuator while delivering your dose.
- When you have finished breathing in, hold your breath for about 10 seconds, or for as long as is comfortable.
- Note: It is normal to hear a soft click from the indicator as it counts down during use.

Step 5.
Take your finger completely off the center of the dose indicator and remove the inhaler from your mouth. Breathe out gently. (See Figure F)



Figure F

Step 6. Replace the cap to keep the mouthpiece clean.

Step 7. Rinse your mouth with water and spit it out. Do not swallow.

**Cleaning your ALVESCO Inhalation Aerosol unit**
- Clean the mouthpiece weekly with a clean dry tissue, both inside and out. (See Figure G)



Figure G

Wipe over the front of the small hole where the medicine comes out with a dry, folded tissue. (See Figure H)



Figure H

- Do not wash or put any part of your ALVESCO Inhalation Aerosol unit in water or any other liquids.

**How to tell if your ALVESCO Inhalation Aerosol canister is empty**
- Your ALVESCO Inhalation Aerosol unit is fitted with a dose indicator display which shows you how much of your medicine is left after each use.
- Each canister of ALVESCO Inhalation Aerosol contains enough medicine for you to spray your medicine 60 times. This does not count the first sprays used for priming.
- The dose indicator display counts down by 10 and will move every tenth time you take a puff (i.e., 60-50-40, etc.).
- The dose indicator display window will turn red when there are only 20 sprays left. This means that you need to replace your inhaler soon.
- When the dose indicator display window reads "0" you should throw away your ALVESCO Inhalation Aerosol unit. (See Figure I)



Figure I

- Although your ALVESCO Inhalation Aerosol unit is fitted with a dose indicator display to help determine the number of sprays left, you should keep track of the number of sprays used from each canister of your ALVESCO Inhalation Aerosol unit.

This PPI and Instructions for Use has been approved by the U.S. Food and Drug Administration.

Manufactured for:
Covis Pharma
Zug, 6300 Switzerland
Made in the United Kingdom

ALVESCO is a registered trademark of the AstraZeneca group of companies.
©2017 Covis Pharma and AstraZeneca group of companies. All rights reserved.

Revised November 2017

ALVESCO® (ciclesonide)
Inhalation Aerosol 80 mcg, 160 mcg
For Oral Inhalation Only

ALVESCO® (ciclesonide)
Inhalation Aerosol 80 mcg, 160 mcg
For Oral Inhalation Only

100296

ALVESCO® (ciclesonide)
*Inhalation Aerosol 80 mcg, 160 mcg*
For Oral Inhalation Only

6179531 R02



100296

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use ALVESCO® safely and effectively. See full prescribing information for ALVESCO®.**

**ALVESCO® (ciclesonide) Inhalation Aerosol 80 mcg, 160 mcg**
**For Oral Inhalation Only**
**Initial U.S. Approval: 2006**

**INDICATIONS AND USAGE**

ALVESCO is an inhaled corticosteroid indicated for: Maintenance treatment of asthma as prophylactic therapy in adult and adolescent patients 12 years of age and older. (1)
ALVESCO is NOT indicated for the relief of acute bronchospasm. (1)

**DOSAGE AND ADMINISTRATION**

FOR ORAL INHALATION ONLY (2)

| | Recommended Starting Dose | Highest Recommended Dose |
|---|---|---|
| Patients ≥ 12 years who received bronchodilators alone | 80 mcg twice daily | 160 mcg twice daily |
| Patients ≥ 12 years who received inhaled corticosteroids | 80 mcg twice daily | 320 mcg twice daily |
| Patients ≥ 12 years who received oral corticosteroids[1] | 320 mcg twice daily | 320 mcg twice daily |

[1] Prednisone should be reduced gradually, no faster than 2.5 mg/day on a weekly basis, beginning after at least 1 week of therapy with ALVESCO. Patients should be carefully monitored for signs of asthma instability, including monitoring of serial objective measures of airflow, and for signs of adrenal insufficiency during steroid taper and following discontinuation of oral corticosteroid therapy *[see Warnings and Precautions (5.1)]*.

**DOSAGE FORMS AND STRENGTHS**

Inhalation Aerosol 80 mcg/actuation or 160 mcg/actuation (3)

**CONTRAINDICATIONS**

- Patients with status asthmaticus or other acute episodes of asthma where intensive measures are required. (4.1)
- Patients with a known hypersensitivity to ciclesonide or any of the ingredients of ALVESCO. (4.2)

**WARNINGS AND PRECAUTIONS**

- *Candida albicans* infection of the mouth and pharynx. Monitor patients periodically for signs of adverse effects on the oral cavity. Advise patients to rinse mouth following inhalation. (5.1)
- Potential worsening of existing tuberculosis; fungal, bacterial, viral, or parasitic infection; or ocular herpes simplex. More serious or even fatal course of chickenpox or measles in susceptible patients. Use caution in patients with above because of the potential for worsening of these infections. (5.3)
- Risk of impaired adrenal function when transferring from oral steroids to inhaled corticosteroids. Taper patients slowly from systemic corticosteroids if transferring to ALVESCO. (5.4)
- Hypercorticism, suppression of hypothalamic-pituitary-adrenal (HPA) function with very high dosages or at the regular dosage in susceptible individuals. If such changes occur, discontinue ALVESCO slowly. (5.5)
- Suppression of growth in children. Monitor growth routinely in pediatric patients receiving ALVESCO. (5.7)
- Development of glaucoma, increased intraocular pressure and posterior subcapsular cataracts. Monitor patients with a change in vision or with a history of increased intraocular pressure, glaucoma, and/or cataracts closely. (5.8)

**ADVERSE REACTIONS**

Most common adverse reactions (≥ 3%) are headache, nasopharyngitis, sinusitis, pharyngolaryngeal pain, upper respiratory infection, arthralgia, nasal congestion, pain in extremity and back pain. (6)

Other adverse reactions have been reported. (6)

**To report SUSPECTED ADVERSE REACTIONS, contact Covis Pharma at 1-866-488-4423 or FDA at 1-800-FDA-1088 or *www.fda.gov/medwatch*.**

**See 17 for PATIENT COUNSELING INFORMATION and FDA-approved patient labeling.**

**Revised: 11/2017**

**FULL PRESCRIBING INFORMATION: CONTENTS***

1 INDICATIONS AND USAGE
1.1 Treatment of Asthma
2 DOSAGE AND ADMINISTRATION
3 DOSAGE FORMS AND STRENGTHS
4 CONTRAINDICATIONS
4.1 Status Asthmaticus
4.2 Hypersensitivity
5 WARNINGS AND PRECAUTIONS
5.1 Local Effects
5.2 Acute Asthma Episodes
5.3 Immunosuppression
5.4 Transferring Patients From Systemic Corticosteroid Therapy
5.5 Hypercorticism and Adrenal Suppression
5.6 Reduction in Bone Mineral Density
5.7 Effect on Growth
5.8 Glaucoma and Cataracts
5.9 Bronchospasm
6 ADVERSE REACTIONS
6.1 Clinical Trial Experience
6.2 Post-marketing Experience
7 DRUG INTERACTIONS
8 USE IN SPECIFIC POPULATIONS
8.1 Pregnancy
8.3 Nursing Mothers
8.4 Pediatric Use
8.5 Geriatric Use
10 OVERDOSAGE
11 DESCRIPTION
12 CLINICAL PHARMACOLOGY
12.1 Mechanism of Action
12.2 Pharmacodynamics
12.3 Pharmacokinetics
13 NONCLINICAL TOXICOLOGY
13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
14 CLINICAL STUDIES
14.1 Asthma
16 HOW SUPPLIED/STORAGE AND HANDLING
17 PATIENT COUNSELING INFORMATION
17.1 Oral Candidiasis
17.2 Status Asthmaticus and Acute Asthma Symptoms
17.3 Immunosuppression
17.4 Hypercorticism and Adrenal Suppression
17.5 Reduction in Bone Mineral Density
17.6 Reduced Growth Velocity
17.7 Use Daily for Best Effect
17.8 How to Use ALVESCO

*Sections or subsections omitted from the full prescribing information are not listed.

**FULL PRESCRIBING INFORMATION**

**1 INDICATIONS AND USAGE**

**1.1 Treatment of Asthma**

ALVESCO is indicated for the maintenance treatment of asthma as prophylactic therapy in adult and adolescent patients 12 years of age and older.

Important Limitations of Use:
ALVESCO is NOT indicated for the relief of acute bronchospasm.
ALVESCO is NOT indicated for children under 12 years of age.

**2 DOSAGE AND ADMINISTRATION**

ALVESCO should be administered by the orally inhaled route. Prime ALVESCO Inhalation Aerosol before using for the first time by actuating 3 times prior to using the first dose from a new canister or when the inhaler has not been used for more than 10 days. Individual patients will experience a variable time to onset and degree of symptom relief. Maximum benefit may not be achieved for four weeks or longer after initiation. After asthma stability has been achieved, it is desirable to titrate to the lowest effective dosage to reduce the possibility of side effects. For patients who do not respond adequately to the starting dose after 4 weeks of therapy, higher doses may provide additional asthma control. The safety and efficacy of ALVESCO when administered in excess of the highest recommended doses has not been established.

Recommended Dosages
The recommended starting dose and the highest recommended dose of ALVESCO Inhalation Aerosol are listed in the following table.

| Previous Therapy | Recommended Starting Dose | Highest Recommended Dose |
|---|---|---|
| Patients ≥ 12 years who received bronchodilators alone | 80 mcg twice daily | 160 mcg twice daily |
| Patients ≥ 12 years who received inhaled corticosteroids | 80 mcg twice daily | 320 mcg twice daily |
| Patients ≥ 12 years who received oral corticosteroids[1] | 320 mcg twice daily | 320 mcg twice daily |

[1] Prednisone should be reduced gradually, no faster than 2.5 mg/day on a weekly basis, beginning after at least 1 week of therapy with ALVESCO. Patients should be carefully monitored for signs of asthma instability, including monitoring of serial objective measures of airflow, and for signs of adrenal insufficiency during steroid taper and following discontinuation of oral corticosteroid therapy *[see Warnings and Precautions (5.1)]*.

**3 DOSAGE FORMS AND STRENGTHS**

ALVESCO Inhalation Aerosol is available in the following two strengths: 80 mcg/actuation, and 160 mcg/actuation. The 80 mcg/actuation strength contains 60 actuations fill/canister, and the 160 mcg/actuation strength contains 60 actuations fill/canister.

ALVESCO 80 mcg Inhalation Aerosol is supplied with a brown plastic actuator with a red dust cap.

ALVESCO 160 mcg Inhalation Aerosol is supplied with a red plastic actuator with a red dust cap.

**4 CONTRAINDICATIONS**

**4.1 Status Asthmaticus**

ALVESCO is contraindicated in the primary treatment of status asthmaticus or other acute episodes of asthma where intensive measures are required.

**4.2 Hypersensitivity**

ALVESCO is contraindicated in patients with known hypersensitivity to ciclesonide or any of the ingredients of ALVESCO. Rare cases of hypersensitivity reactions with manifestations such as angioedema, with swelling of the lips, tongue and pharynx, have been reported.

**5 WARNINGS AND PRECAUTIONS**

**5.1 Local Effects**

In clinical trials, the development of localized infections of the mouth and pharynx with *Candida albicans* occurred in 32 of 3038 patients treated with ALVESCO. Of the 32 reported cases, 20 occurred in 1394 patients treated with a total daily dose of 320 mcg of ALVESCO or higher. Most cases of *Candida* infection were mild to moderate. When such an infection develops, it should be treated with appropriate local or systemic (i.e., oral antifungal) therapy while remaining on treatment with ALVESCO, but at times therapy with ALVESCO may need to be interrupted. Patients should rinse the mouth after inhalation of ALVESCO.

**5.2 Acute Asthma Episodes**

ALVESCO is not a bronchodilator and is not indicated for rapid relief of bronchospasm or other acute episodes of asthma. Patients should be instructed to contact their physician immediately if episodes of asthma not responsive to their usual doses of bronchodilators occur during the course of treatment with ALVESCO. During such episodes, patients may require therapy with oral corticosteroids.

**5.3 Immunosuppression**

Persons who are using drugs that suppress the immune system are more susceptible to infections than healthy individuals. Chickenpox and measles, for example, can have a more serious or even fatal course in susceptible children or adults using corticosteroids. In such children or adults who have not had these diseases or been properly immunized, particular care should be taken to avoid exposure. How the dose, route, and duration of corticosteroid administration affect the risk of developing a disseminated infection is not known. The contribution of the underlying disease and/or prior corticosteroid treatment to the risk is also not known. If exposed to chickenpox, prophylaxis with varicella *zoster immune globulin (VZIG)* may be indicated. If exposed to measles, prophylaxis with pooled intramuscular immunoglobulin (IG) may be indicated. (See the respective package inserts for complete VZIG and IG prescribing information.) If chickenpox develops, treatment with antiviral agents may be considered.

Inhaled corticosteroids should be used with caution, if at all, in patients with active or quiescent tuberculosis infection of the respiratory tract; untreated systemic fungal, bacterial, viral, or parasitic infections; or ocular herpes simplex.

**5.4 Transferring Patients from Systemic Corticosteroid Therapy**

Particular care is needed for patients who are transferred from systemically active corticosteroids to ALVESCO because deaths due to adrenal insufficiency have occurred in asthmatic patients during and after transfer from systemic corticosteroids to less systemically-available inhaled corticosteroids. After withdrawal from systemic corticosteroids, a number of months are required for recovery of hypothalamic-pituitary-adrenal (HPA) function.

Patients who have been previously maintained on 20 mg or more per day of prednisone (or its equivalent) may be most susceptible, particularly when their systemic corticosteroids have been almost completely withdrawn. During this period of HPA suppression, patients may exhibit signs and symptoms of adrenal insufficiency when exposed to trauma, surgery, or infection (particularly gastroenteritis) or other conditions associated with severe electrolyte loss. Although ALVESCO may provide control of asthma symptoms during these episodes, in recommended doses it supplies less than normal physiological amounts of corticosteroid systemically and does NOT provide the mineralocorticoid activity that is necessary for coping with these emergencies.

During periods of stress or a severe asthma attack, patients who have been withdrawn from systemic corticosteroids should be instructed to resume oral corticosteroids (in large doses) immediately and to contact their physicians for further instruction. These patients should also be instructed to carry a medical identification card indicating that they may need supplementary systemic corticosteroids during periods of stress or a severe asthma attack.

Patients requiring oral corticosteroids should be weaned slowly from systemic corticosteroid use after transferring to ALVESCO. Prednisone reduction can be accomplished by reducing the daily prednisone dose by 2.5 mg on a weekly basis during ALVESCO therapy *[see Dosage and Administration (2)]*. Lung function ($FEV_1$ or AM PEFR), beta-agonist use, and asthma symptoms should be carefully monitored during withdrawal of oral corticosteroids. In addition to monitoring asthma signs and symptoms, patients should be observed for signs and symptoms of adrenal insufficiency, such as fatigue, lassitude, weakness, nausea and vomiting, and hypotension.

Transfer of patients from systemic steroid therapy to ALVESCO may unmask allergic conditions previously suppressed by the systemic steroid therapy, e.g., rhinitis, conjunctivitis, eczema, arthritis, and eosinophilic conditions.

During withdrawal from oral steroids, some patients may experience symptoms of systemically active steroid withdrawal, e.g., joint and/or muscular pain, lassitude, and depression, despite maintenance or even improvement of respiratory function.

**5.5 Hypercorticism and Adrenal Suppression**

ALVESCO will often help control asthma symptoms with less suppression of HPA function than therapeutically similar oral doses of prednisone. Since individual sensitivity to effects on cortisol production exists, physicians should consider this information when prescribing ALVESCO. Particular care should be taken in observing patients postoperatively or during periods of stress for evidence of inadequate adrenal response. It is possible that systemic corticosteroid effects such as hypercorticism and adrenal suppression may appear in a small number of patients particularly when ALVESCO is administered at higher than recommended doses over prolonged periods of time. If such effects occur, the dosage of ALVESCO should be reduced slowly, consistent with accepted procedures for reducing systemic corticosteroids and for management of asthma.

**5.6 Reduction in Bone Mineral Density**

Decreases in bone mineral density (BMD) have been observed with long-term administration of products containing inhaled corticosteroids. The clinical significance of small changes in BMD with regard to long-term outcomes is unknown. Patients with major risk factors for decreased bone mineral content, such as prolonged immobilization, family history of osteoporosis, or chronic use of drugs that can reduce bone mass (e.g., anticonvulsants and oral corticosteroids) should be monitored and treated with established standards of care.

**5.7 Effect on Growth**

Orally inhaled corticosteroids may cause a reduction in growth velocity when administered to pediatric patients. Monitor the growth of pediatric patients receiving ALVESCO routinely (e.g., via stadiometry). To

minimize the system
dose to the lowest do

**5.8 Glaucoma and**
Glaucoma, increased
of inhaled corticoster
change in vision or w

In a comparator contr
age 43.1 years) with
742 were treated wi
population. Patients
measurement, and a
using the Lens Opaci
recorded in 36.1% of
inhaled corticosteroic
patients and 9.2% of
a CLASS III effect, th
and comparator-treat

**5.9 Bronchospas**
As with other inhale
may occur after dos
immediately with a f
and alternative treatn

**6 ADVERSE REA**
Systemic and local co
- *Candida albica*
- Immunosuppre
- Hypercorticism
- Growth effects
- Glaucoma and

**6.1 Clinical Trial E**
The safety data desc
ALVESCO in doses ra
clinical trials. Studie
studied once daily ar
to 16 weeks treatmer
to 16 week treatmen
exposed to ALVESCO.
persistent asthma fro
ALVESCO 320 mcg tw
from once daily dosin
period followed by a
safety study of one-y

Because clinical trial
the clinical trials of a
not reflect the rates o

*Adults and Adolesc*
Four of the five trial
males) with asthma
twice daily for 12 to
(predominantly inhal
the mean age was 3
52.3%, 59.8% and 5
respectively, had at l

Table 1 includes adv
of ≥ 3% in any of the

**Table 1: Adverse R**
**ALVESCO in US Pla**
**or Inhaled Corticost**

| Adverse Reaction |
|---|
| Headache |
| Nasopharyngitis |
| Sinusitis |
| Pharyngolaryngeal p |
| Upper respiratory in |
| Arthralgia |
| Nasal congestion |
| Pain in extremity |
| Back pain |

The following advers
than 1% and occurre

**Infections and Infes**
**Respiratory Disorde**
**Gastrointestinal Dis**
**General Disorders a**
**Respiratory, Thorac**

The fifth study was a
required oral corticos
ALVESCO 320 mcg t
(n = 45) for the frequ
incidence of ≥ 3% in t
hoarseness, oral cand
chest pain, headache

*Pediatric Patients 4*
The safety of ALVESC
ALVESCO 40 mcg, 80
pediatric patients 2 t
once daily for 24 we
*Pediatric Use (8.4)]*.

*Long-Term Clinical*
A total of 197 patient
treatment placebo-c
for one year. The safe
treatment studies. Lo
three open-label one-

**6.2 Post-marketin**
In addition to advers
identified during worl
reported voluntarily f
frequency or establis

Immune System Dis
swelling of the lips, to

**7 DRUG INTERA**
In clinical studies, c
treatment of asthma
*Clinical Pharmacolog*

*In vitro* studies and
metabolic drug intera

In a drug interaction
inhibitor of cytochror
fold at steady state,

minimize the systemic effects of inhaled corticosteroids, including ALVESCO, titrate each patient's dose to the lowest dosage that effectively controls his/her symptoms [see Use in Specific Populations (8.4)].

## 5.6 Glaucoma and Cataracts

Glaucoma, increased intraocular pressure, and cataracts have been reported following the administration of inhaled corticosteroids including ALVESCO. Therefore, close monitoring is warranted in patients with a change in vision or with a history of increased intraocular pressure, glaucoma, and/or cataracts.

In a comparator control study of one-year treatment duration, 743 patients 18 years of age and older (mean age 43.1 years) with moderate persistent asthma were treated with ALVESCO 320 mcg twice daily and 742 were treated with a blinded dose of a comparator-inhaled corticosteroid appropriate for the patient population. Patients had an ophthalmology examination that included visual acuity, intraocular pressure measurement, and a slit lamp examination at baseline, 4, 8 and 12 months. Lens opacities were graded using the Lens Opacification System III. After 52 weeks, CLASS I effects (minimally detected changes) were recorded in 36.1% of the ALVESCO-treated patients and in 38.4% of patients treated with the comparator-inhaled corticosteroid. The more severe CLASS III effects were recorded in 8.1% of the ALVESCO-treated patients and 9.2% of patients treated with the comparator-inhaled corticosteroid. Of those patients having a CLASS III effect, the incidence of posterior sub-capsular opacities was 0.9% and 0.5% in the ALVESCO- and comparator-treated patients, respectively.

## 5.7 Bronchospasm

As with other inhaled asthma medications, bronchospasm, with an immediate increase in wheezing, may occur after dosing. If bronchospasm occurs following dosing with ALVESCO, it should be treated immediately with a fast-acting inhaled bronchodilator. Treatment with ALVESCO should be discontinued and alternative treatment should be instituted.

## 6 ADVERSE REACTIONS

Systemic and local corticosteroid use may result in the following:
- Candida albicans infection [see Warnings and Precautions (5.1)]
- Immunosuppression [see Warnings and Precautions (5.2)]
- Hypercorticism and adrenal suppression [see Warnings and Precautions (5.5)]
- Growth effects [see Warnings and Precautions (5.7)]
- Glaucoma and cataracts [see Warnings and Precautions (5.6)]

## 6.1 Clinical Trial Experience

The safety data described below for adults and adolescents 12 years of age and older reflect exposure to ALVESCO in doses ranging from 80 mcg to 640 mcg twice daily in the double-blind placebo-controlled clinical trials. Studies with once daily dosing are omitted from the safety database because the doses studied once daily are lower than the highest recommended twice daily doses. The five studies were of 12 to 16 weeks treatment duration, one of which included a safety extension follow-up of one year. In the 12 to 16 week treatment studies, 720 patients (398 males and 422 females) aged 12 years and older were exposed to ALVESCO. In the long-term safety trial, 197 patients (87 males and 115 females) with severe persistent asthma from one of the 12-week trials were re-randomized and treated for up to one year with ALVESCO 320 mcg twice daily. Safety information for pediatric patients 4 to 11 years of age, is obtained from once daily dosing studies. Two of these studies were designed with a 12-week double-blind treatment period followed by a long-term open-label safety extension of one year, and one study was an open-label safety study of one-year duration [see Pediatric Use (8.4)].

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a drug cannot be directly compared to rates in the clinical trials of another drug and may not reflect the rates observed in practice.

### Adults and Adolescents 12 Years of Age and Older

Four of the five trials included a total of 624 patients ages 12 years and older (359 females and 265 males) with asthma of varying severity who were treated with ALVESCO 80 mcg, 160 mcg, or 320 mcg twice daily for 12 to 16 weeks. These studies included patients previously using either corticosteroid therapy (predominantly inhaled corticosteroids) or reliever therapy (bronchodilator therapy alone). In these trials, the mean age was 39.1 years, and the majority of the patients (79.9%) were Caucasian. In these trials, 52.3%, 59.8% and 54.1% of the patients in the ALVESCO 80, 160 mcg, and 320 mcg treatment groups, respectively, had at least one adverse event compared to 58.2% in the placebo group.

Table 1 includes adverse reactions for the recommended doses of ALVESCO that occurred at an incidence of ≥ 3% in any of the ALVESCO groups and which were more frequent than with ALVESCO compared to placebo.

Table 1: Adverse Reactions with ≥ 3% Incidence Reported in Patients ≥ 12 Years of Age with ALVESCO in US Placebo-Controlled Clinical Trials in Patients Previously on Bronchodilators and/or Inhaled Corticosteroids

| Adverse Reaction | Placebo (N=507) % | ALVESCO 80 mcg BID (N=325) % | 160 mcg BID (N=127) % | 320 mcg BID (N=172) % |
|---|---|---|---|---|
| Headache | 7.3 | 4.9 | 11.0 | 6.7 |
| Nasopharyngitis | 7.5 | 10.5 | 8.7 | 7.0 |
| Sinusitis | 3.0 | 3.1 | 5.5 | 5.9 |
| Pharyngolaryngeal pain | 4.3 | 4.3 | 2.4 | 4.7 |
| Upper respiratory inf. | 6.5 | 7.1 | 8.7 | 4.1 |
| Arthralgia | 1.0 | 0.9 | 2.4 | 3.5 |
| Nasal congestion | 1.6 | 1.8 | 5.5 | 2.9 |
| Pain in extremity | 1.0 | 0.3 | 3.1 | 2.3 |
| Back pain | 2.0 | 0.6 | 3.1 | 2.3 |

The following adverse reactions occurred in these clinical trials using ALVESCO with an incidence of less than 1% and occurred at a greater incidence with ALVESCO than with placebo.

Infections and Infestations: Oral candidiasis
Respiratory Disorders: Cough
Gastrointestinal Disorders: Dry mouth, nausea
General Disorders and Administrative Site Conditions: Chest discomfort
Respiratory, Thoracic, and Mediastinal Disorders: Dysphonia, dry throat

The fifth study was a 12-week clinical trial in asthma patients 12 years of age and older who previously required oral corticosteroids (average daily dose of oral prednisone of 12 mg/day), in which the effects of ALVESCO 320 mcg twice daily (n = 47) and 640 mcg twice daily (n = 49) were compared with placebo (n = 45) for the frequency of reported adverse reactions. The following adverse reactions occurred at an incidence of ≥ 3% in the ALVESCO-treated patients and were more frequent compared to placebo: sinusitis, headache, laryngitis, influenza, pneumonia, nasopharyngitis, arthralgia, back pain, musculoskeletal chest pain, headache, urticaria, dizziness, gastroenteritis, face edema, fatigue, and conjunctivitis.

### Pediatric Patients less than 12 Years of Age

The safety of ALVESCO in pediatric patients 4 to 11 years of age was evaluated in two studies in which ALVESCO 40 mcg, 80 mcg, and 160 mcg was administered once daily for 12 weeks and in one study in pediatric patients 2 to 6 years of age in which ALVESCO 40 mcg, 80 mcg, and 160 mcg was administered once daily for 24 weeks. Studies have not been conducted in patients less than 2 years of age [see Pediatric Use (8.4)].

### Long-Term Clinical Trials Experience

A total of 197 patients 12 years of age and older (82 males and 115 females) from one of the 12-week treatment placebo-controlled studies were re-randomized to ALVESCO 320 mcg twice daily and followed for one year. The safety profile from the one-year follow-up was similar to that seen in the 12- and 16-week treatment studies. Long-term safety information for pediatric patients 4 to 11 years of age is obtained from these open-label one-year safety studies [see Pediatric Use (8.4)].

## 6.2 Post-marketing Experience

In addition to adverse reactions identified from clinical trials, the following adverse reactions have been identified during worldwide post-marketing use of ciclesonide oral inhalation. Because these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship with drug exposure.

Immune System Disorders: Immediate or delayed hypersensitivity reactions such as angioedema with swelling of the lips, tongue and pharynx.

## 7 DRUG INTERACTIONS

In clinical studies, concurrent administration of ciclesonide and other drugs commonly used in the treatment of asthma (albuterol, formoterol) had no effect on pharmacokinetics of des-ciclesonide [see Clinical Pharmacology (12.3)].

In vitro studies and clinical pharmacology studies suggested that des-ciclesonide has no potential for metabolic drug interactions or protein binding-based drug interactions [see Clinical Pharmacology (12.3)].

In a drug interaction study, co-administration of orally inhaled ciclesonide and oral ketoconazole, a potent inhibitor of cytochrome P450 3A4, increased the exposure (AUC) of des-ciclesonide by approximately 3.6-fold at steady state, while the level of ciclesonide remained unchanged.

## 8 USE IN SPECIFIC POPULATIONS

### 8.1 Pregnancy

Teratogenic Effects: Pregnancy Category C
Oral administration of ciclesonide in rats up to 900 mcg/kg/day (approximately 10 times the maximum human daily inhalation dose based on mcg/m$^2$/day) produced no teratogenicity or other fetal effects. However, subcutaneous administration of ciclesonide in rabbits at 5 mcg/kg/day (less than the maximum human daily inhalation dose based on mcg/m$^2$/day) or greater produced fetal toxicity. This included fetal loss, reduced fetal weight, cleft palate, skeletal abnormalities including incomplete ossifications, and skin effects. No toxicity was observed at 1 mcg/kg (less than the maximum human daily inhalation dose based on mcg/m$^2$).

There are no adequate and well-controlled studies in pregnant women. ALVESCO should be used during pregnancy only if the potential benefit justifies the potential risk to the fetus. Experience with oral corticosteroids since their introduction in pharmacologic as opposed to physiologic doses suggests that rodents are more prone to teratogenic effects from corticosteroids than humans. In addition, because there is a natural increase in corticosteroid production during pregnancy, most women will require a lower exogenous corticosteroid dose and many will not need corticosteroid treatment during pregnancy.

Non-teratogenic Effects: Hypoadrenalism may occur in infants born of mothers receiving corticosteroids during pregnancy. Such infants should be carefully monitored.

### 8.3 Nursing Mothers

It is not known if ciclesonide is secreted in human milk. However, other corticosteroids are excreted in human milk. In a study with lactating rats, minimal, but detectable levels of ciclesonide were recovered in milk. Caution should be used when ALVESCO is administered to nursing women.

### 8.4 Pediatric Use

The safety and effectiveness of ALVESCO in children under 12 years of age have not been established.

Two randomized, double-blind, placebo-controlled studies of the efficacy of ALVESCO 40, 80, or 160 mcg administered once daily for 12 weeks in patients 4 to 11 years of age with asthma. These studies included 1048 patients previously using either controller therapy (predominantly inhaled corticosteroids) or reliever therapy (bronchodilator therapy alone). The patients had a mean baseline percent predicted FEV1 of 88%. The primary efficacy endpoint was morning pre-dose FEV1. Other measures of efficacy included AM PEF, asthma symptoms, and rescue albuterol use. The studies showed inconsistent results and do not establish the efficacy of ALVESCO in patients 4 to 11 years of age.

One randomized, double-blind, placebo-controlled study was conducted to evaluate the efficacy of ALVESCO 40, 80, and 160 mcg administered once daily for 24 weeks in 992 patients 2 to 6 years of age with persistent asthma. The primary efficacy endpoint was time to the first severe asthma exacerbation [defined as worsening of asthma which required treatment with systemic (including oral) steroids or any other asthma medication besides treatment medication and rescue medication] or lack of improvement, whichever occurred first. No statistically significant differences were observed for the individual comparisons of ALVESCO 40, 80, and 160 mcg to placebo. Results from this study did not establish efficacy of ALVESCO in patients 2 to 6 years of age.

The safety of ALVESCO was evaluated in 957 children between the ages of 4 and 11 and 747 children between the ages of 2 and 6 years of age who were treated with ALVESCO in the three controlled clinical studies, two open-label one-year safety extensions of the controlled clinical studies, and one open-label safety study. In the controlled studies, the distribution of adverse events in the ALVESCO and placebo groups was similar. This type of adverse events reported was similar to events reported in this patient population with other inhaled corticosteroids. The open-label safety studies in children 4 to 11 years of age compared the safety of ALVESCO in doses up to 160 mcg once daily with an orally inhaled corticosteroid comparator. The types of adverse events seen were similar to those seen in the 12-week controlled studies.

Studies in children under 2 years of age have not been conducted since the lack of efficacy observed in patients 2 to 11 years of age.

Controlled clinical studies have shown that orally inhaled corticosteroids may cause a reduction in growth velocity in pediatric patients. In these studies, the mean reduction in growth velocity was approximately one centimeter per year (range 0.3 to 1.8 cm per year) and appears to be related to dose and duration of exposure. This effect has been observed in the absence of laboratory evidence of hypothalamic-pituitary-adrenal (HPA) axis suppression, suggesting that growth velocity is a more sensitive indicator of systemic corticosteroid exposure in pediatric patients than some commonly used tests of HPA axis function. The long-term effects of this reduction in growth velocity associated with orally inhaled corticosteroids, including the impact on final adult height, are unknown. The potential for "catch up" growth following discontinuation of treatment with orally inhaled corticosteroids has not been adequately studied. The growth of pediatric patients receiving orally inhaled corticosteroids, including ALVESCO, should be monitored routinely (e.g., via stadiometry).

A 52-week, multi-center, double-blind, randomized, placebo-controlled, parallel-group study was conducted to assess the effect of orally inhaled ciclesonide on growth rate in 609 pediatric patients with mild persistent asthma, aged 5 to 8.5 years. Treatment groups included orally inhaled ciclesonide 40 mcg or 160 mcg or placebo given once daily. Growth was measured by stadiometer height during the baseline, treatment and follow-up periods. The primary comparison was the difference in growth rates between ciclesonide 40 mcg and 160 mcg and placebo groups. Conclusions cannot be drawn from this study because compliance could not be assured. There was no difference in efficacy measures between the placebo and the ALVESCO groups. Ciclesonide blood levels were also not measured during the one-year treatment period.

The potential growth effects of prolonged treatment with orally inhaled corticosteroids should be weighed against clinical benefits obtained and the availability of safe and effective noncorticosteroid treatment alternatives. To minimize the systemic effects of orally inhaled corticosteroids, including ALVESCO, each patient should be titrated to his/her lowest effective dose.

### 8.5 Geriatric Use

Clinical studies of ALVESCO did not include sufficient numbers of patients aged 65 years and older to determine whether they respond differently than younger patients. Other reported clinical experience has not identified differences in responses between the elderly and younger patients. In general, dose selection for an elderly patient should be cautious, usually starting at the low end of the dosing range reflecting the greater frequency of decreased hepatic, renal, or cardiac function and of concomitant disease or other drug therapy.

## 10 OVERDOSAGE

Chronic overdosage may result in signs/symptoms of hypercorticism [see Warnings and Precautions (5.5)]. ALVESCO was well tolerated following inhalation by healthy subjects of single doses of 2880 mcg. A single oral dose of up to 10 mg of ciclesonide in healthy subjects was well tolerated and serum cortisol levels were virtually unchanged in comparison with placebo. Ciclesonide blood levels were also not measured during the toxicity or severity.

The median lethal doses in mice and rats after single oral and intraperitoneal administration were > 2000 mg/kg and > 200 mg/kg, respectively. These doses are > 12000 and > 2500 times the maximum recommended daily inhalation dose in adults on a mg/m$^2$ basis.

## 11 DESCRIPTION

The active component of ALVESCO 80 mcg Inhalation Aerosol and ALVESCO 160 mcg Inhalation Aerosol is ciclesonide, a non-halogenated glucocorticoid having the chemical name pregna-1,4-diene-3,20-dione, 16,17-[[(R)-cyclohexylmethylene]bis(oxy)]-11-hydroxy-21-(2-methyl-1-oxopropoxy)-,[11β,16α]-. The empirical formula is $C_{32}H_{44}O_7$ and its molecular weight is 540.7. Its structural formula is as follows:

Ciclesonide is a white to yellow-white powder. It is soluble in dehydrated alcohol, acetone, dichloromethane, and chloroform.

ALVESCO 80 mcg Inhalation Aerosol and ALVESCO 160 mcg Inhalation Aerosol are pressurized, metered-dose aerosol units fitted with a dose indicator. ALVESCO is intended for oral inhalation only. Each unit contains a solution of ciclesonide in propellant HFA-134a (1,1,1,2 tetrafluoroethane) and ethanol. After priming, ALVESCO 80 mcg delivers 100 mcg from the valve and 80 mcg of ciclesonide from the actuator. ALVESCO 160 mcg delivers 200 mcg from the valve and 160 mcg of ciclesonide from the actuator. This product delivers 50 microliters (35.3 milligrams) of solution as a fine particle mist from the valve with each actuation. The actual amount of drug delivered to the lung may depend on patient factors, such as the coordination between the actuation of the device and inspiration through the delivery system. ALVESCO should be "primed" by actuating 3 times prior to using the first dose from a new canister or when the inhaler has not been used for more than 10 days. Avoid spraying in the eyes or face while priming ALVESCO.

## 12 CLINICAL PHARMACOLOGY

### 12.1 Mechanism of Action

Ciclesonide is a prodrug that is enzymatically hydrolyzed to a pharmacologically active metabolite, C21-desisobutyryl-ciclesonide (des-ciclesonide or RM1) following oral inhalation. Des-ciclesonide has anti-inflammatory activity with affinity for glucocorticoid receptors that is 120 times greater than the parent compound and 12 times greater than dexamethasone. The clinical significance of these findings is unknown.

The precise mechanisms of corticosteroid action in asthma are unknown. Inflammation is recognized as an important component in the pathogenesis of asthma. Corticosteroids have been shown to have a wide range of inhibitory activities against multiple cell types (e.g., mast cells, eosinophils, basophils, lymphocytes, macrophages, and neutrophils) and mediators (e.g., histamine, eicosanoids, leukotrienes, and cytokines) involved in the asthmatic response. These anti-inflammatory actions of corticosteroids may contribute to their efficacy in asthma. Though effective for the treatment of asthma, corticosteroids do not affect asthma symptoms immediately. Individual patients will experience a variable time to onset and degree of symptom relief. Maximum benefit may not be achieved for four weeks or longer after starting treatment. When corticosteroids are discontinued, asthma stability may persist for several days or longer.

### 12.2 Pharmacodynamics

The effect of ciclesonide by oral inhalation on the HPA axis was assessed in adults with mild asthma in a 28-day placebo-controlled study. Twenty-four hour urinary-free cortisol was assessed in a total of 59 adults who were randomized to 320 mcg or 640 mcg ALVESCO, a comparator corticosteroid, or placebo twice daily. At the end of 28 days of treatment, the mean (SE) change from baseline in 24-hr urinary-free cortisol was -8.69 (5.6) mcg/day, -4.01 (5.03) mcg/day, and -8.84 (5.02) mcg/day for the placebo, ALVESCO 640 mcg/day, and ALVESCO 1280 mcg/day, respectively. The difference from placebo for the change from baseline in 24-hr urinary-free cortisol was -4.7 mcg/day [95% CI: -10.58; 19.93] and -0.16 mcg/day [95% CI: -15.20; 14.89] for the 640 mcg/day or 1280 mcg/day treatments, respectively. The effects observed with the comparator corticosteroid validate the sensitivity of the study to assess the effect of ciclesonide on the HPA axis.

### 12.3 Pharmacokinetics

Absorption
Ciclesonide and des-ciclesonide have negligible oral bioavailability (both are less than 1%) due to low gastrointestinal absorption and high first-pass metabolism. Serum concentrations of ciclesonide and des-ciclesonide were measured and compared following oral inhalation of 1280 mcg ALVESCO and intravenous administration of 800 mcg ciclesonide. The absolute bioavailability of ciclesonide was 22% and the relative systemic exposure of des-ciclesonide was 63%. The mean $C_{max}$ for des-ciclesonide was 1.02 ng/mL (range 0.6–1.5 ng/mL) in asthmatic patients following a single dose of 1280 mcg by oral inhalation. The mean $C_{max}$ (0.369 ng/mL) and $AUC_{0-\infty}$ (2.18 ng·h/mL) of des-ciclesonide following multiple dose administration of ciclesonide 320 mcg once daily increased up to 26% compared to single dose administration.

Distribution
Following intravenous administration of 800 mcg of ciclesonide, the volumes of distribution of ciclesonide and des-ciclesonide was approximately 2.9 L/kg and 12.1 L/kg, respectively. The percentage of ciclesonide and des-ciclesonide bound to human plasma proteins averaged ≥ 99% each, with ≤ 1% of unbound drug detected in the systemic circulation. Des-ciclesonide is not significantly bound to human transcortin.

Metabolism
Ciclesonide is hydrolyzed to a biologically active metabolite, des-ciclesonide, by esterases. Des-ciclesonide undergoes further metabolism in the liver to additional metabolites mainly by the cytochrome P450 (CYP) 3A4 isozyme and to a lesser extent by CYP 2D6. The full range of potentially active metabolites of ciclesonide has not been characterized. After intravenous administration of $^{14}C$-ciclesonide, 19.3% of the resulting radioactivity in the plasma is accounted for by ciclesonide or des-ciclesonide; the remainder may be a result of other, as yet, unidentified multiple metabolites.

Elimination
Following intravenous administration of 800 mcg of ciclesonide, the clearances of ciclesonide and des-ciclesonide were high (approximately 152 L/hr and 228 L/hr, respectively). $^{14}C$-labeled ciclesonide was predominantly excreted via the feces after intravenous administration (66%) indicating that excretion through bile is the major route of elimination. Approximately 20% or less of des-ciclesonide was excreted in the urine. The mean half-life of ciclesonide and des-ciclesonide was 3.71 hours and 6 to 7 hours, respectively. $T_{max}$ of des-ciclesonide occurs at 1.04 hours following inhalation of ciclesonide.

Special Populations
Population pharmacokinetic analysis showed that characteristics of des-ciclesonide after oral inhalation of ciclesonide were not appreciably influenced by a variety of subject characteristics such as body weight, age, race, and gender.

Renal Insufficiency
Studies in renally-impaired patients were not conducted since renal excretion of des-ciclesonide is a minor route of elimination (≤ 20%).

Hepatic Insufficiency
Compared to healthy subjects, the systemic exposure of des-ciclesonide ($C_{max}$ and AUC) in patients with moderate to severe liver impairment increased in the range of 1.4 to 2.7 fold after 1280 mcg ex-actuator ciclesonide by oral inhalation. Dose adjustment in patients with liver impairment is not necessary.

Pediatric
In two clinical safety and efficacy studies conducted in patients 4 to 11 years of age with asthma, population pharmacokinetic samples were obtained in 53 patients for pharmacokinetic analysis. For these pediatric patients, treated with daily doses of 40, 80 or 160 mcg of ALVESCO, the median (min, max) $C_{max}$ values of des-ciclesonide were 41 pg/mL (not detectable, 146 pg/mL) (n=11), 113 pg/mL (35, 237 pg/mL) (n=13) and 128 pg/mL (12, 357 pg/mL) (n=14), respectively.

Drug-Drug Interactions
In a drug interaction study, co-administration of orally inhaled ciclesonide and oral ketoconazole, a potent inhibitor of cytochrome P450 3A4, increased the exposure (AUC) of ciclesonide and/or des-ciclesonide, by approximately 3.6-fold at steady state, while levels of ciclesonide remained unchanged [see Drug Interactions (7)].

In another single-dose drug interaction study, co-administration of orally inhaled ciclesonide and oral erythromycin, an inhibitor of cytochrome P450 3A4, had no effect on the pharmacokinetics of either ciclesonide and the active metabolite, des-ciclesonide, or erythromycin.

Based on in vitro studies in human liver microsomes, des-ciclesonide had no significant potential to inhibit or induce the metabolism of other drugs metabolized by CYP450 enzymes. The inhibitory potential of ciclesonide on CYP450 isoenzymes has not been studied. Based on in vitro human hepatocyte studies, ciclesonide and des-ciclesonide had no potential to induce major CYP450 isozymes.

In vitro studies demonstrated that the plasma protein binding of des-ciclesonide was not affected by warfarin or salicylic acid, indicating no potential for protein binding-based drug interactions.

In a population pharmacokinetic analysis including 98 subjects, co-administration of ALVESCO and albuterol had no effect on the pharmacokinetics of des-ciclesonide.

Concomitant administration of ALVESCO (640 mcg) and formoterol (24 mcg) did not change the pharmacokinetics of either des-ciclesonide or formoterol.

## 13 NONCLINICAL TOXICOLOGY

### 13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility

Ciclesonide demonstrated no carcinogenic potential in a study of oral doses up to 900 mcg/kg/day (approximately 8 times the maximum human daily inhalation dose based on mcg/m$^2$/day) in mice for 104 weeks and in a study of inhalation doses up to 193 mcg/kg/day (approximately 2 times the maximum human daily inhalation dose based on mcg/m$^2$/day) in rats for 104 weeks.

Ciclesonide was not mutagenic in an Ames test or in a forward mutation assay and was not clastogenic in a human lymphocyte assay or in an in vitro micronucleus test. However, ciclesonide was clastogenic in an in vivo mouse micronucleus test. The concurrent reference corticosteroid (dexamethasone) in this study showed similar findings.

No evidence of impairment of fertility was observed in a reproductive study conducted in male and female rats both dosed orally up to 900 mcg/kg/day (approximately 10 times the maximum human daily inhalation dose based on mcg/m$^2$/day).

## 14 CLINICAL STUDIES

### 14.1 Asthma

Adults and Adolescents 12 Years of Age and Older
ALVESCO was evaluated in six randomized, double-blind, placebo-controlled, parallel-group clinical trials of 12 to 16 weeks duration in 1211 patients 12 years of age and older with mild persistent to severe persistent asthma. The six trials included two trials in which patients were treated with ALVESCO administered once daily for 12 weeks, two trials in which patients were treated with ALVESCO twice daily for 12 weeks, and two trials in which patients were treated with ALVESCO twice daily for 16 weeks. These trials included a total of 2843 patients (1167 males and 1676

Count     2


Exhibit     B


ARS  36-734

1 page

order pursuant to an affidavit of the petitioner or intervenor or the afflicted person or the afflicted person's attorney that states the need for further evidentiary hearing and the reasons the hearing is necessary before the time set for the release of the afflicted person.

Added by Laws 1997, Ch. 184, § 9.

### § 36–733. Choice of physician and mode of treatment

This article does not allow a private or public facility or agency to restrict an afflicted person's right to choose a physician or to select the mode of treatment within the terms determined by the tuberculosis control officer or the local health officer as available and necessary to protect the health and safety of another person or the community.

Added by Laws 1997, Ch. 184, § 9.

### § 36–734. Treatment; exemption

**A.** An afflicted person is not required to undergo treatment under this article if that person depends exclusively on prayer or spiritual means for healing in accordance with the tenets and practices of a recognized church or religious denomination and claims an exemption on that ground. The requirements of this article regarding compulsory reporting of tuberculosis disease, exclusion from employment or school, monitoring, examination, isolation and quarantine apply if there is clear and convincing evidence that the person is an afflicted person and is a substantial danger to another person or the community.

**B.** An afflicted person is not required to submit to any medical treatment or to go to or be confined in any hospital or other medical institution, if the afflicted person can be safely examined, monitored, isolated or quarantined in the afflicted person's home or another place that is suitable to the health of the afflicted person, provides appropriate protection to other persons and the community and is approved by either the department, the tuberculosis control officer or a local health officer.

**C.** This section does not exempt a person from complying with applicable laws regarding sanitation.

Added by Laws 1997, Ch. 184, § 9.

### § 36–735. Notification of rights

**A.** An afflicted person who is ordered to receive court ordered examination, treatment, monitoring, isolation or quarantine pursuant to this article or, if a minor or incapacitated person, the afflicted person's parent or guardian shall be informed in writing of the following rights:

1. The right to appropriate care and treatment in accordance with accepted standards of medical practice and in an appropriate setting consistent with the protection of the afflicted person, the community and the public health.

2. The right not to receive unnecessary or excessive medication.

3. The right to refuse to participate in a research program.

4. A humane treatment environment that provides reasonable protection from harm and appropriate privacy for personal needs.

**B.** The statement of rights shall be in the afflicted person's primary language, if reasonably possible and, if applicable, shall be provided through means reasonably calculated to communicate with a hearing impaired or visually impaired person.

**C.** The director of an institution or program that provides care pursuant to this article is responsible for the following:

1. To make reasonable efforts to provide for the care, safety and detention of the afflicted person and adequate security to prevent the afflicted person from leaving the institution or program without its permission or from transmitting the communicable disease to others in the community.

2. The examination and evaluation by a licensed physician at least once every thirty days and as medically necessary.

3. Reports advising the tuberculosis control officer or the local health officer of the status of the afflicted person's disease and the person's compliance with any orders or treatment plan.

4. Adequate prior notification under the circumstances to the tuberculosis control officer or the local health officer of the pending discharge of the afflicted person.

Added by Laws 1997, Ch. 184, § 9.

### § 36–736. Administrative procedures act; judicial review of administrative procedures; exemption; appeals

**A.** Orders of the tuberculosis control officer or local health officer issued pursuant to this article and procedures prescribed by this article are exempt from title 41, chapter 6 [1] and title 12, chapter 7, article 6.[2]

**B.** An order of the superior court that imposes, denies, modifies, amends or rescinds court ordered examination, treatment, monitoring, isolation or

Count 2

Exhibit C

Grievance Exhaustion
pages 1-22

# GRIEVANCE RESPONSE

**DATE: May 29, 2019**
**INMATE NAME: Bearup, Patrick**
**ADC # and UNIT: 136226 Central**
**GRIEVANCE NUMBER: A01-071-019**
**ASPC FLORENCE**
**FROM: Trina Randall, Assistant Facility Health Administrator**

This letter is in response to the Formal Grievance dated 5/27/2019 and received by Corizon Medical Administration on 5/27/2019.

Summarization of inmate Complaint:
Patient is not wanting the annual Purified Protein Derivative (PPD) tests.

Description of action taken to investigate the complaint:
Review the patient medical record,
Review grievance information

Summary of Findings:
Per ADC Policy 11.02, "Communicable Disease and Infection Control", section 5.2, inmates cannot refuse annual PPD testing.

Decision:
Mr. Bearup,
  At this time, if you have any further follow up issues specific to this grievance, please follow up with an inmate letter to the ADON of your unit. This has been asked and answered in the previous grievance A01-046-019. At this time I find this matter RESOLVED and closed.

**\*Per Policy 802.05 1.2: The decision of the Contract Facility Health Administrator is final and constitutes exhaustion of all remedies within the Department. In accordance with current policy, this response is final, and constitutes exhaustion of all remedies within the Department.**

Thank you

Trina Randall
Assistant Facility Health Administrator

5/29/19
Date

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Inmate Grievance**

Note: You may appeal the Grievance Coordinator's decision to the Warden/Deputy Warden/Administrator by filing form 802-3, within 10 calendar days of receipt of this notice.

| RECEIVED BY | |
|---|---|
| CO III K. MCKNIGHT | |
| TITLE | |
| CO III | |
| BADGE NUMBER | DATE (mm/dd/yyyy) |
| 2216 | 4-24-19 |

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | DATE (mm/dd/yyyy) |
|---|---|---|
| Bearup, Patrick W. | 136226 | 4-22-19 |
| INSTITUTION/FACILITY | CASE NUMBER | |
| Central  A72 | A01-071-019 | |

TO: GRIEVANCE COORDINATOR

**Description of Grievance** (To be completed by the Inmate)

Nobody responded to my 3-22-19 informal (attached) - ADC and Corizon Staff violated ARS 36-734 which allows me to forego ALL TB Treatments, including P.P.D. testing. The Religious Land Use and Institutionalized Person Act was also violated as these employees refused my sincerely held religious belief, and least restrictive option (Exhibit C, C.1, and C.2) Therefore, the "evil intent" of staff was clearly present and therefore is claimable under cited law - ADC/Corizon cited policy, which does not supercede current law, therefore to force me, against my religious beliefs, to undergo TB treatments This issue deals with ADC Policy and Law, plus staff conduct, Therefore ADC must respond

Attached Informal, Exhibit A (2pgs) Exhibit B (9 pgs) Exhibits C, C.1, C.2

**Proposed Resolution** (What informal attempts have been made to resolve the problem? What action(s) would resolve the problem?)

To have Medical follow STATE LAW ARS 36-734 and not force me to do any PPD injections, and to have blood tests or x-rays done for TB monitoring

| Inmate's Signature | Date | Grievance Coordinator's Signature | Date |
|---|---|---|---|
| | 4-22-19 | | 5/27/19 |

**Action taken by Documentation of Resolution or Attempts at Resolution.**

Rec'd 5/27/19

Trina Randall
Assistant Facility Healthcare Administrator

| Staff Member's Signature | Badge Number | Date |
|---|---|---|
| | | |

DISTRIBUTION: INITIAL: White and Canary or Copies – Grievance Coordinator; Pink or Copy - Inmate
FINAL: White – Inmate; Canary – Grievance File

802-1
12/12/13

②

EXHIBIT C

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Informal Complaint Resolution

5-A-7

Complaints are limited to one page and one issue. Please print all information.

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | INSTITUTION/UNIT | DATE (mm/dd/yyyy) |
|---|---|---|---|
| Bearup, Patrick W. | 136226 | Central A72 | 1-20-19 |

| TO | LOCATION |
|---|---|
| AFHA | Corizon Medical |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

On 1-16-19 ADON Beckler responded to my inquiry concerning the yearly PPD Test. ARS § 36-734 provides exemptions for Tuberculosis treatment. I hold a sincerely held religious belief not to inject certain chemicals, viruses, etc into my body. I FULLY claim an exemption on religious grounds" as I use "spiritual means" to deal with this issue.

I do NOT have issues with needle size, as ADON Beckler somehow thought my issue was. I merely will not allow myself to be injected with Aplisol, or any other TB related fluid. I have provided a "least restrictive means" to allow Corizon to test me for inactive or active TB and that is a blood test. The Quantiferon TB gold blood test — F.D.A. approved in 2001 for TB testing.

To resolve this issue, Corizon will comply with my Federally protected religious rights established under R.L.U.I.P.A. and allow a TB test that does not infringe upon my sincerely held Religious beliefs. by forcing me to accept a NON-KOSHER injection.

Attached: 1-9-19 I/m letter to ADON Beckler, 1-16-19 ADON Beckler Response HNR dated 1-3-19

| INMATE SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
| | 1-20-19 |

Have you discussed this with institution staff? ☒ Yes ☐ No

If yes, give the staff member name: Beckler

(COPY) (Exhibit C.1)

**ARIZONA DEPARTMENT OF CORRECTIONS**

Inmate Letter

S-A-7

Requests are limited to one page and one issue. NO ATTACHMENTS PERMITTED. Please print all information.

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | INSTITUTION/UNIT | DATE (mm/dd/yyyy) |
|---|---|---|---|
| Beamp, Patrick W. | 138228 | Central AZ2 | 1-9-19 |

| To ADON D. Becker | Location Corizon Medical |
|---|---|

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

Maam, due to a sincerely held religious belief, I am requesting that instead of the P.P.D. injection of Aplisol or any similar test, that Corizon provide me with the Quantiferon TB gold blood test. This is an F.D.A. approved test, since 2001 and is more accurate than sub-dermal injections especially for people who take Corticosteroids, like myself.

This least restrictive means, for this test. Will help to resolve all my concerns over this topic. Please advise me as to a Plan of Action.

I also wrote an HNR, but it was returned, and I was told to write this.

Thankya

| INMATE SIGNATURE | DATE (mm/dd/yyyy) 1-9-19 |
|---|---|

Have You Discussed This With Institution Staff? ☑ Yes ☐ No

If yes, give the staff member's name: Nurse line

Distribution: Original – Master File
Copy - Inmate

916-1(e)
5/14/12

④

Exhibit C.2

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Health Needs Request (HNR)**

Date: _____
Time: _____
Initials: _____

## SECTION/SECCIÓN I

| INMATE NAME/NOMBRE (Last, First M.I.) (Apellido, Nombre, Inicial) | ADC NUMBER/NÚMERO DE ADC | DATE/FECHA (mm/dd/yyyy) |
|---|---|---|
| Bearup, Patrick M. | 138776 | 1-3-19 |

| CELL/BED NUMBER/CELDA/ NÚMERO DE CAMA | UNIT/UNIDAD | P.O. BOX/APARTADO POSTAL | INSTITUTION/INSTALACIÓN: ADC |
|---|---|---|---|
| 5-A-7 | Central | 8200 | Florence |

You are required to be truthful. Failure to be cooperative and any abuse of the health care system or its staff could cause a delay in delivery of care to you and others, and may result in disciplinary action. [Se le exige diga la verdad. La falta de cooperación y cualquier abuso del sistema del cuidado de la salud o del personal podría retrasar la asistencia de este cuidado para usted y para otros y puede dar lugar a una acción disciplinaria.]

## SECTION/SECCIÓN II

| AREA OF INTEREST (Check only one block below)/AREA DE INTERES (Marque Un Espacio Solamente) | ☐ Medical/Médico | ☐ Dental | ☐ FHA |
|---|---|---|---|

☐ Pharmacy/Farmacia ☐ Mental Health/Salud Mental ☐ Eyes/Ojos ☒ Other (specify)/Otros (especifique) TB Test

PLEASE PRINT! Describe your medical/dental treatment issue need in the space below. Be clear and specific. NO ADDED PAGES. [POR FAVOR, ESCRIBA EN IMPRENTA! Describa su tratamiento o necesidad médica/dental en el espacio de abajo. Describa claramente y sea específico. ¡NO USE MAS HOJAS!]

I noticed Corizon as to my Religious Objection to receiving a TB injection. Desiring, as a Post release measure, I request EARNESTLY the Quantiferon TB gold blood test to be done instead of an injection or Aerosals into my skin. The FMDA approved this test is used as a safer, more accurate TB test, such as Aplisol.

I understand that, per ARS 31-201.01, I will be charged a $4.00 Health Services fee (excluding exemptions granted by statute) for the visit that I am herein requesting. I further understand that by paying this fee I do not have the right to dictate treatment or who provides treatment. [Entiendo que de acuerdo con ARS 31-201.01 se me cobrará una cuota por el servicio médico de $4.00 por la cita que aquí estoy pidiendo (excluyendo las exenciones otorgadas por la ley). Además entiendo que al pagar esta cuota no tengo el derecho de imponer el tratamiento o quien lo proporcione.]

INMATE SIGNATURE/FIRMA DEL PRISIONERO

REMOVE THE GOLDENROD COPY AND PLACE THE REMAINDER IN THE HEALTH NEEDS REQUEST DROP BOX [SEPARE LA COPIA DE COLOR AMARILLO OBSCURO Y DEJE LAS DEMAS EN EL BUZON PETICION DE NECESIDADES MÉDICAS.]

## SECTION III/SECCIÓN III

| REFERRAL BY MEDICAL STAFF/REFERENCIA MEDICA | ☐ Medical/Médico | ☐ Dental | ☐ Pharmacy/Farmacia | ☐ FHA |
|---|---|---|---|---|

☐ Pharmacy/Farmacia ☐ Mental Health/Salud Mental ☐ Eyes/Ojos ☐ Other (specify)/Otros (especifique)

| STAFF SIGNATURE STAMP/FIRMA DEL EMPLEADO | DATE/FECHA (mm/dd/yyyy) | TIME/HORA |
|---|---|---|
| | | |

## SECTION/SECCIÓN IV

| PLAN OF ACTION/PLAN DE ACCION |
|---|
| |
| |
| |

| STAFF SIGNATURE STAMP/FIRMA DEL EMPLEADO | DATE/FECHA (mm/dd/yyyy) | TIME/HORA |
|---|---|---|
| | | |

*This document is a translation from original text written in English. This translation is unofficial and is not binding on this state or a political subdivision of this state. [Este documento es una traducción de texto original escrito en inglés. Esta traducción no es oficial y no compromete a este estado ni una subdivisión política de este estado.]*

Distribution/Distribución: White/Blanca – Health Unit/Unidad de Salud
Canary, Pink & Goldenrod – Inmate/Amarillo Canario, Rosa y Amarillo Obscur - Prisionero

1101-10ES
12/13/16

SECTION 4, HNR

To Whom It May Concern:

I hereby declare that, I, Patrick W. Bearup    , withhold my consent on Tuberculosis screening on the grounds that such testing is in violation of my United States of America Constitutional 1st Amendment Right to religious freedom. It would be a violation of my religious beliefs to knowingly contaminate the body with inorganic and/or organic substances, such as the mycoplasma antigens, that can cause injury, illness, or other harm to my well-being.

- The Tuberculin Purified Protein Derivative (Mantoux skin test). Tubersol™ determines that a person has been previously exposed to or had a previous infection by M. tuberculosis or a variety of non-tuberculosis bacteria. A positive reaction may also represent an allergic reaction to the components of the test. **It cannot tell whether a person has active tuberculosis disease.**

- Tubersol™ contains Tween 80™ as preservatives. A very recent study (December, 2005) discovered that Tween 80™, also known as polysorbate 80, can cause anaphylaxis, a potentially fatal reaction characterized by a sharp drop in blood pressure, hives, and breathing difficulties in persons previously exposed. Researchers concluded that the anaphylactic response was not a typical allergic response caused by histamines and IgE antibodies, but it was caused by a serious disruption that had occurred within the immune system. **REF:** Coors, Esther A, et. al. "Polysorbate 80 in medical products and nonimmunologic anaphylactoid reactions." <u>Annals of Allergy, Asthma and Immunology</u>. 95 (2005): 593-599.

I further assert the following:

- There is no tuberculosis epidemic in Florence, Arizona    [city] to warrant the mandate of such testing

- There is no tuberculosis crisis at the CB5 Central Unit   to warrant the mandate of such testing

- Symptoms commensurate with tuberculosis are known to be:

    1. Coughing up blood/ Chest infection

    2. Severe weight loss

    3. Night sweats

    4. Constant exhaustion

    5. Loss of appetite

I, Patrick W. Bearup have not exhibited any of these of symptoms. There is no reason to suspect that I may be infected with Tuberculosis.

The CDC reports the following persons represent these high-risk categories for contracting TB:

- Those coming into close contact with persons known or suspected to have TB

- Foreign-born persons from areas where TB is common: Asia, Africa, or Latin America

- Elderly persons (over 65 yrs.)

- Health care worker who serves high risk patients—AIDS, TB, indigent

- Healthcare worker in close contact with medically underserved, low income populations

- I am not an Intravenous Drug Abuser

I, Patrick W. Bearup do not fall into any of these categories. The chance that I may be infected with Tuberculosis is minute and thus, provides no basis to suspect I may be infected with Tuberculosis.

Overall, I am a healthy adult who poses no serious, infectious health threat to others. My overall good health has been confirmed during visits to my primary physician and other healthcare givers.

I have included these assertions to show that by not being tested for Tuberculosis, I pose no threat to the health and well-being of others here at
The Florence Central Unit.

Sincerely,

Notary Public:

Signature Date

4/13/18          AZ  Oct. 1, 2021

City, Maricopa          State My Commission expires

OFFICIAL SEAL
KAREN D STOWE
Notary Public - Arizona
MARICOPA COUNTY
My Commission Expires
OCTOBER 1, 2021

# APLISOL®
(Tuberculin Purified Protein Derivative, Diluted [Stabilized Solution])

**Diagnostic Antigen For Intradermal Injection Only**

## DESCRIPTION

Aplisol (tuberculin PPD, diluted) is a sterile aqueous solution of a purified protein fraction for intradermal administration as an aid in the diagnosis of tuberculosis. The solution is stabilized with polysorbate (Tween) 80, buffered with potassium and sodium phosphates and contains 0.25% phenol as a preservative.

This product is ready for immediate use without further dilution.

The purified protein fraction is isolated from culture media filtrates of a human strain of *Mycobacterium tuberculosis* by the method of F.B. Seibert.[1,2] Tuberculin PPD, diluted, is prepared from Tuberculin PPD which is clinically bioequivalent in potency to the standard PPD-S* (5 TU** per 0.1mL) of the U.S. Public Health Service, National Centers for Disease Control.
The potency of each lot of tuberculin PPD, diluted is determined in sensitized guinea pigs.

## CLINICAL PHARMACOLOGY

In the United States, the prevalence of *Mycobacterium tuberculosis* infection and active disease varies for different segments of the population; however, the risk for *M. tuberculosis* infection in the overall population is low. Tuberculosis (TB) case rates declined steadily for decades in the United States. However, in 1985 the TB case rate stabilized and subsequently increased through 1992, accompanied by a 14% increase in the TB mortality rate in 1988. This has been attributed to several complex social and medical factors, including the human immunodeficiency virus (HIV) epidemic, the occurrence of TB in foreign-born persons from countries that have a high prevalence of TB, the emergence of drug-resistant strains of TB, and the transmission of *M. tuberculosis* in congregate settings (e.g., health-care facilities, correctional facilities, drug-treatment centers, and homeless shelters). Because the overall risk of acquiring *M. tuberculosis* is low for the total U.S. population, the primary strategy for preventing and controlling TB in the United States is to minimize the risk of transmission by the early identification and treatment of patients who have active infectious TB, finding and screening persons who have been in contact with active infectious TB patients and screening high risk populations.

Tuberculin PPD is indicated as an aid in the detection of infection with *Mycobacterium tuberculosis*.[3,4] After a person becomes infected with mycobacteria, T lymphocytes proliferate and become sensitized. These sensitized T cells enter the bloodstream and circulate for months or years. This sensitization process occurs principally in the regional lymph nodes and may take 2–10 weeks to develop following infection. Once acquired, tuberculin sensitivity tends to persist, although it often wanes with time and advancing age. The injection of tuberculin into the skin stimulates the lymphocytes and activates the series of events leading to a delayed-type hypersensitivity (DTH) response. This response is called "delayed" because the reaction becomes evident hours after injection. Dermal reactivity involves vasodilation, edema, and the infiltration of lymphocytes, basophils, monocytes, and neutrophils into the site of antigen injection. Antigen-specific T lymphocytes proliferate and release lymphokines,[5] which mediate the accumulation of other cells at the site. The area of induration reflects DTH activity. In most tuberculin-sensitive individuals, the delayed hypersensitivity reaction is evident 5–6 hours after administration of a tuberculin skin test and is maximal 48–72 hours. In geriatric patients or in patients receiving a tuberculin skin test for the first time, the reaction may develop more slowly and may not be maximal until after 72 hours.[6,7] Because their immune systems are immature, many neonates and infants <6 weeks of age, who are infected with *M. tuberculosis*, do not react at all to tuberculin tests.[5]

Immediate erythematous or other hypersensitivity reactions to tuberculin or the constituents of the diluent may occur at the injection site.

A possible decrease in responsiveness to skin testing may occur in the presence of infections, viral infections (measles, mumps, chickenpox, HIV), live virus vaccinations (measles, mumps, rubella, oral polio, varicella, yellow fever), bacterial infections (typhoid fever, brucellosis, typhus, leprosy, pertussis, overwhelming tuberculosis, tuberculous pleurisy), fungal infections (South American blastomycosis), drugs (corticosteroids and other immunosuppressive agents), metabolic derangements (chronic renal failure), low protein states (severe protein depletion, afibrinogenemia), age (newborns, elderly patients with waned sensitivity), stress (surgery, burns, mental illness, graft-versus-host reactions), diseases affecting lymphoid organs (Hodgkin's disease, lymphoma, chronic leukemia, sarcoidosis) and malignancy (see **WARNINGS**).

Tuberculin skin-test results are also less reliable as CD4 counts decline in HIV infected individuals.[3]

The 5TU dose of Tuberculin PPD intradermally (Mantoux) is indicated as an aid in the detection of infection with *Mycobacterium tuberculosis*. Reactions to the Mantoux test are interpreted on the basis of a quantitative measurement of the response to a specific dose (5 TU PPD-S or equivalent) of Tuberculin PPD.[7]

To determine that the Tuberculin PPD is clinically bioequivalent in potency to standard 5TU PPD-S*, 3 dose-response studies were conducted in the following populations (1) persons with a history of bacteriologically confirmed TB; (2) healthy volunteers; and (3) volunteers with active or previously active nontuberculosis mycobacterial lung disease.

### INDICATIONS AND USAGE

Tuberculin PPD is indicated as an aid in the detection of infection with *Mycobacterium tuberculosis*. The standard tuberculin test employs the intradermal (Mantoux) test using a 5 TU dose of tuberculin PPD.[7] The 0.1 mL test dose of Aplisol (tuberculin PPD, diluted) is equivalent to the 5 TU dose which has been clinically utilized and standardized with PPD-S. Tuberculin skin testing is not contraindicated for persons who have been vaccinated with BCG and the skin-test results of such persons are used to support or exclude the diagnosis of *M. tuberculosis* infections.[4] HIV infection is a strong risk factor for the development of TB disease in persons having TB infection. All HIV-infected persons should receive a PPD-tuberculin skin test.[3]

### CONTRAINDICATIONS

Aplisol is contraindicated in patients with known hypersensitivity or allergy to Aplisol or any of its components. Aplisol should not be administered to persons who have previously experienced a severe reaction (e.g., vesiculation, ulceration, or necrosis) because of the severity of reactions that may occur at the test site.

### WARNINGS

Aplisol should not be administered to persons who previously experienced a severe reaction (e.g., vesiculation, ulceration, or necrosis) because of the severity of reactions that may occur at the test site (see **CONTRAINDICATIONS**).

Not all infected persons will have a delayed hypersensitivity reaction to a tuberculin test. A number of factors have been reported to cause a decreased ability to respond to the tuberculin test, such as the presence of infections, viral infections (measles, mumps, chickenpox, HIV), live virus vaccinations (measles, mumps, rubella and other live vaccines), bacterial infections (typhoid fever, brucellosis, typhus, leprosy, pertussis, overwhelming tuberculosis, tuberculous pleurisy), fungal infections (South American blastomycosis), drugs (corticosteroids and other immunosuppressive agents), metabolic derangements (chronic renal failure), low protein states (severe protein depletion, afibrinogenemia), age (newborns, elderly patients with waned sensitivity), stress (surgery, burns, mental illness, graft-versus-host reactions), diseases affecting lymphoid organs (Hodgkin's disease, lymphoma, chronic leukemia, sarcoidosis), and

malignancy.[7,8,9]

Any condition that impairs or attenuates cell mediated immunity potentially can cause a false negative reaction, including aging.[10,11]

Tuberculin skin test results are less reliable in HIV-infected individuals as CD4 counts decline (see **CLINICAL PHARMACOLOGY**).[3]

Avoid injecting tuberculin subcutaneously. If this occurs, no local reaction develops, but a general febrile reaction and/or acute inflammation around old tuberculous lesions may occur in highly sensitive individuals.

## PRECAUTIONS
### General

The predictive value of the tuberculin skin test depends on the prevalence of infection with *M. tuberculosis* and the relative prevalence of cross-reactions with nontuberculous mycobacteria.[9,12]

A separate, sterile, single-use disposable syringe and needle should be used for each individual patient to prevent possible transmission of serum hepatitis virus and other infectious agents from one person to another. Special care should be taken to ensure that the product is injected intradermally and not into a blood vessel.

Before administration of Aplisol, a review of the patient's history with respect to possible immediate-type hypersensitivity to the product, determination of previous use of Aplisol and the presence of any contraindication to the test should be made (see **CONTRAINDICATIONS**).

As with any biological product, epinephrine should be immediately available in case an anaphylactoid or acute hypersensitivity reaction occurs.

Failure to store and handle Aplisol as recommended may result in a loss of potency and inaccurate test results.[8,13]

Reactivity to the test may be depressed or suppressed for as long as 5–6 weeks in individuals following immunization with certain live viral vaccines, viral infections or discontinuation of corticosteroids or immunosuppressive agents.[8,9]

### Information to Patients

Patients should be instructed to report adverse events such as vesiculation, ulceration or necrosis which may occur at the test site in highly sensitive individuals. Patients should be informed that pain, pruritus and discomfort may occur at injection site.

Patients should be informed of the need to return to their physician or health care provider for the reading of the test and of the need to keep and maintain a personal immunization record.

### Drug Interactions

In patients who are receiving corticosteroids or immunosuppressive agents, reactivity to the test may be depressed or suppressed. This reduced reactivity may be present for as long as 5–6 weeks after discontinuation of therapy (see **PRECAUTIONS – General**).[9]

The reactivity to PPD may be temporarily depressed by certain live virus vaccines (measles, mumps, rubella, oral polio, yellow fever, and varicella). Therefore, if a tuberculin test is to be performed, it should be administered either before the live vaccine or given simultaneously, but at a separate site than the live vaccine, or testing should be postponed for 4–6 weeks.[9]

**Carcinogenesis, Mutagenesis, Impairment of Fertility**
No long term studies have been conducted in animals or in humans to evaluate carcinogenic or mutagenic potential or effects on fertility with Aplisol.

**Pregnancy**
**Teratogenic effects:** Pregnancy Category C. Animal reproduction studies have not been conducted with Aplisol. It is also not known whether Aplisol can cause fetal harm when administered to a pregnant woman or can affect the reproduction capacity. Aplisol should be given to a pregnant woman only if clearly needed. However, the risk of unrecognized tuberculosis and the postpartum contact between a mother with active disease and an infant leaves the infant in grave danger of tuberculosis and complications such as tuberculous meningitis. Although there have not been any reported adverse effects upon the fetus recognized as being due to tuberculosis skin testing, the prescribing physician will want to consider if the potential benefits outweigh the possible risks for performing the tuberculin test on a pregnant woman or a woman of childbearing age, particularly in certain high risk populations.

Tuberculin skin testing is considered valid and safe throughout pregnancy.[3]

**Geriatric Use**
Once acquired, tuberculin sensitivity tends to persist, although it often wanes with time and advancing age. In geriatric patients or in patients receiving a tuberculin skin test for the first time, the reaction may develop more slowly and may not be maximal until after 72 hours.[6,7] (see **CLINICAL PHARMACOLOGY**). Not all infected persons will have a delayed hypersensitivity reaction to a tuberculin test. A number of factors have been reported to cause a decreased ability to respond to the tuberculin test, such as elderly patients with waned sensitivity. Any condition that impairs or attenuates cell mediated immunity potentially can cause a false negative reaction, including aging[10,11] (see **WARNINGS**). An induration of >10 mm is classified as positive in all persons who do not meet any of the criteria listed under an induration of >5 mm, but who belong to one or more of the following groups at high risk for TB, including residents and employees of high risk congregate settings, such as nursing homes and other long-term facilities for the elderly.

The negative tuberculin skin test should never be used to exclude the possibility of active tuberculosis among person for whom the diagnosis is being considered (symptoms compatible with tuberculosis) (see **DOSAGE AND ADMINISTRATION-Interpretation of Tuberculin Reaction**).

**Pediatric Use**

Because their immune systems are immature, many neonates and infants <6 weeks of age, who are infected with *M. tuberculosis*, may not have a delayed hypersensitivity reaction to a tuberculin test (see **WARNINGS**). Older infants and children develop tuberculin sensitivity 3-6 weeks, and up to 3 months, after initial infection.[5,20] Infants and children who have been exposed to persons with active tuberculosis should be considered positive when reaction to the tuberculin skin test measures > 5 mm. Those children younger than 4 years of age who are exposed to persons at increased risk to acquire tuberculosis are considered positive when reaction measures >10 mm. Children with minimal risk exposure to tuberculosis would be considered positive when reaction measures >15 mm.[5,20] Other criteria for positive tuberculin reactions that are applicable to both pediatric and adult patients are provided in **DOSAGE AND ADMINISTRATION, Interpretation of Tuberculin Reaction**.

**ADVERSE REACTIONS**
In highly sensitive individuals, strongly positive reactions including vesiculation, ulceration or necrosis may occur at the test site. Cold packs or topical steroid preparations may be employed for symptomatic relief of the associated pain, pruritus and discomfort.

Strongly positive test reactions may result in scarring at the test site.

Local hypersensitivity reactions may occur at the injection site including erythema, pruritus, edema, urticaria and rash.

Systemic allergic reactions including anaphylaxis/anaphylactoid reactions have been reported to occur in association with the use of Aplisol. The reactions, including anaphylaxis, generally occurred within 24 hours of exposure and manifestations included rash, urticaria, edema/angioedema and pruritus.

To report **SUSPECTED ADVERSE REACTIONS**, contact JHP at 1-866-923-2547 or MEDWATCH at 888-INFO-FDA (1-888-463-6332) or http://www.fda.gov/medwatch/.

## DOSAGE AND ADMINISTRATION

**Aplisol vials should be inspected visually for both particulate matter and discoloration prior to administration and discarded if either is seen. Vials in use for more than 30 days should be discarded.**

The 0.1 mL dose of Aplisol (tuberculin PPD, diluted) is equivalent to the 5 tuberculin units (TU) dose of Tuberculin PPD, which is the standard strength used for intradermal Mantoux testing.

### Standard Method (Mantoux Test)
The Mantoux test is performed by **intradermally** injecting, on the volar aspect of the forearm, with a syringe and needle, exactly 0.1 mL of Aplisol. The result is read 48 to 72 hours later and **palpable induration only is considered in interpreting the test.** Induration is a hard, raised area with clearly defined margins at and around the injection site (see **Interpretation of Tuberculin Reaction**). Erythema may develop at the injection site but has no diagnostic value.
The standard test is performed as follows:
1. The site of the test is usually the volar or dorsal surface of the forearm about 4" below the elbow. Other skin sites may be used, but the volar surface of the forearm is preferred. The use of a skin area free of lesions and away from any veins is recommended.[7]
2. The skin at the injection site is cleansed with 70% alcohol and allowed to dry.
3. The test material is administered with a tuberculin syringe (0.5 or 1.0 mL) fitted with a short (1/4 to 1/2") 27 gauge needle.
4. A separate, sterile, single-use disposable syringe and needle should be used for each individual patient.
5. The diaphragm of the vial-stopper should be wiped with 70% alcohol.
6. The needle is inserted through the stopper diaphragm of the inverted vial. Exactly 0.1 mL is filled into the syringe with care being taken to exclude air bubbles and to maintain the lumen of the needle filled.
7. The point of the needle is inserted into the most superficial layers of the skin with the needle bevel pointed upward. As the **Tuberculin solution is injected, a pale bleb 6 to 10 mm in size (1/3") will rise over the point of the needle**. This is quickly absorbed and no dressing is required.
8. There may be a drop of blood when the needle is withdrawn. This is normal. Use a gauze pad and gently dab to remove the blood. Do not press down as this may squeeze out the tuberculin thereby disrupting the test.

In the event the injection is delivered subcutaneously (i.e., no bleb will form), or if a significant part of the dose leaks from the injection site, the test should be repeated immediately at another site at least 5 cm (2") removed from the initial injection site.

### Interpretation of Tuberculin Reaction
Readings of Mantoux reactions should be made by a trained health professional during the period from 48 to 72 hours after the injection. **Induration only should be considered in interpreting the test.** The diameter of induration should be measured transversely to the long axis of the forearm and recorded in millimeters. Erythema has no diagnostic value and should be disregarded. The presence and size of

necrosis and edema if present should be recorded although not used in the interpretation of the test. In the absence of induration, an area of erythema greater than 10 mm in diameter may indicate the injection was made too deeply and retesting is indicated. Find the margins of the induration by drawing the index or middle finger lightly across the reaction. The tip of a ballpoint pen pushed at a 45° angle toward the site of injection will also stop at the edges of induration.

The diameter of induration should be measured (preferable with a caliper) transversely to the long axis of the forearm and recorded in millimeters.

Erythema has no diagnostic value and should be disregarded. The absence of induration should be recorded as "0 mm" not "negative".

**Reactions should be interpreted as follows (Please refer to most recent guidelines):**

Based on current guidelines,[3,7,14,19] interpretation of reactions is as follows:

**Positive reactions:**

| Reaction ≥ 5 mm of induration | Reaction ≥ 10 mm of induration | Reaction ≥ 15 mm of induration |
|---|---|---|
| Human immunodeficiency virus (HIV)-positive persons | Recent immigrants (i.e., within the last 5 yr) from high prevalence countries | Persons with no risk factors for TB |
| Recent contacts of tuberculosis (TB) case patients | Injection drug users | |
| Fibrotic changes on chest radiograph consistent with prior TB | Residents and employees[†] of the following high-risk congregate settings: prisons and jails, nursing homes and other long-term facilities for the elderly, hospitals and other health care facilities, residential facilities for patients with acquired immunodeficiency syndrome (AIDS), and homeless shelters | |
| Patients with organ transplants and other immunosuppressed patients (receiving the equivalent of ≥ 15 mg/d of prednisone for 1 mo or more) [*] | Mycobacteriology laboratory personnel | |
| | Persons with the following clinical conditions that place them at high risk: silicosis, diabetes mellitus, chronic renal failure, some hematological disorders (e.g., leukemias and lymphomas), other specific malignancies (e.g., carcinoma of the head or neck and lung), weight loss of ≥ 10% of ideal body weight, gastrectomy, and jejunoileal bypass | |
| | Children younger than 4 yr of age or infants, children, and adolescents exposed to adults at high-risk | |

[*] Risk of TB in patients treated with corticosteroids increases with higher dose and longer duration.[*]
[†] For persons who are otherwise at low risk and are tested at the start of employment, a reaction of ≥ 15 mm induration is considered positive.


Skin test conversions
- For persons with negative skin test reactions who undergo repeat skin testing (e.g., health care workers), an increase in reaction size ≥ 10 mm within a period of 2 years should be considered a skin test conversion indicative of recent infection with *M. tuberculosis*.[19]
- In some individuals who have been infected with nontuberculous mycobacteria or have

undergone BCG vaccination, the skin test may show some degree of induration. For these individuals, a conversion to "positive" is defined as an increase in induration by 10 mm on subsequent tests.[7]

Healthcare facilities and other high-risk settings
- For health care workers and employees in other high-risk settings with no other risk factors for TB, a cut-off of 15 mm of induration (rather than 10 mm) on the tuberculin skin test should be used to define a positive baseline test at the time of initial employment.
- An increase of $\geq$10 mm in reaction size is generally accepted as a positive test result on subsequent testing unless the worker is a contact of a TB case or has HIV infection or is otherwise immunocompromised, in which case a result of $\geq$5 mm is considered positive.[21]

**Negative Reaction**
A negative reaction is an induration of less than 15 mm in persons with no risk factors for TB. This indicates a lack of hypersensitivity to tuberculoprotein and tuberculous infection is highly unlikely.[7]

It should be noted that reactivity to tuberculin may be depressed or suppressed for as long as 5–6 weeks by viral infections, live virus vaccines (i.e., measles, smallpox, polio, rubella and mumps), or after discontinuation of therapy with corticosteroids or immunosuppressive agents. Malnutrition may also have a similar effect (see **WARNINGS**). When of diagnostic importance, a negative test should be accepted as proof that hypersensitivity is absent only after normal reactivity to non-specific irritants has been demonstrated. A primary injection of tuberculin may possibly have a boosting effect on subsequent tuberculin reactions. A pediatric patient who is known to have been exposed to a person with tuberculosis must not be adjudged free of infection until that patient has a negative tuberculin reaction at least ten weeks after contact with tuberculous person has ceased.[17] Annual testing is generally recommended for pediatric patients in high risk populations, such as persons from countries with a high prevalence of tuberculosis and low-income groups.[18]

A positive tuberculin reaction does not necessarily signify the presence of active disease. Further diagnostic procedures (e.g., chest radiograph, sputum smear and/or culture examination) should be carried out before a diagnosis of tuberculosis is made. A small percentage of responders may not have been infected with *M. tuberculosis* but by some other mycobacterium. The negative tuberculin skin test should never be used to exclude the possibility of active tuberculosis among persons for whom the diagnosis is being considered (symptoms compatible with tuberculosis).

**Booster Effect and Two-Step Testing**
Infection of an individual with tubercle bacilli or other mycobacteria or BCG vaccination results in a delayed hypersensitivity response to tuberculin which is demonstrated by the skin test. The delayed hypersensitivity response may gradually wane over a period of years. If a person receives a tuberculin test at this time, a significant reaction may not be detected. However, the stimulus of the test may boost or increase the size of the reaction to a second test, sometimes causing an apparent conversion or development of sensitivity. This booster effect can be seen on a second test done one week after the initial stimulating test and can persist for a year, and perhaps longer. When routine periodic tuberculin testing of adults is done, initially two-stage testing should be considered to minimize the likelihood of interpreting a boosted reaction as a conversion.[7,15,18]

In this testing method, persons who have a negative initial skin test undergo a second tuberculin skin test 1-3 weeks after the first. Both tests should be read and recorded at 48 to 72 hours. Those individuals with a positive reaction on the second test should be considered to be previously infected, and those with a negative reaction on the second test should be considered uninfected. In these uninfected persons, a positive result on any future skin test should be interpreted as a skin test conversion.[7]

**HOW SUPPLIED**
Tuberculin PPD-Aplisol bioequivalent to 5 US units (TU) PPD-S per test dose (0.1 mL) is available in the

following presentations:
**NDC 42023-104-01 (Bio. 1525)**
1 mL (10 tests) – multiple dose vial
**NDC 42023-104-05 (Bio.1607)**
5 mL (50 tests) – multiple dose vial

This product is ready for use without further dilution.

**Storage**
**DO NOT FREEZE**
This product should be stored at 2°–8°C (36°–46°F) and protected from light.
**Vials in use more than 30 days should be discarded due to possible oxidation and degradation which may affect potency.**

**REFERENCES**

1. Seibert, F.B. The isolation and properties of the purified protein derivative of tuberculin: Am Rev Tuberc 1934; 30:713.
2. Seibert, F.B., and Glenn, J.T. Tuberculin purified protein derivative. Preparation and analyses of a large quantity for standard. Am Rev Tuberc 1941; 44:9-25.
3. Centers for Disease Control and Prevention (CDC). Essential components of a tuberculosis prevention and control program; and Screening for tuberculosis and tuberculosis infection in high-risk populations: recommendations of the Advisory Council for the Elimination of Tuberculosis. MMWR 1995;44(RR-11):1-34.
4. Centers for Disease Control and Prevention (CDC). Prevention and control of tuberculosis in correctional facilities: recommendations of the Advisory Council for the Elimination of Tuberculosis. MMWR 1996;45(RR-8):1-27.
5. Huebner RE, Shein MF, Bass JB. The Tuberculin Skin Test. *Clin Infect Dis* 1993;17:968–75.
6. AHFS Drug Information, 1997, 36:84 pp 1962–1968.
7. American Thoracic Society: Diagnostic Standards and classification of tuberculosis in Adults and Children. Am J Respir Crit Care Med 2000 Apr; 161:1376-95.
8. Am Rev Respir Dis 1985;886.
9. Brickman HF et.Al. The Timing of Tuberculin Tests in Relation to Immunization with Live Viral Vaccines. *Pediatrics* 1975;55:392.
10. Nakayama K, Monma M, Fukushima T, Ohrui T, Sasaki H. Tuberculin responses and risk of pneumonia in immobile elderly patients. Thorax 2000 Oct;55(10):867-9.
11. Fukushima T, Nakayama K, Monma M, Sekizawa K, Sasaki H. Depression of T helper-1 and the tuberculin responses in older bed-bound patients. J Am Geriatr Soc 1999 Feb;47(2):259-260.
12. American Academy of Pediatrics. Tuberculosis. In: Pickering LK, CJ Baker, Long SS, McMillan JA, eds. *Red Book*: 2006 Report of the Committee on Infectious Diseases, 27th ed. Elk Grove Village, IL: American Academy of Pediatrics 2006: 678-698.
13. Landi S, Held HR. Stability of a dilute solution of tuberculin purified derivative at extreme temperatures. *J Biol Stand* 1981; 9:195.
14. Centers For Disease Control and Prevention (CDC). Diagnosis of TB Infection and TB Disease, March 21,1996, Doc# 2250102.
15. Sewell, E.M., O'Hare, D., and Kendig, E.L., Jr. The Tuberculin Test. Pediatrics Vol. 54, No. 5, Nov.1974.
16. Centers for Disease Control and Prevention(CDC). Prevention and control of tuberculosis in facilities providing long-term care to the elderly. Recommendations of the Advisory Committee of Elimination of Tuberculosis (ACET): MMWR 1990, 39(RR-10): 7–20.
17. Centers for Disease Control and Prevention(CDC). The use of preventative therapy for tuberculosis infection in the United States, Recommendations of the Advisory Committee of Elimination of Tuberculosis (ACET), MMWR 1990 39(RR-8):9–12.
18. Centers for Disease Control and Prevention(CDC). Screening for tuberculosis and tuberculosis infection in high risk populations. Recommendations of the Advisory Committee of Elimination of

Tuberculosis (ACET), MMWR 1990, 39(RR-8): 1-7.

19  Centers for Disease Control and Prevention (CDC). Targeted Tuberculin Testing and Treatment of Latent Tuberculosis Infection. MMWR, 2000. 49(RR-6): 1-51.

20  Pediatrics: Screening for Tuberculosis in Infants and Children, 1994. 93: 131-134.

21  Centers for Disease Control and Prevention (CDC). Controlling Tuberculosis in the United States. MMWR 2005. 54 (RR-12).

**Rx only.**
Prescribing Information as of November 2013.

Manufactured and Distributed by:
JHP Pharmaceuticals, LLC
Rochester, MI 48307

3003008D


# ARIZONA DEPARTMENT OF CORRECTIONS
# INMATE GRIEVANCE APPEAL RESPONSE

| Log # | Inmate Name | ADC# | Case # | Complex | Unit |
|-------|-------------|------|--------|---------|------|
| 498 | Bearup | 136226 | A01099019 | Florence | Central |

In your grievance filed at Central Unit, you claim the Department does not provide a religious exemption to forego Purified Protein Derivative (PPD) testing. Furthermore you believe Department policy violates A.R.S. §36-734. Your resolution is for Department policy to be changed to reflect a religious exemption in reference to PPD testing and for alternative means for Tuberculosis testing to be used.

Your grievance has been reviewed at Central Office and the Deputy Warden's response is affirmed. You have provided no evidence to prove Department policy violates A.R.S. §36-734. There are no plans to amend Department policy or change the process for TB testing.

No further action is warranted in this matter.

cc: Warden, Florence Complex

RK

*R. Kepney*
**Appeals Officer**

*CRGlynn for*
**Charles L. Ryan, Director**

07/01/2019
**Date**

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance Appeal

Please type or print in black or blue ink. (To be completed by staff member initially receiving appeal)

The inmate may appeal the Warden's, Deputy Warden's or Administrator's decision to the Director by requesting the appeal on this form.

Received By: _COIII K. MCKNIGHT_
Title: _CO III_
Badge #: _2216_
Date: (mm/dd/yyyy) _6-17-19_

**Please Print**

| INMATE'S NAME (Last, First M.I.) (please print) | ADC NUMBER | DATE (mm/dd/yyyy) |
|---|---|---|
| Bearup, Patrick W. | 136226 | 6-15-19 |

| INSTITUTION | CASE NUMBER |
|---|---|
| ASPC-F-Central A72 | A01-099-019 |

TO: _Director Ryan_

I am appealing the decision of _Unit Deputy Warden_ for the following reasons:

The issue is not resolved; Arizona Law trumps ADC policy. A.R.S. § 36-734 allows me to refuse ANY TB related treatment. I have tried to do so, as I have a sincerely held religious belief to NOT receive treatment/testing. Staff cite DO1102 (S.2) as grounds to violate state Law. Therefore, they act with evil intent, as I clearly expressed my FAITH and Az Law. There is no excuse for these actions. Therefore, the Director needs to change ADC Policy. SEE resolutions on Grievance —

Attached: Informal, COIII Response, Grievance, DW Response

| INMATE'S SIGNATURE | DATE (mm/dd/yyyy) | GRIEVANCE COORDINATOR'S SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|---|---|
| | 6-15-19 | CO III 2538 | 6/18/19 |

| RESPONSE TO INMATE BY | LOCATION |
|---|---|
| | |

| STAFF SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
| | |

DISTRIBUTION: INITIAL: White & Canary – Grievance Coordinator
Pink – Inmate
FINAL: White – Inmate
Canary – Grievance File

802-3
12/12/13

(18)

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance Response

| Inmate Name (Last, First M.I.) | ADC Number | Institution/Facility | Case Number |
|---|---|---|---|
| BEARUP, PATRICK | 136226 | ASPC-F/Central | A01-099-019 |

In your grievance dated 006/04/19 and received by this office on 06/07/19, you are requesting a change in policy to allow religious exemption to be implemented into ADC policy 1102.5.2

I have reviewed your complaint. Policy can only be changed or modified at the director's level.

Based on the above information, this issue is resolved.

If you do not accept this decision, you may submit your appeal to the Complex Warden by filing a Grievance Appeal (form 802-3p), within 5 work days of receipt of this notice.

Jason Monson, Deputy Warden                                    Date

(19)

6-12-19

INITIAL DISTRIBUTION – Committee Recommendation – All copies to Grievance Advisory Committee
FINAL DISTRIBUTION – White and Pink – Inmate, Canary – Grievance File

INITIAL DESTRIBUTION - GF Supplement – White and Canary – Grievance Coordinator, Pink – Inmate
FINAL DISTRIBUTION White Inmate Canary – Grievance File

802-7P
2/14/00

## ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance

Note: You may appeal the Grievance Coordinator's decision to the Warden/Deputy Warden/Administrator by filing form 802-3, within 10 calendar days of receipt of this notice

| RECEIVED BY | |
|---|---|
| CO III K. MCKNIGHT | |
| TITLE | |
| CO III | |
| BADGE NUMBER | DATE (mm/dd/yyyy) |
| 2216 | 6-4-19 |

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | DATE (mm/dd/yyyy) |
|---|---|---|
| Bearup, Patrick W. | 136226 | 6-4-19 |

| INSTITUTION/FACILITY | CASE NUMBER |
|---|---|
| Central A72 | A01-099-019 |

TO: GRIEVANCE COORDINATOR

**Description of Grievance** (To be completed by the Inmate)

This is to ADOC NOT Corizon - Policy DO1102 (5.2) does not provide a Religious Exemption. This violates ARS § 36-734 which permits ANY person to forego ANY T.B. treatment, including P.P.D. testing. ADOC, through their medical vendor, therefore knowingly, willingly, and with evil intent has caused harm to myself. The CO III's response was unable to correct this civil rights violation - Please review informal for the full argument.

Attached: Informal, CO III Response

**Proposed Resolution** (What informal attempts have been made to resolve the problem? What action(s) would resolve the problem?)

My resolution is to have Policy changed to reflect a Religious Exemption for any injection including P.P.D., for ADOC to write a memo reflecting that NO ADOC employee or vendor shall force any injection into my body, and for ADOC to provide a Least Restricted Means for TB testing, either chest X-ray or blood test using the Quantiferon TB Gold blood test.

| Inmate's Signature | Date 6-4-19 | Grievance Coordinator's Signature CO III ___ Pierce | Date 6/7/19 |
|---|---|---|---|

Action taken by Documentation of Resolution or Attempts at Resolution.

| Staff Member's Signature | Badge Number | Date |
|---|---|---|

DISTRIBUTION: INITIAL: White and Canary or Copies – Grievance Coordinator; Pink or Copy - Inmate
FINAL: White – Inmate; Canary – Grievance File

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Informal Complaint Resolution

5-A-7

Complaints are limited to one page and one issue. Please print all information.

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | INSTITUTION/UNIT | | DATE (mm/dd/yyyy) |
|---|---|---|---|---|
| Bearup, Patrick W. | 136226 | Central | 1972 | 6-3-19 |

| TO CO III McKnight | LOCATION CB5 |
|---|---|

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

I submit this informal against ADOC - NOT Corizon - Policy DO1102 Communicable Disease and Infection Control, Section 5.2. allows an inmate to be forced to receive a P.P.D. injection. This policy is in direct violation of State Law, specifically A.R.S. § 36-734 which allows a Religious Exemption for ANY person to forego ANY Tuberculosis treatment!

For ADOC to force an inmate (myself as Plaintiff here) ~~refuses~~ to violate the Sincerely Held Religious Belief to NOT be submitted to P.P.D. Testing Now creates a liberty interest. Where ADOC policy is in conflict with State Law and The Religious Land Use and Institutionalized Person Act (RLUIPA).

Harm has been suffered, as twice now I have been subjected to FORCED injections by Corizon and ADOC staff. For staff and ADOC's vendor to knowingly and willingly act with "Evil intent", as I cited the Law, policy, and my Religious sincerely held belief! ADOC has thus condoned harming my body in an illegal fashion.

My resolution is for ADOC to correct Policy to reflect a Religious Exemption, for refusal of ANY injection, P.P.D. included, to also write a memo preventing ANY ADOC Vendor or employee to inject me with ANY substance without my written approval, and to provide a Least Restrictive Means for TB testing. (Either chest X-Ray or blood test using the Quantiferon TB Gold blood test.

Timeframes are NOT exhausted as this policy daily violates my civil rights!

| INMATE SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
| | 6-3-19 |

Have you discussed this with institution staff? ☑ Yes ☐ No

If yes, give the staff member name: Corizon Medical

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Informal Complaint Response

*For Distribution: Copy of Corresponding Inmate Informal Complaint Resolution must be attached to this response.*

| Inmate Name *(Last, First M.I.)* | ADC Number |
|---|---|
| BEARUP, PATRICK W. | 136226 |

| Institution/Unit |
|---|
| ASPC/FLORENCE-CENTRAL UNIT |

| From | Location |
|---|---|
| COIII K. McKnight | CB5 Programs |

This is in response to your Informal Complaint dated 6/3/19 regarding P.P.D. testing. This is an issue that has been addressed with you in the past by Corizon. I am unable to resolve your issue at this level. A grievance form is attached should you want to pursue it further.

End of response.

| Staff Signature | Date |
|---|---|
| Co III K. McKnight | 6-3-19 |

Distribution:  Original - Inmate
         Copy – Grievance Coordinator File



802-12(e)
12/19/12

## Count 2

## Exhibit D

Quantiferon TB gold blood test

December 28, 2009 Blog post

pages 1-5

Search Answers    Search Web     🔒 Sign in   ✉ Mail   ⚙

Details      Submit


Healthier skin. Healthier us?™   Dial



SAVE NOW    Available at Walmart ✦

All Categories
Arts & Humanities
Beauty & Style
Business & Finance
Cars & Transportation
Computers & Internet
Consumer Electronics
Dining Out
Education & Reference
Entertainment & Music
Environment
Family & Relationships
Food & Drink
Games & Recreation
**Health**
Home & Garden
Local Businesses
News & Events
Pets
Politics & Government
Pregnancy & Parenting
Science & Mathematics
Social Science
Society & Culture
Sports
Travel
Yahoo Products

International
About

Health    General Health Care    Other - General Health Care



# What alternatives are there to the TB skin test?

I understand that Asian babies frequently produce false positives, resulting in a lot of hassle and extra tests and follow-up visits. With that in mind, I am looking for an alternative to the TB skin test to avoid a problem before it springs up.

1 following     3 answers

Answers                 Relevance



Best Answer: I've never heard of Asian babies in general producing false negatives (which of course doesn't mean it's not possible). What I HAVE heard of is people from Asian countries - China for certain - having been immunized against TB. Once you've been exposed to the bacterium that causes the disease or have received the immunization, you'll generate a positive result to the skin test. This is usually followed up by antibiotics and chest x-rays. If you haven't had the immunization and haven't been exposed to the bacterium, then you shouldn't generate a positive result.

So basically, as long as the baby hasn't been immunized against TB, you shouldn't have to worry about a false positive. If they have been immunized, then yes, they should generate a positive result to the skin test for the rest of their lives unless their immune system stops working. You should be able to explain to the baby's doctor that the baby was immunized; they'll probably want to check once to make sure the baby doesn't actually have TB, and then hopefully they'll just keep that info on record. And if you're curious, I was told that the USA doesn't use the TB vaccine very often because the incidence of TB is lower here.

Source(s):
http://health.rutgers.edu/immunizations/...

raspberrymelomel · 1 decade ago

0     0                    Comment



The Quest for TB Test Alternative
December 28, 2009
By oksana
I'm happy to report that my quest for TB shot (aka skin test) alternative has been a success. I have found a safe and a lot less harmful blood test available as of 2001 for anyone who asks, but it wasn't easy. And you have to ask for it.

The name of this test is Quantiferon TB gold blood test, and, unlike the TB skin test where TB bacteria is injected under your skin along with highly toxic chemical phenol (and god knows what else), the blood test experiments are done outside your body. All you need to do is draw blood, which, however unpleasant, is much safer.

Unfortunately, not all doctors know about this test as they have been conditioned to refer anyone seeking TB test to the TB skin test (aka the injection).

### Related Questions

Question about TB test at 9month check up?

Tb test led to bcg vaccine because of no immunity.?

Alternatives to TB X-Ray screening? (repeated x-ray-> develop cancer-> week ImmSys-> latent tb becomes active)?

Positive TB test. skew?????????????????...

TB Test After Live Vaccine?

### Answer Questions

Does IV drips have calories?

Can you use an inhaler if you have not been diagnosed with asthma but just breathless?

Is it okay to take other meds while on mantoux test?

Why not able to stop caffeine?

### Trending

What'll taking 9 Tylenols at once result in?
11 answers

Is buying calcium enriched milk like bone insurance?
10 answers

Why don't people think emotional abuse is as valid as physical abuse?
12 answers

Is this hygienic?
9 answers

Drank Hydrochloric Acid and now I feel bad?
7 answers

Is anyone else just as insomniac as I am and happens to be awake at this time?
7 answers

Terms   Privacy   AdChoices   RSS

I have visited a Qwick Health clinic in San Mateo, CA and the doctor there didn't mention anything about the blood test. He was trying to convince me that TB shot is ordinary and there is really nothing else I could do to determine whether or not I have tuberculosis. Maybe the Xrays?

I called the South San Francisco Health Center and again, the nurse on the phone told me that there is NO TB Blood test.

It was the UCSF medical school who told me about it. After a little bit of research I found that the Quantiferon TB gold blood test has been approved by FDA in 2001 and is "A much safer, more accurate, quicker, and convenient blood test."[Child Health Guide 2005].

So I called the Seton Hospital Lab and asked if they offered this test. The answer was yes, but I needed to be referred by a doctor. When I went to a Rotto Care clinic operated in the same building as Seton Hospital to get the referral, I was told again, there isn't such a test.

I insisted that they call the lab and ask for it. The nurse dialed the number and with a look of surprise on her face, hung up the phone and said "ok then, you have found yourself a neat little test".

Yes I did.

And now you know about it too. Take your child to do this test instead. Please spread the word.

Dec. 10. 2012: Also, I recently found a way to order and pay for your TB blood test online!! Works in most states for $149. Check out https://www.accesalabs.com/tb

jina · 5 years ago

1           0                                    Comment

 The only alternative I know of is a chest x-ray.

trippple   1 decade ago

0           0                                    Comment

# ⊞ Centurion™

**Printed from Krames Online:**
http://centurionmanagedcare.kramesonline.com/3,S,89229

Close Window

## *Tuberculosis (TB)*

Tuberculosis (TB) is a serious disease caused by bacteria that spread from person to person through the air. Most often, TB infects the lungs. But it can also affect other parts of the body such aslymph glands, the brain, kidneys and spine. TB is a common cause of death worldwide. Here is more information about TB, how it is treated, and ways to help prevent its spread.



Droplets with
TB germs

Lungs

**TB germs spread through the air when someone with the active form of TB coughs or sneezes.**

## What are the risk factors for TB?

Anyone can get TB. But your risk is greatest if you:

- Have an immune system weakened by medicinessuch as steroids or a disease such as HIV infection

- Have close contact with someone who has untreated active TB of the lungs

- Are older

- Live or work in a residential facility, such as a shelter, nursing home, or prison

- Travel to or come from a country where TB is common

## How does TB spread?

TB germs (bacteria) are released into the air when someone with the active form of lung TB coughs or sneezes. The bacteria spread easily, especially in crowded places with poor airflow. The longer you breathe these germs, the more likely you are to become infected.

## What are the symptoms of TB?

There are 2 types of TB: inactive (also called latent TB infection) and active (also called TB disease).

### Inactive TB (latent TB infection)

If you have been diagnosed with inactive TB, it means you:

- Have live TB bacteria in your lungs, but the germs have been sealed off, much like a scab covers a wound. As a result, you don't have symptoms or feel sick. The only way to know you have inactive TB is with a TB test.

- Can't spread the infection to others

- Often need medicine to keep the infection from becoming active at some future time

### Active TB (TB disease)

If you have been diagnosed with active TB, it means you:

- Have symptoms of TB such as a lasting cough, phlegm, tiredness (fatigue), fever, night sweats, swollen glands, weight loss or other symptoms from the part of the body affected. You are likely to feel very sick.

- Can spread the infection to others if your active TB affects the lungs or throat.

- Must take medicine to help cure the disease. Treatment takes at least 6 months. TB is sometimes hard to cure.

## How is TB diagnosed?

Several tests are used to help find TB infection:

- **Skin test (PPD).** A testing solution is placed just under the skin on your arm. This is done tosee if there is a reaction (such as a hard, red bump). You will need to return to the office in 2 or 3 days to have your arm checked. Be sure to keep the appointment. You will learn the test results during this visit.

- **Blood test.** A small amount of blood is drawn and sent to a lab for testing. Your healthcare provider can tell you if this test is offered in your area.

- **Other tests.** If you have TB infection, other tests, such as a chest X-ray, are needed to learn if the infection is active. Your provider may also take a sample of the mucus that comes up when you cough (sputum). Or the provider may do a biopsy of a swollen gland or other body part. The sample is sent to a lab and tested for TB bacteria. Knowing the type of bacteria causing your illness helps your provider choose the right medicine to treat the disease.

## What do the test results mean?

- A negative result often means that your body is free of TB bacteria. Sometimes the test can be negative, even in someone with TB infection or active TB.

- A positive result means you have been exposed to the germs that cause TB. You may have an inactive or active infection. You will need further evaluation.

## How is TB treated?

- Both inactive and active TB are treated with medicines. If you have active TB, you will be prescribed more medicines for a longer time.

- You will likely begin feeling better shortly after starting treatment. But keep taking all the medicine you have been prescribed. This is the only way to cure the disease. Not taking all the medicine means you won't get well and can continue to spread TB germs to others.

- Sometimes TB is drug-resistant. This means it doesn't respond to 1 or more of the usual medicines for TB. Resistant TB is harder to cure. Itrequires different medicines and often longer treatment.

## What is DOT?

During treatment, you may be offered or be required to take part in a program called DOT (directly observed therapy). In this program, a nurse or healthcare worker supervises your treatment. This is a standard approach. It makes it easier to manage



medicines, watch for any side effects, and make sure the medicines are working.

## During treatment for TB

- Take all the medicine as directed, even when you start feeling better. You will take the medicine for 6 months or longer. Sticking to this schedule takes patience. But stopping treatment early means your symptoms may come back. It may also lead to drug-resistant TB.

-

- Check with your healthcare provider before using any over-the-counter (OTC) medicines that haven't been prescribed. OTCs can interact with your prescription medicines

- If you are taking birth control pills, you may need to use an additional backup method of birth control. Some TB medicines may make the pill less effective.

- You might need to limit your activity to avoid fatigue.

- Keep your medical appointments. You will need to be checked often to make sure that your medicine is working and you are getting better.

## How family and friends can help

TB is a serious illness that takes a long time to cure. If you have a family member or friend with TB, you can help by reminding your loved one to:

- Take TB medicines at the same time every day (they're best taken with water, milk, or juice 30 minutes before meals or at bedtime)

- Keep all follow-up appointments (you can help by driving or arranging for a ride)

- Get plenty of rest

- Eat healthy meals

## Preventing the spread of TB

If you have active TB of the lungs or throat, you should:

- Ask family, friends, and the people you work with to get tested. Active TB can spread to other people.

- Don't have close contact with others until your healthcare provider says it's OK.

- Wash your hands often, especially after coughing. Use soap and water and scrub your hands for at least 15 to 30 seconds.

- Use a tissue to cover your mouth when you cough. If you don't have a tissue, cough into your elbow, not your hand. Wash your hands after you cough or sneeze.

- Wear a mask, if you have been told to do so, when you go out in public or visit your healthcare provider.

- Use a plastic bag to throw away old tissues and other supplies.

## When to call the healthcare provider

Call your healthcare provider right away if you have any of the following:

- A fever of 100.4°F (38°C) or higher, or as directed by your provider

- Increased coughing or coughing up blood

- Chest pain or shortness of breath

- Worsening or recurring night sweats

- Trouble breathing

Also call your healthcare provider if you are taking TB medicine and think you are having side effects. These include skin rash, yellowing of the eyes, or stomach problems.

© 2000-2019 The StayWell Company, LLC. 800 Township Line Road, Yardley, PA 19067. All rights reserved. This information is not intended as a substitute for professional medical care. Always follow your healthcare professional's instructions.

Count ___2___

Exhibit ___E___

Aplisol Side Effects

pages 1-2



# Aplisol Side Effects

**Generic Name:** *tuberculin purified protein derivative*

> **Note:** This document contains side effect information about tuberculin purified protein derivative. Some of the dosage forms listed on this page *may not* apply to the brand name Aplisol.

*Applies to tuberculin purified protein derivative: intradermal solution*

Along with its needed effects, tuberculin purified protein derivative (the active ingredient contained in Aplisol) may cause some unwanted effects. Although not all of these side effects may occur, if they do occur they may need medical attention.

*Check with your doctor or nurse immediately* if any of the following side effects occur while taking tuberculin purified protein derivative:

## Incidence Not Known

- Bleeding at the injection site (occurring up to 3 days after the skin test)
- blistering, crusting, or scabbing at the injection site
- cough
- deep, dark purple bruise at the injection site (occurring up to 3 days after the skin test)
- difficult or labored breathing
- dizziness
- fainting
- fast heartbeat
- fever
- hard lump at the injection site
- hives
- itching, pain, redness, or swelling at the injection site
- large, hive-like swelling on the face, eyelids, lips, tongue, throat, hands, legs, feet, or sex organs


*WebMD*

| HEALTH A-Z | DRUGS & SUPPLEMENTS | LIVING HEALTHY | FAMILY & PREGNANCY | NEWS & EXPERTS |

Search


ADVERTISEMENT
Looking for Answers?
● 129 Doctors online
Ask a Doctor »

Drugs & Medications > Aplisol Vial

# Aplisol Vial Side Effects by Likelihood and Severity

## INFREQUENT side effects

If experienced, these tend to have a Less Severe expression (!)

- Itching
- Pain
- Signs And Symptoms At Injection Site

## RARE side effects

If experienced, these tend to have a Severe expression (!)

- Dead Skin
- Giant Hives
- Hives
- Life Threatening Allergic Reaction
- Rash
- Skin Ulcer
- Trouble Breathing

If experienced, these tend to have a Less Severe expression (!)

- Abnormally High-Pitched Breathing Sound
- Fever

**Full Drug Information >**

Selected from data included with permission and copyrighted by First Databank, Inc. This copyrighted material has been downloaded from a licensed data provider and is not for distribution, expect as may be authorized by the applicable terms of use.

**CONDITIONS OF USE:** The information in this database is intended to supplement, not substitute for, the expertise and judgment of healthcare professionals. The information is not intended to cover all possible uses, directions, precautions, drug interactions or adverse effects, nor should it be construed to indicate that use of a particular drug is safe, appropriate or effective for you or anyone else. A healthcare

## TODAY ON WEBMD


**Medications That Make You Tired**
Common culprits and what you can do.


**Pharmacy and Medication Tips**
Things to remember when you fill your prescription.


**Medication Side Effects**
Tips for dealing with them.


**Reading Medicine Labels**
How to make sense of them.

General Practitioners in
Mesa, AZ

**Gene M.. Winfield, DO**
Tempe, AZ 85282

**Gale . Barr**
Mesa, AZ 85202

More General Practitioners

Count     2


Exhibit     F

P.P.D. Test Results 2019
1 page

Ordered Date: 03/22/2019      Time: 12:56:00

Encounter Type: Nurse - PPD Administration

Location: ASPC-F CENTRAL D/RW [A72]      Staff: Moore, Tracey, LPN

Ordering Practitioner*:

---

● Formulary   ○ Non-Formulary

Lab Test Ordered*: PPD [PPD]

Priority*: PPD(Admnster;Resits-72h)

Lab Schedule Date*:

Fasting*: No

Recurring Frequency*: 365 days (prior to 1 year clinic)

Order Number:

---

Reason: Annual Test      Body Location: Left Forearm

Manufacturer: PAR Pharmaceuticals      Solution: Tubersol

Lot #: 316433

Test Location: ASPC-F CENTRAL D/RW [A72]

Measurement: 0      Result Read: 03/24/2019      Time: 15:06:01

Result Read By: Winfield, Jesse      PPD Test Result: Negative

**Lab Test Results**

| Observation Code | Result | Unit | Abnormal Flag | Reference | Result Status | Analyze |
|---|---|---|---|---|---|---|
| | | | No Rows Found | | | |

**Scanned Documents/Photos**

| Document Type | Date Scanned | Title | Source | Privacy Level |
|---|---|---|---|---|
| | No Rows Found | | | |

**Standard Forms**

| Type | Staff | Date | Time |
|---|---|---|---|
| | No Rows Found | | |

**Results Comments**

None

**Results Review**

Reviewed Date:      Time:

Review Staff:

Inmate Notice:

**Review Notes**

None

---

Status: Completed      As of Date*: 03/24/2019      [ Status History ]

[ Prepare To Update ]      [ Prior Page ]

Show Last Updated Information

①

Count 3

Exhibit A

Publication Review Notice

Pages 1-3

# ARIZONA DEPARTMENT OF CORRECTIONS
# ARIZONA STATE PRISON COMPLEX-FLORENCE
# COMPLEX OPERATIONS

## MEMORANDUM

## <u>PHOTO REVIEW NOTICE</u>

**To:**       **BEARUP, P. 136226_5-B-20**

**From:**    Florence Complex Mail Room

**Date:**    **04/10/2018**

**Subject:**  Unauthorized Photos, D.O. 914, 914.07

**Reference:**  136226.1.01-3   ◯ COMPLETE

You have received personal photographs via the U.S. Mail that have been deemed unauthorized by the Office of Publication Review (OPR) under the provisions of Department Order 914, 914.07. These photographs were received from:

M. JENSEN
7454 E. CAROL CIR
MESA, AZ 85208
ON CERTIFIED LOG: 70180360000097266751

The total numbers of photographs being held at the Florence Complex Mail Room are- **3 PRINTED SHEETS** 6PHOTOS ON SHEETS

Per Department Order 914 you have thirty (30) calendar days to request an appeal in writing to the Departmental Office of Publication Review in Central Office through the Florence Complex mail room. Should you choose the appeal process the Central Office Publication Review, staff shall have thirty (30) days from the date of your request to complete the appeal. The Central Office Publication Review staff's decision is FINAL, and exhausts all remedies or appeals per D.O. 914. There is no Deputy Director appeal. Should the Central Office OPR uphold the initial decision you will be notified in writing via form 914-06; OPR Notice of Result and the photos will be sent to your unit property staff as contraband, per D.O. 909.

Should the initial decision be overturned by Central Office OPR then your photos will be issued to you upon the final appeal decision. The photos are not to be considered as contraband until thirty (30) days from the date of this memo with no response from you or upon the FINAL appeal decision by the Central Office OPR.


| REVIEW DATE *(mm/dd/yyyy)* | PUBLICATION TITLE |
|---|---|
| 04/10/2018 | PHOTOS |

| ISBN OR VOL./N: | PUBLICATION DATE *(mm/dd/yyyy)* |
|---|---|
| 136226.1.01-3  BEARUP, P. | |

The publication described above has been reviewed per Department Order (DO) 914, Inmate Mail. This publication will be:

☐ **Allowed**   ☒ **Excluded** for the reasons marked by an "X" in the sections below. Refer to DO 914, Inmate Mail, Section 914.07 for a complete explanation.

| X | Section # | Description | X | Section # | Description | X | Section # | Description |
|---|---|---|---|---|---|---|---|---|
| ☐ | 1.1 | Detrimental to the Safe, Secure, and Orderly Operation of the facility | ☐ | 1.2.6 | Hands, Feet, or Head as Weapons/Fighting Techniques/Self-Defense | ☒ | 1.2.17 | Encourage Sexual or Hostile Behaviors |
| ☐ | 1.2.1 | Nudity | ☐ | 1.2.7 | Promotion/Instructions for Brewing Alcohol, Manufacturing/Cultivation of Drugs, Narcotics, Poisons | ☐ | 1.2.18 | Medical Publications |
| ☐ | 1.2.2.1 | Contact with Unclothed Genitals, Pubic Area, Buttocks, Female Breast | ☐ | 1.2.8 | Promotes Superiority of One Group Over Another/Promotes Racism/Degradation | ☐ | 1.2.19 | Canine Search/Scent Procedures |
| ☐ | 1.2.2.2 | Sadomasochistic Abuse | ☐ | 1.2.9 | Sale, Manufacture, Concealment, or Construction of Weapons | ☐ | 1.2.20 | Safe, Secure, and Orderly Operation of the Institution |
| ☐ | 1.2.2.3 | Sexual Intercourse, Fellatio, Cunnilingus, Bestiality or Sodomy | ☐ | 1.2.10 | Detailed Descriptions of Computers, Communications Systems, or Electronics | ☐ | 1.3.1 | Three-Way Calling Services |
| ☐ | 1.2.2.4 | Masturbation, Lewd Exhibition | ☐ | 1.2.11 | Promote or Instruct on Identify Theft | ☐ | 1.3.2 | Pen Pal Services |
| ☐ | 1.2.2.5 | Incestuous Sexual Activity | ☐ | 1.2.12 | Methods of Escape and/or Eluding Capture | ☐ | 1.3.3 | Purchase of Products or Services with Postage Stamps |
| ☐ | 1.2.2.6 | Sexual Activity with Unwilling Participant or Children | ☐ | 1.2.13 | Survival Skills | ☐ | 1.3.4 | Purchase of Products That Violate Policy |
| ☐ | 1.2.3 | Incite, Aid, Abet Riots, Work Stoppages, Means of Resistance | ☐ | 1.2.14 | Tattoos and/or Skins Modification | ☐ | 1.3.5 | Conducting a Business While Incarcerated |
| ☐ | 1.2.4 | Street Gangs/STG | ☐ | 1.2.15 | Cipher/Code | | | |
| ☐ | 1.2.5 | Function of Locks and/or Security Devices | ☐ | 1.2.16 | Promote Acts of Violence | Offending Page(s) | | |

**Notes to Inmates:**

- To appeal this decision, you must send an Inmate Letter, Form 916-1, to your Complex/Unit Publication Review staff within 30 calendar days of receiving this notice. DO NOT send the request directly to the Office of Publication Review.

- If you request an appeal, the Office of Publication Review may decide to allow the publication by removing or redacting unauthorized material.

- You should contact Complex/Unit Publication Review staff six to eight weeks prior to your scheduled release date to request any publications being held by either the Complex/Unit or Office of Publication Review.

**ELECTRONICALLY SENT**   

_____

Original Signature on File

Requests are limited to one page and one issue. NO ATTACHMENTS PERMITTED. Please print all information.

5-B-20

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | INSTITUTION/UNIT | DATE (mm/dd/yyyy) |
|---|---|---|---|
| Bearup, Patrick W. | 136226 | Central AZ2 | 4-10-18 |

| To Dept. Office of Publication Review | Location Florence Complex Mailroom |
|---|---|

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

I hereby appeal Ref. # 136226.1.01-3⁵ illegal seizure and 1st Amendment censorship of my wife's art and photography. In the event that O.P.R. denies this appeal. The names of staff involved in the decision and the EXACT reason for denial is requested, as my next response will be to have the courts review this process of censorship of married couples.

Thank you

(c.c. file)

| INMATE SIGNATURE | DATE (mm/dd/yyyy) 4-10-18 |
|---|---|

| Have You Discussed This With Institution Staff? ☐ Yes ☒ No |
|---|
| If yes, give the staff member's name: |

RECEIVED APR 2 3 2018

Count    3


Exhibit    B


Diane Miller Exclusion
1 page



# ARIZONA DEPARTMENT OF CORRECTIONS

## Office of Publication Review – Appeal Decision

| PUBLICATION INFORMATION | |
| --- | --- |
| Publication Title | 3 Printed Sheets - 6 Photos |
| ISBN or Volume/Nbr | I/M Bearup #136226 |
| Publication Date | 136226.1.01-3 |

| INITIAL DISPOSITION | |
| --- | --- |
| Complex/Unit | Florence |
| Disposition Date | 04/10/2018 |
| Reason(s) for Exclusion | DO 914.07 1.2.17 |

| APPEAL DISPOSITION | |
| --- | --- |
| Appeal Request Date | 04/10/2018 |
| Appeal Request By | ☒ Inmate<br>☐ Publisher |
| Appeal Disposition Date | 04/25/2018 |
| Appeal Disposition | ☒ Uphold Initial Decision, EXCLUDE PUBLICATION IN ITS ENTIRETY<br>☐ Overturn Initial Decision, ALLOW PUBLICATION IN ITS ENTIRETY<br>☐ REDACT AND ALLOW PUBLICATION WITH REDACTION(S) |
| Reason(s) for Exclusion on Appeal<br><br>⟳ COMPLETED | Concur with complex exclusion per DO 914.07 1.2.17 "Content in publications, photographs, drawings, or in any type of image or text, that may, could reasonably be anticipated to, could reasonably result in, is or appears to be intended to cause or encourage sexual excitement or arousal or hostile behaviors, or that depicts sexually suggestive settings, poses or attire, and/or depicts sexual representations of inmates, correctional personnel, law enforcement, military, medical/mental health staff, programming staff, teachers or clergy. |
| If REDACTED AND ALLOWED WITH REDACTION, describe material to be redacted. | |

**ELECTRONICALLY SENT**

*D Miller*

Original Signature on File

914-8(e)
3/22/16

Count     3

Exhibit     C

Contraband Notice
1 Page

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Property/Contraband/Disposition Tracking

| LOCATION/UNIT | DATE *(mm/dd/yyyy)* | TIME |
|---|---|---|
| ASPC-FLORENCE/CENTRAL UNIT | 4/27/18 | 1014 |

| INMATE NAME *(Last, First M.I.) (Please print)* | ADC NUMBER | PROPERTY SEIZED BY |
|---|---|---|
| BEARUP, P. 5-B-20 | 136226 | COI Deivalle |

### SEIZED PROPERTY RECEIPT

| # | Description | Reason |
|---|---|---|
| 3 | PHOTO PRINTED SHEETS | CONTRABAND-914.07-1.2.17 |
| - | -ENCOURAGES SEXUAL OR HOSTIL BEHAVIORS. | - |
| - | - | - |
| - | SENDER: M. JENSEN ~~#2212~~. CAROL CIR_MESA, AZ 85208 | - |
| - | ON CERTIFIED LOG:70180360000097266751 | - |
| - | REF:136226.1.01-3 | - |

*The above described contraband was seized from the suspect/inmate when he/she knowingly took said contraband into a correctional facility, or was found in possession of said contraband in violation of A.R.S. 13-2505.*

### CONTRABAND CONTROL / CHAIN OF EVIDENCE

Evidence Control Number:

| From | Date *(mm/dd/yyyy)* | Time | To | Initials |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

### PROPERTY RELEASE

| INMATE SIGNATURE | DATE OF NOTIFICATION *(mm/dd/yyyy)* |
|---|---|
| | |

| CONTRABAND CONTROL NUMBER | NOTIFIED BY *(Staff Signature and Badge Number)* |
|---|---|
| A01-18-447 | COI Deivalle #11334 |

- [ ] I wish to donate the property listed above to the Department of Corrections
- [ ] I wish to have the property listed above destroyed by the Department of Corrections
- [ ] **HOLD FOR:** Appeal *(This option applies only for publications excluded under Department Order 914, Inmate Mail).* Inmate must timely submit Inmate Letter, Form 916-1 to initiate appeal process per Department Order 914, Inmate Mail.

| - [ ] **SEND TO:** | - [ ] **HOLD FOR:** |
|---|---|
| Name _____ | Name _____ |
| Address _____ | Address _____ |
| _____ | _____ |
| _____ | _____ |

| SIGNATURE OF PERSON PICKING UP PROPERTY | DATE PROPERTY PICKED UP |
|---|---|
| | |

| CONTRABAND CONTROL OFFICER *(Last, First M.I.) (Please print)* | BADGE NUMBER | DISPOSAL DATE *(mm/dd/yyyy)* |
|---|---|---|
| DESTRUCTION COMMITTEE MEMBER *(Last, First M.I.) (Please print)* | BADGE NUMBER | DISPOSAL DATE *(mm/dd/yyyy)* |
| DESTRUCTION COMMITTEE MEMBER *(Last, First M.I.) (If Inmate unavailable)* | BADGE NUMBER | DISPOSAL DATE *(mm/dd/yyyy)* |

Count    3


Exhibit    D

Grievance Exhaustion
Pages 1-6

# ARIZONA DEPARTMENT OF CORRECTIONS
## INMATE GRIEVANCE APPEAL RESPONSE



| Log # | Inmate Name | ADC# | Case # | Complex | Unit |
|-------|-------------|------|--------|---------|------|
| 449 | Bearup | 136226 | A01150018 | Florence | Central |

In your grievance filed at Central Unit, you claim the Department has violated your ability to practice your religion by denying you the opportunity to receive intimate pictures from your spouse. Your resolution is for Department Policy to be amended to allow you to receive uncensored photographs from your spouse.

Your grievance has been reviewed at Central Office and the Deputy Warden's response is affirmed. Department Policy will not be changed to allow you to receive photographs which contradict what is allowed in policy. You have provided no evidence to substantiate what you believe has violated your freedom to practice your religion. Your resolution is denied.

No further action is warranted in this matter.

cc: Warden, Florence Complex

RK

*R. Kepney*
**Appeals Officer**

*CR Glynn for*
**Charles L. Ryan, Director**

06/19/2018
**Date**

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance Appeal

...te may appeal the Warden's, Deputy Warden's or
...istrator's decision to the Director by requesting the appeal
on this form.

Please type or print in black or blue ink.
(To be completed by staff member
initially receiving appeal)

| Received By: | Taylor |
|---|---|
| Title: | CO III |
| Badge #: | 1655 |
| Date: (mm/dd/yyyy) | 5/23/18 |

**Please Print**

| INMATE'S NAME (Last, First M.I.) (please print) | ADC NUMBER | DATE (mm/dd/yyyy) |
|---|---|---|
| Beamp, Patrick W. | 136276 | 5-22-18 |

| INSTITUTION | CASE NUMBER |
|---|---|
| ASPC-Central A12 | A01-190-018 |

TO: Director Ryan

I am appealing the decision of **Deputy Warden** _____ for the following reasons:

The Deputy Warden asserts DO 527 as a basis for violating federally established rights. However, there has been no reported incidents where an inmate used his wife's photos to harass staff. The opposite has actually occurred. According to Public Records, since ADOC banned intimate photos from spouses, there has been a rise of staff sexually harassing inmates! Staff being compromised should be a greater security threat than one's spouse wearing a bikini or nightie, which current policy allows staff to censor. ADOC has also neglected a "least restrictive means" provision. As intimate photos are the least restrictive means ALREADY for the Biblically Mandated Marital consummation, in prison, conjugal visitation — The resolution stands to amend policy to allow married inmates to receive intimate photos from their spouses.

| INMATE'S SIGNATURE | DATE (mm/dd/yyyy) | GRIEVANCE COORDINATOR'S SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|---|---|
| | 5-22-18 | | 5-24-18 |

| RESPONSE TO INMATE BY | LOCATION |
|---|---|
| | |

| STAFF SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
| | |

DISTRIBUTION: INITIAL: White & Canary – Grievance Coordinator
Pink – Inmate
FINAL: White – Inmate
Canary – Grievance File

802-3
12/12/13



# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance Response

| Name (Last, First M.I.) | ADC Number | Institution/Facility | Case Number |
|---|---|---|---|
| BEARUP, PATRICK | 136226 | ASPC-F/CENTRAL | A01-150-018 |

In your grievance dated April 17, 2018 and received by this office on May 16, 2018, you state that you feel that the D.O. 914 policy restricting inmates from receiving personal photos depicting nudity violates your exercise of religion.

Your proposed resolution is to amend D.O. 914 to allow verifiably married inmates to receive uncensored photos of their spouse.

To address your complaint, I have reviewed the documentation you have provided with your grievance which includes; your Inmate Informal Complaint Resolution (Form 802-11), and Inmate Informal Complaint Response (Form 802-12) from COIII Taylor.

D.O. 914.07 UNAUTHORIZED CONTENT- 1.1 In order to assist with rehabilitation and treatment objectives, reduce sexual harassment and prevent a hostile work environment for inmates, staff and volunteers, inmates are not permitted to send, receive or possess sexually explicit material or content that is detrimental to the safe, secure, and orderly operation of the facility as set forth in this Department Order.

D.O. 527 EMPLOYMENT DISCRIMINATION AND HARRASSMENT states in part; specific acts that violate the standards of this policy and may constitute sexual harassment include but are not limited to:

Comments or Materials of a Sexual Nature

These Department Orders are designed to prevent a hostile environment for inmates, staff and volunteers. Regardless of whether or not inmates receive photos depicting nudity from a spouse these photos may constitute sexual harassment to staff, volunteers, and inmates and are, therefore, not permitted.

The censorship of inmate photographs can be appealed through the Office of Publication Review on a case by case basis. You have 30 calendar days to appeal to the Complex Mail Room.

If you are not satisfied with this response, you may appeal my decision to the Director within (5) workdays of receipt.

| Ruben Montano, Deputy Warden | Date |
|---|---|
| _[signature]_ | 5/17/18 |

INITIAL DESTRIBUTION – Committee Recommendation – All copies to Grievance Advisory Committee
FINAL DISTRIBUTION – White and Pink – Inmate, Canary – Grievance File

③

INITIAL DESTRIBUTION - GF Supplement – White and Canary – Grievance Coordinator, Pink – Inmate
FINAL DISTRIBUTION – White – Inmate, Canary – Grievance File

802-7P
2/14/00

ARIZONA DEPARTMENT OF CORRECTIONS

Inmate Grievance

~~You may appeal the Grievance Coordinator's decision to the~~ Deputy Warden/Administrator by filing form 802-3, within 10 calendar days of receipt of this notice.

| | |
|---|---|
| Received By | Tau G |
| Title | CO II |
| Badge Number | 1055 | Date 4/17/18 |

| | | |
|---|---|---|
| Inmate Name (Last, First M.I.) Beard, Patrick W. | ADC Number 136226 | Date |
| Institution/Facility ASPC-F-Central A72 | Case Number A01-150-018 | |
| To: Griev. Coord. | * 5.16.18 * | |

Description of Grievance (To be completed by the inmate)

The COIII's response fails to address the issues of Federal Law, i.e. RLUIPA, whereas the State cannot "substantially burden a person's exercise of religion". This is why the actual policy is being brought to Class Action. As, even if, a compelling governmental interest exists, which I deny does, there is no "least restrictive means" provided instead of an outright ban and illegal denial of Federal Rights. The cite of DO914.07(1.1) is of particular interest as it states "in order to assist with rehabilitation", this assist is to include the strengthening of familial bonds. As ADOC's website touts. Therefore censorship of marital communications via photography is in conflict with ADOC's attestation for rehabilitation, since only spousal harm occurs during this unlawful censorship by ADOC policy. — To note: As in previous litigation, just because ADOC has a written policy allowing censorship, DOES NOT mean that policy is LEGAL and/or Constitutional.

Proposed Resolution ( What informal attempts have been made to resolve the problem? What action(s) would resolve the problem?)

My only resolution is to amend DD914.02 (1.9,1.22) and 914.07 (1.2.1, 1.2.7) To allow verifiable married inmates to receive uncensored photographs from their spouse.

| | | | |
|---|---|---|---|
| Inmate's Signature | Date | Grievance Coordinator's Signature | Date 5.16.18 |
| Action taken by | | Documentation of Resolution or Attempts at Resolution. | |

| | | |
|---|---|---|
| Staff Member's Signature | Badge Number | Date |

Initial Distribution - White and Canary - Grievance Coordinator; Pink - Inmate
Final Distribution - White - Inmate; Canary - Grievance File

(9)

802-1
7/13/09

## ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Informal Complaint Response

*For Distribution: Copy of Corresponding Inmate Informal Complaint Resolution must be attached to this response.*

| Inmate Name *(Last, First M.I.)* | ADC Number |
|---|---|
| Bearup | 136226 |

Institution/Unit

ASPC-Florence \ Central Unit

| From | Location |
|---|---|
| COIII Taylor | CB-5 Programs - Able \ Baker \ Fox \ George |

I am in receipt of your informal complaint dated 04/15/18 received on 04/16/18. You raise a concern regarding personal photos that were deemed contraband Reference # 136226.1.01-3 regarding publication review.

I have reviewed your complaint in its entirety. It is my interpretation that you are either arguing the censorship by Complex Mail Room (Publication Review Process) or you are arguing the written policy governing sexual explicit photographs and its enforcement.

If you are arguing the Complex Mail Room (Publication Review Process) censorship there is an appeal process in place for addressing this issue. You have 30 calendar days to appeal the Publication Review Process via Inmate Letter to Complex Mail Room.

If you are arguing the written policy governing sexual explicit photographs it will be considered beyond my scope of authority to change policy or the way it is enforced.

In conclusion, your complaint was received, reviewed and addressed. If you are unsatisfied with this response you may continue to the next level of resolution.

| Staff Signature | Date |
|---|---|
| | 4/16/18 |

Distribution:  Original - Inmate
Copy – Grievance Coordinator File

⑤

802-12(e)
12/12/13

| INMATE NAME *(Last, First M.I.)* *(Please print)* | ADC NUMBER | INSTITUTION/UNIT | DATE *(mm/dd/yyyy)* |
|---|---|---|---|
| Bearup, Patrick W. | 136228 | Central AZ | 4-15-18 |

| TO | LOCATION |
|---|---|
| CO III Taylor | CB5 |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

On 4-10-18 an unknown ADOC staff contraband personal photos from my legally married spouse. Ref. # 136228,1.01-3. They First claim Publication Review is to deal with this. However, DO 914.02 (1.9,1.22) Is the authority which only bars Personal photographs for nudity or sexually explicit acts, (Those acts are CLEARLY defined in DO 914). My wife did NOT pose nude or violate the definitions of sexually explicit — Yet, even if she did, denial violates the 1st Amendment. Under this alone, my photographs are to be given to me. ~~[struck through text]~~

~~[struck through text]~~

~~[struck through text]~~

~~[struck through text]~~ Therefore, ADOC does NOT have any reasonable, legitimate government intrest in denying me access to my wife's photographs. While, ADOC can allege certain rights, those ideas do not pass the "Turner Test". With this basic bar on my photographs or any censorship. ADOC is in violation of U.S. v. Felipe, 148 F.3d 101 (2d Cir 1998) Also see Procunier v. Martinez, 416 U.S. 396 and Thornburgh v Abbott, 490 U.S. 401, 404 — If this censorship continues the Prison will need to justify its policy in a convincing way — see Spellman v. Hopper 95 F.Supp. 2d 1267 —

For ADOC to allege that ~~[struck]~~ personal picture communication between my wife and I encourages hostile behavior is an unproven slander.

This censorship also violates the Religious Land Use and Institutionalized Person Act. As I hold a sincere religious belief that I must provide for my wife's needs in all areas, that we are one flesh, and that my marriage bed is undefiled. So, the least restrictive means to meet my "RLUIPA" claim is to allow me any photograph of my wife that we need to express our love etc.

| INMATE SIGNATURE | DATE *(mm/dd/yyyy)* |
|---|---|
| [signature] | 4-15-18 |

Have you discussed this with institution staff? ☒ Yes ☐ No

If yes, give the staff member name: Publication Review Office

Distribution: INITIAL: White and Canary or Copies – Grievance Coordinator; Pink or Copy – Inmate
FINAL: White – Inmate; Canary – Grievance Coordinator File

802-11
6/25/14

(6)

Count   4


Exhibit   A

DO 909  Attachment A
1 Page

STORE/PROPERTY LIST - ATTACHMENT A
– July 19, 2019 / [3]

ed   0 – Not Allowed    SF – Sugar-Free Only

| | Minimum By Phase | | | Medium By Phase | | | Close By Phase | | | Maximum By Phase | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | I $60 | II $80 | III $100 | I $60 | II $80 | III $100 | I $60 | II $80 | III $100 | I $60 | II $80 | III $100 |
| reakfast (includes Sugar Free) | × | × | × | × | × | × | × | × | × | SF | SF | SF |
| dry, bagged | × | × | × | × | × | × | × | × | × | × | × | × |
| Sausage, Beef Salami, Beef Jerky | × | × | × | × | × | × | × | × | × | × | × | × |
| cludes in-a-bag, refried, etc.) | × | × | × | × | × | × | × | × | × | × | × | × |
| w | × | × | × | × | × | × | × | × | × | × | × | × |
| ef, soft package/pouch | × | × | × | × | × | × | × | × | × | × | × | × |
| soft package/pouch | × | × | × | × | × | × | × | × | × | × | × | × |
| t package/pouch | × | × | × | × | × | × | × | × | × | × | × | × |
| anilla Cappuccino (Authorized for Phase III - Death Row) | × | × | × | × | × | × | × | × | 0 | 0 | 0 | 0 |
| atmeal (includes Kosher) | × | × | × | × | × | × | × | × | × | × | × | × |
| astries (Pop-Tarts, etc.) | × | × | × | × | × | × | × | × | × | × | × | × |
| Nut Varieties (no shells) | × | × | × | × | × | × | × | × | 0 | 0 | 0 | 0 |
| | × | × | × | × | × | × | × | × | 0 | 0 | 0 | 0 |
| e (Louisiana, Tapatio, etc.) | × | × | × | × | × | × | × | × | × | × | × | × |
| easoning – various | × | × | × | × | × | × | × | × | × | × | × | × |
| ckle | × | × | × | × | × | × | × | × | × | × | × | × |
| ant | × | × | × | × | × | × | × | × | 0 | 0 | 0 | 0 |
| Pasta | × | × | × | × | × | × | × | × | × | × | × | × |
| na, Salmon, Mackerel, Sardines, etc. (soft pkg/pouch, in water only) | × | × | × | × | × | × | × | × | × | × | × | × |
| udes Kosher) (Authorized for Phase III - Death Row) | × | × | × | × | × | × | × | × | 0 | 0 | 0 | 0 |
| s – 2 varieties filtered, 2 varieties unfiltered | 10 | 10 | 10 | 10 | 10 | 10 | 7 | 7 | 7 | 0 | 0 | 0 |
| Tobacco | 7 | 7 | 7 | 7 | 7 | 7 | 5 | 5 | 5 | 0 | 0 | 0 |
| – loose, rolling, with papers | 24 | 24 | 24 | 24 | 24 | 24 | 12 | 12 | 12 | 0 | 0 | 0 |
| (plastic) | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 |

Aids

Count     4


Exhibit     B

Grievance Exhaustion
Pages 1-6



# DEPARTMENT OF CORRECTIONS
## GRIEVANCE APPEAL RESPONSE

| Log # | Inmate Name | ADC# | Case # | Complex | Unit |
|-------|-------------|------|--------|---------|------|
| 637 | Bearup | 136226 | A01149019 | Florence | Central |

In your grievance filed at Central Unit, you claim you are being denied the opportunity to purchase chewing tobacco products at Central Unit. Your resolution is to be sold tobacco products or to be provided the Department policy that denies the opportunity to purchase tobacco.

Your grievance has been reviewed at Central Office and the Deputy Warden's response is affirmed. There are no plans to sell or to allow inmates tobacco products at your assigned unit. At this time tobacco is not allowed at your unit based on the needs of the institution.

No further action is warranted in this matter.

cc: Warden, Florence Complex

RK

*R. Kepney*
**Appeals Officer**

*CRGlynn for*
**Charles L. Ryan, Director**

08/12/2019
**Date**

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance Appeal

The inmate may appeal the Warden's, Deputy Warden's or Administrator's decision to the Director by requesting the appeal on this form.

Received by: COIII K. MCKNIGHT
Title: COIII
Badge #: 2216
Date: 7-22-19

**PLEASE PRINT**

| Inmate's Name *(Last, First, M.I.)* | | ADC No. | Date |
|---|---|---|---|
| Bearup, Patrick | W. | 136226 | 7-22-19 |

| Institution | | Case Number |
|---|---|---|
| ASPC-F-Central | 5-A-7 | A01-149-019 |

TO: Director Ryan

I am appealing the decision of **Deputy Warden Monson** _____ for the following reasons:

I have seen NO Policy, DE, or DO of which DW Monson speaks. On 7-20-19 I personally discussed my access to smokeless tobacco with Director Ryan - He spoke of NO POLICY denying CLOSE CUSTODY Death Row at Central Unit, in fact he seemed puzzled that I was being denied tobacco. Therefore, as DW Monson stated - if there is an unknown policy/directive denying me equal protection/treatment (access to smokeless tobacco) as the 14th Amendment provides. Also - if forced to litigate, please contact the A.G.'s Office on how they can overcome the Needed "Compelling Government Interest" under the Turner Test. Which they cannot as DO 909 Attachment "A" shows ADC giving tobacco to others at my custody level. See Informal for Resolutions

| Inmate's Signature | Date | Grievance Coordinator's Signature | | Date |
|---|---|---|---|---|
| | 7-22-19 | CO III 8538 | | 7/22/19 |

| Response To Inmate By: | Location |
|---|---|
| | |

| Staff Signature | | Date |
|---|---|---|
| | | |

DISTRIBUTION:
INITIAL: White & Canary - Grievance Coordinator
Pink - Inmate
FINAL: White - Inmate
Canary - Grievance File

802-3
7/13/09

## Inmate Grievance Response

| Inmate Name (Last, First M.I.) | ADC Number | Institution/Facility | Case Number |
|---|---|---|---|
| BEARUP, PATRICK | 136226 | ASPC-F/Central | A01-149-019 |

In your grievance dated 07/16/19 and received by this office on 07/18/19, you are requesting for change to the current policy concerning tobacco usage at Central Unit.

I have read your request. Policy can only be changed or modified at the director's level.

Based on the above information, this issue is resolved.

If you do not accept this decision, you may submit your appeal to the Complex Warden by filing a Grievance Appeal (form 802-3p), within 5 work days of receipt of this notice.

Jason Monson, Deputy Warden:

Date:

07/18/19

INITIAL DESTRIBUTION – Committee Recommendation – All copies to Grievance Advisory Committee
FINAL DISTRIBUTION – White and Pink – Inmate, Canary – Grievance File

INITIAL DESTRIBUTION - GF Supplement – White and Canary – Grievance Coordinator, Pink – Inmate
FINAL DISTRIBUTION – White – Inmate, Canary – Grievance File

802-7P
2/14/00

Rec 7-22-19

③

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance

RECEIVED BY CO III K. McHugh
TITLE CO III
BADGE NUMBER 2216
DATE (mm/dd/yyyy) 7-17-19

Note: You may appeal the Grievance Coordinator's decision to the Warden/Deputy Warden/Administrator by filing form 802-3, within 10 calendar days of receipt of this notice

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | DATE (mm/dd/yyyy) |
|---|---|---|
| Beamp, Patrick W. | 136226 | 7-16-19 |

| INSTITUTION/FACILITY | | CASE NUMBER |
|---|---|---|
| ASPC-F-Central 5-A-7 | | A01-149-019 |

TO: GRIEVANCE COORDINATOR

### Description of Grievance (To be completed by the Inmate)

The CO III's response is that Director Ryan has implemented a policy that only he can change. I have not been provided with any DI or DO that permits Central Unit to deny Chewing Tobacco to a class of Close Custody inmates. Unless, Central Unit is saying that I am Not Close Custody, or am Close Management?? Therefore in order to challenge this in court, ADC needs to provide me Director level written instructions to deny ME the ability to purchase Chewing tobacco as DO909 attachment A says that I am ALLOWED to purchase

Attached: Informal, CO III Response

### Proposed Resolution (What informal attempts have been made to resolve the problem? What action(s) would resolve the problem?)

Sell me chewing tobacco as policy permits, if denied provide me a copy of the DI or DO that states I am to be treated differently than DO909 states.

| Inmate's Signature | Date | Grievance/Coordinator's Signature | Date |
|---|---|---|---|
| | 7-16-19 | CO III ___ 2538 | 7/18/19 |

### Action taken by Documentation of Resolution or Attempts at Resolution.

| Staff Member's Signature | Badge Number | Date |
|---|---|---|
| | | |

DISTRIBUTION: INITIAL: White and Canary or Copies – Grievance Coordinator; Pink or Copy - Inmate
FINAL: White – Inmate; Canary – Grievance File

802-1
12/12/13

(4)



# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Informal Complaint Response

*For Distribution: Copy of Corresponding Inmate Informal Complaint Resolution must be attached to this response.*

| Inmate Name *(Last, First M.I.)* | ADC Number |
|---|---|
| BEARUP, PATRICK W. | 136226 |

| Institution/Unit |
|---|
| ASPC/FLORENCE-CENTRAL UNIT |

| From | Location |
|---|---|
| COIII K. McKnight | CB5 Programs |

This is in response to your Informal Complaint dated 7/4/19 in which you are requesting a change to the current policy concerning tobacco usage at Central Unit.

Policy can only be changed or modified at the Director's level. Your issue is considered resolved. End of response.

| Staff Signature  *C O III K. McKnight* | Date  7-12-19 |
|---|---|

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Inmate Informal Complaint Resolution**

5-A-7

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | INSTITUTION/UNIT | DATE (mm/dd/yyyy) |
|---|---|---|---|
| Bearup, Patrick W. | 136226 | Central   A72 | 7-4-19 |

TO LO III Mcknight

LOCATION CB5

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

ADC Central Unit is in daily violation of DO 909, specifically Attachment "A".

Central Unit is a Close Custody Yard, I am on this yard (Close Custody) under my settlement with Director Charles Ryan, District Court No. CV15-2299-PHX-DLR (MHB) - Bearup v. Ryan - As a Close Custody inmate, I am to be afforded all the abilities and privileges afforded under ADC policies. The 14th Amendment says "nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." ADOC is also governed under Turner v. Safley 482 U.S. 78 (1987) Specifically, is a denial of a "perceived right" reasonably related to a legitimate, neutral government interest? This means the prison's goal must not be related to its dislike of a particular idea! Central Unit CANNOT pass this test, when denying me page 2 of DO909 Attachment A where I am being refused to purchase Store items! #5017 JD Blend Regular Chew and 5004 Longhorn Snuff — I am guaranteed "Equal Protection" under the law. This means "a prison cannot treat some prisoners differently than it treats others without a reason." By creating a policy (DO909 supra) that gives chewing tobacco to ANY Close Custody inmate, ADOC has now provided me a valid "Liberty Interest" For my "Conditions of Confinement" See Tates v. Blamas No. S-00-2539 2003 WL 238 64868 (E.D. Cal. Mar. 11 2003) and Medina-Tejada v. Sacramento County No. Civ. S-04-138, 2006 WL 463158 (E.D. Cal. Feb 27, 2006)

Resolution! 1. Sell me all chewing tobaccos listed in Policy or if you continue the unconstitutional ban, then ban ALL staff and ADC contractors from using ANY and ALL Tobacco/Vape products anywhere on Central Unit.

| INMATE SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
|  | 7-4-19 |

Have you discussed this with institution staff?   ☒ Yes   ☐ No

If yes, give the staff member name: Dw Monson, Property, Store

(6)

Count    4


Exhibit    C

Close Custody Treatment
Possible Resolution
Pages 1-3

<center>COPY</center>

Mr. Joseph Dylo                                          2-4-18

RE: Bearup v. Ryan CV15-2299-PHX-DLR (MHB)· Settlement Conference

On February 13, 2017 we both met for a settlement conference concerning the above cited litigation. The reason for this letter is to resolve a misunderstanding that I may have.

I fully believe that we moved forward in good faith to resolve my lawsuit. However, it was my understanding, from Az Dept. of Corrections Security Mr. Lee, at our conference, that upon my move to Close Custody, I would be afforded ALL of the privileges that Close Custody inmates receive on yards with that classification. This has not been the case at Central Unit. Where ADC staff refuse to comply with their own policy.

So, in order to forego another lawsuit, I was hoping we could resolve this to mutual satisfaction. My concerns are:

1. My Religions Kosher diet is still Max., not Close Custody menu

2. My Visitation time is limited to Phase I Close Custody, Not Phase III

3. The Keefe store will not follow D.O. 909 Attachment "A" and sell Close Custody Condemned Row Tobacco products or CD Players - (The Max. inmates at Browning Unit are allowed CD Players)

I appreciate your help to resolve this matter.

Patrick Bearup 136226                        Sincerely,
ASPC-F-Central
PO Box 8200
Florence, AZ 85132-8200              ①



# ARIZONA DEPARTMENT OF CORRECTIONS

**Inmate Letter**

Requests are limited to one page and one issue. NO ATTACHMENTS PERMITTED. Please print all information.

5-B-30

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | INSTITUTION/UNIT | DATE (mm/dd/yyyy) |
|---|---|---|---|
| Bearup, Patrick W. | 136226 | Cntr,) | 1-31-18 |

| To | Location |
|---|---|
| CO III Taylor | CB5 |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

Sir, I need to set up a legal call with

Joseph Dylo

joseph.dylo@azag.gov

602-542-7695

---

02/02/18

Inmate Bearup -
The above attorney has requested that if you want a call, you must write
him a letter explaining exactly why you are requesting that he call you.

COIII Stowe  K Stowe Co III

| INMATE SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
| | 1-31-18 |

Have You Discussed This With Institution Staff? ☒ Yes   ☐ No

If yes, give the staff member's name: YOL


Complaints are limited to one page and one issue.

Please print all information.

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | INSTITUTION/UNIT | DATE (mm/dd/yyyy) |
|---|---|---|---|
| Bearup, Patrick W. | 136226 | Central 5-B-20 | 11-30-17 |

| TO | LOCATION |
|---|---|
| CO III | Central CB5 |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

ADOC has created a 14th Amendment violation, specifically "Equal Protection Under the Law". This act has occurred non-stop since my arrival at the Central Unit (07-19-17) On that date, in compliance with Bearup v. Ryan (Az Dist. Court) CV15-2299-PHX-DLR (MHB). However, in settlement talks Agents for Director Ryan stipulated to the Court that in placing me in Close Custody, I would receive ALL Close Custody privileges as every Close Custody inmate receives around the State. However, ADOC has failed to comply with our agreement by not doing the following: 1) Selling ALL store items allowed across the State 2) allowing CD players or CD's 3) giving me the Close Custody Kosher diet menu when I eat. (still feed me as a Max, inmate) 4) giving me the 12 hrs of contact visits other yards receive. — While a HUGE attempt has been given on all other Close Custody benefits, my settlement dated Feb 24, 2017 told me and the Court that I would receive my Close Custody benefits by the end of August. ADOC is in violation of that date, currently and does not seem to want to comply.

Resolution: Since Central Unit cannot support (according to Admin at Central office) the Full Close Custody treatment for myself, my resolution is first to move me to a yard where I can enjoy the agreed to items ALL other Close Custody yards receive, or to give me those items listed in this informal on Central Unit.

+ Point 5) Legal visits in a non-recorded private area for more than an hour - whenever I need it - not only every 30-60 days.

I tried to resolve with many floor staff

| INMATE SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
| | 11-30-17 |

Have you discussed this with institution staff?  ☒ Yes  ☐ No

If yes, give the staff member name: Floor Staff, G. Trujillo et al.

Distribution: INITIAL: White and Canary or Copies – Grievance Coordinator; Pink or Copy – Inmate
FINAL: White – Inmate; Canary – Grievance Coordinator File

802-11
6/25/14

Count    5


Exhibit    A

Grievance Exhaustion
Pages 1-6

# ARIZONA DEPARTMENT OF CORRECTIONS
# INMATE GRIEVANCE APPEAL RESPONSE



| Log # | Inmate Name | ADC# | Case # | Complex | Unit |
|-------|-------------|------|--------|---------|------|
| 608 | Bearup | 136226 | A01150019 | Florence | Central |

In your grievance filed at Central Unit, you claim your current unit does not have a working fire alarm suppression system. Your resolution is for a new fire alarm suppression system to be installed.

Your grievance has been reviewed at Central Office and the Deputy Warden's response is affirmed. After consultation with Department Fire Safety staff it has been determined that per the state Fire Marshall, the Department is a 24 hour a day facility and conducts thirty minute health and welfare checks. Furthermore, there are standard fire house and extinguishers throughout the facility, which are inspected monthly. Based on this information, the Department is complying with fire code requirements.

No further action is warranted in this matter.

cc: Warden, Florence Complex

RK

*R. Kepney*
**Appeals Officer**

*CRGlynn for*
**Charles L. Ryan, Director**

08/06/2019
**Date**

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance Appeal

The inmate may appeal the Warden's, Deputy Warden's or Administrator's decision to the Director by requesting the appeal on this form.

*(To be completed by staff member initially receiving appeal)*

Received by: CO II K. McKNIGHT
Title: CO II
Badge #: 2-216
Date: 7-25-19

**PLEASE PRINT**

| Inmate's Name *(Last, First, M.I.)* | ADC No. | Date |
|---|---|---|
| Bearup, Patrick W. | 136226 | 7-24-19 |

| Institution | | Case Number |
|---|---|---|
| ASPC-F - Central (A72) 5-A-7 | | A01-150-019 |

TO: Director Ryan

I am appealing the decision of _DW Monson_ for the following reasons:

If the DW's response is correct, why did Congress order the fire system at Buckeye to be FIXED? Why is it Law that buildings such as CB-5 Central Unit have working smoke detectors? And How can Staff see a fire if ADC cannot employ staff to stay in my tower? It remains empty HALF the day! So if a fire starts the inmate may die long before Staff even reports smoke. A smoke detector will save countless seconds and save lives. If ADC cares they will fix this issue. Lastly, if DW Monson is correct, why is the monthly audit of the fire system given to the Captain of Security with the Smoke Detectors marked as NOT Functioning? Obviously, Fire hoses and extinguishers are NOT the only thing required by la.

| Inmate's Signature | Date 7-24-19 | Grievance Coordinator's Signature 2538 | Date 7/26/19 |
|---|---|---|---|

| Response To Inmate By: | Location |
|---|---|
| | |

| Staff Signature | Date |
|---|---|
| | |

DISTRIBUTION:
INITIAL:   White & Canary - Grievance Coordinator
           Pink - Inmate
FINAL:    White - Inmate
           Canary - Grievance File

802-3
7/13/09

②

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance Response

| Inmate Name (Last, First M.I.) | ADC Number | Institution/Facility | Case Number |
|---|---|---|---|
| BEARUP, PATRICK | 136226 | ASPC-F/Central | A01-150-019 |

In your grievance dated 07/16/19 and received by this office on 07/18/19, you are concerned that fire safety measures are inadequate.

There are continuous fire and safety watches being conducted in your building, in addition to staff completing their building walks to ensure the health and welfare of the inmate population. Furthermore, there are standard fire hoses and fire extinguishers throughout the facility, which are inspected on a monthly basis by the Department's Fire Safety Marshall to ensure they are in working order and ready for use at any given time. The Department is complying with fire code requirements.

Based on the above information, this issue is resolved.

To appeal this decision, file Grievance Appeal (form 802-3p), within 5 work days of receipt of this notice.

Jason Monson, Deputy Warden:

Date: 07/19/19

INITIAL DISTRIBUTION – Committee Recommendation – All copies to Grievance Advisory Committee
FINAL DISTRIBUTION – White and Pink – Inmate, Canary – Grievance File

INITIAL DISTRIBUTION - GF Supplement – White and Canary – Grievance Coordinator, Pink – Inmate
FINAL DISTRIBUTION – White – Inmate, Canary – Grievance File

802-7P
2/14/00

REC 7-24-19
RWB

(3)

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance

ADC

**RECEIVED BY** Co III K. McHugh

**TITLE** CO III

**BADGE NUMBER** 2216

**DATE** (mm/dd/yyyy) 7-17-19

*Note: You may appeal the Grievance Coordinator's decision to the Warden/Deputy Warden/Administrator by filing form 802-3, within 10 calendar days of receipt of this notice*

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | DATE (mm/dd/yyyy) |
|---|---|---|
| Bearup, Patrick W. | 136226 | 7-16-19 |

| INSTITUTION/FACILITY | CASE NUMBER |
|---|---|
| ASPC-F-Central  5-A-7 | A01-150-019 |

TO: GRIEVANCE COORDINATOR

**Description of Grievance** *(To be completed by the Inmate)*

The issue of a non-working fire alarm/suppression system is obviously enough of a concern for Congress (AZ) to order ADC to FIX the one at Buckeye Unit. Therefore, I find the claims put forth in the Informal Response, that a State Agency (Office of Fire Marshal) will knowingly and willingly permit ADC to endanger inmate's lives for YEARS, as the current system has not functioned in my cluster, and possibly the entire yard, since my arrival here. Therefore, I will turn this issue over to the Media, Congress, and Law Enforcement in order to protect the inmates at Central Unit.

Attached: Informal, CO III Response

**Proposed Resolution** *(What informal attempts have been made to resolve the problem? What action(s) would resolve the problem?)*

Install a complete new fire alarm system

| Inmate's Signature | Date 7-16-19 | Grievance Coordinator's Signature 2238 | Date 7/18/19 |
|---|---|---|---|

**Action taken by Documentation of Resolution or Attempts at Resolution.**

| Staff Member's Signature | Badge Number | Date |
|---|---|---|

DISTRIBUTION: INITIAL: White and Canary or Copies – Grievance Coordinator; Pink or Copy - Inmate
FINAL: White – Inmate; Canary – Grievance File

802-1
12/12/13

(4)

## ARIZONA DEPARTMENT OF CORRECTIONS

### Inmate Informal Complaint Response

| Inmate Name *(Last, First M.I.)* | ADC Number |
|---|---|
| BEARUP, PATRICK W. | 136226 |

Institution/Unit

ASPC/FLORENCE-CENTRAL UNIT

| From | Location |
|---|---|
| COIII K. McKnight | CB5 Programs |

This is in response to your Informal Complaint dated 7/4/19 in which you claim the fire safety system inside CB5 is not functioning.

A fire watch is conducted every 30 minutes as a substitute for the non-functional fire alarm systems. These fire watches and the many cameras throughout the unit is the policy that has been approved by the Office of the State Fire Marshal until the fire alarm/suppression systems are properly repaired/replaced.

End of response.

| Staff Signature | Date |
|---|---|
| COIII K. McKnight | 7-16-19 |

Distribution:  Original - Inmate
Copy – Grievance Coordinator File

(5)

## ARIZONA DEPARTMENT OF CORRECTIONS

### Inmate Informal Complaint Resolution

*Complaints are limited to one page and one issue. Please print all information.*

5-A-7

| INMATE NAME *(Last, First M.I.) (Please print)* | ADC NUMBER | INSTITUTION/UNIT | DATE *(mm/dd/yyyy)* |
|---|---|---|---|
| Begrup, Patrick W. | 136226 | Central   A72 | 7-4-19 |

| TO | LOCATION |
|---|---|
| COII McKnight | CB5 |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

Today I realized that the Fire Safety system inside CB5 is NOT functioning based upon issues raised in the Arizona Congress concerning the fire system being broken at the Buckeye Unit and a demand by Congress for it to be fixed. I therefore stand on case: Id at 784 of Hoptowit v. Spellman 753 F.2d 779, 783 (9th Cir 1985) as my legal reason to demand that the fire system at this unit be fixed immediately. Refusal to do so means that ADC now knowingly and willingly are violating State Law concerning Fire Alarms etc..., and are showing deliberate indifference to the safety of ADC staff and Inmate living/working in CB5.

Resolution: Fix the Fire System in CB5

| INMATE SIGNATURE | DATE *(mm/dd/yyyy)* |
|---|---|
|  | 7-4-19 |

Have you discussed this with institution staff?   ☐ Yes   ☐ No

If yes, give the staff member name:

Distribution:   INITIAL:   White and Canary - Inmate

①

802-11

Count    6

Exhibit    A

Parson's Stipulation Page 5
1 Page

1     14.    For prisoners who are not fluent in English, language interpretation for

2    healthcare encounters shall be provided by a qualified health care practitioner who is

3    proficient in the prisoner's language, or by a language line interpretation service.

4    15.    If a prisoner who is taking psychotropic medication suffers a heat

5    intolerance reaction, all reasonably available steps will be taken to prevent heat injury or

6    illness. If all other steps have failed to abate the heat intolerance reaction, the prisoner will

7    be transferred to a housing area where the cell temperature does not exceed 85 degrees

8    Fahrenheit.

9    16.    Psychological autopsies shall be provided to the monitoring bureau within

10    thirty (30) days of the prisoner's death and shall be finalized by the monitoring bureau

11    within fourteen (14) days of receipt. When a toxicology report is required, the

12    psychological autopsy shall be provided to the monitoring bureau within thirty (30) days

13    of receipt of the medical examiner's report. Psychological autopsies and mortality reviews

14    shall identify and refer deficiencies to appropriate managers and supervisors including the

15    CQI committee. If deficiencies are identified, corrective action will be taken.

16    **B.**    **Maximum Custody Prisoners.**

17    17.    Defendants shall request that the Arizona Legislature approve a budget to

18    allow ADC to implement DI 326 for all eligible prisoners.  This provision shall not be

19    construed as an agreement by Plaintiffs that this budget request is sufficient to comply

20    with the terms of this Stipulation.

21    18.    Defendants shall comply with the maximum custody performance measures

22    set forth in Exhibit D.

23    19.    **Measurement and reporting of performance measures:** Compliance with

24    the performance measures set forth in Exhibit D shall be measured and reported monthly

25    as follows.

26          a.  The performance measures analyzed to determine ADC substantial

27             compliance with the Maximum Custody provisions of this Stipulation

28

Count    6


Exhibit    B

Grievance Exhaustion
Pages 1-6

# ARIZONA DEPARTMENT OF CORRECTIONS
# INMATE GRIEVANCE APPEAL RESPONSE



| Log # | Inmate Name | ADC# | Case # | Complex | Unit |
|-------|-------------|------|--------|---------|------|
| 610 | Bearup | 136226 | A01158019 | Florence | Central |

In your grievance filed at Central Unit, you claim the temperatures within your cell exceed what is required within the Parsons v. Ryan stipulation. Furthermore, you state you were told air conditioning would be provided, but this has not occurred. Your resolution is for air conditioning to be installed, to leave your cell door open between 0600 hours and 2000 hours, to be provided ice during excessive temperatures, and to have the Parsons monitor to conduct temperature checks.

Your grievance has been reviewed at Central Office and the Deputy Warden's response is affirmed. The cooling system within your assigned unit is deemed appropriate. The Unit Administration will not break policy in order for your cell to be cooler. Furthermore, scheduled daily temperature checks are conducted to ensure the heat is monitored appropriately.

No further action is warranted in this matter.

cc: Warden, Florence Complex

RK

_R. Kepney_
**Appeals Officer**

_CRGlynn for_
**Charles L. Ryan, Director**

08/12/2019
**Date**

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance Appeal

The inmate may appeal the Warden's, Deputy Warden's or Administrator's decision to the Director by requesting the appeal on this form.

(To be completed by staff member initially receiving appeal)

Received by: COIII R. MCKNIGHT
Title: COIII
Badge #: 2216
Date: 7-25-19

**PLEASE PRINT**

| Inmate's Name (Last, First, M.I.) | ADC No. | Date |
|---|---|---|
| Bearup, Patrick W. | 136226 | 7-24-19 |

| Institution | | Case Number |
|---|---|---|
| ASPC-F-(Central) 5-A-7  A72 | | AO1-158-019 |

TO: Director Ryan

I am appealing the decision of __DW Monson__ for the following reasons:

The DW is incorrect, I do not cite my personal "standards", rather the NEEDED HELP for enforcement/protection of myself being forced into a hot cell where death, injury, and medical issues may arise. The DW neglects to RECALL the heat related death at Perryville! I DO NOT! second the Acurite Portable Anemometer (model 00256) that staff uses to check Pod-NOT CELL Temperatures!! - Is not used per Manfacter's instructions Whereas, staff do NOT spend the required 30 seconds fanning the meter, nor is it adjusted to the proper altitude! See Acurite.com - Lastly, ADC has already been found to falsify temp readings- See Phoenix NewTimes.com - My resolution is to have point 16 of Parson's v.Ryan enforced for inmates who take psych meds, and install an Air system for CB-5

| Inmate's Signature | Date 7-24-19 | Grievance Coordinator's Signature 2538 | Date 7/26/19 |
|---|---|---|---|

| Response To Inmate By: | Location |
|---|---|
| | |

| Staff Signature | Date |
|---|---|
| | |

DISTRIBUTION:
INITIAL:  White & Canary - Grievance Coordinator
          Pink - Inmate
FINAL:    White - Inmate
          Canary - Grievance File

802-3
7/13/09

②

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance Response

| Inmate Name (Last, First M.I.) | ADC Number | Institution/Facility | Case Number |
|---|---|---|---|
| BEARUP, PATRICK | 136226 | ASPC-F/Central | A01-158-019 |

In your grievance dated 07/19/19 and received by this office on 07/22/19, you state that temperatures in CB-5 are extremely hot.

Although the building temperatures may not be to your standards, the Daily Temperature Logs reflect the building temperatures are checked two times a day and are within an acceptable range. When issues do arise they are addressed as quickly as possible. Additionally, maintenance is consulted regularly to assure coolers are functioning correctly.

Based on the above information, this issue is resolved.

To appeal this decision, file Grievance Appeal (form 802-3p), within 5 work days of receipt of this notice.

| Jason Monson, Deputy Warden: | Date: |
|---|---|
| | 07/22/19 |

INITIAL DESTRIBUTION – Committee Recommendation – All copies to Grievance Advisory Committee
FINAL DISTRIBUTION – White and Pink – Inmate, Canary – Grievance File

INITIAL DESTRIBUTION - GF Supplement – White and Canary – Grievance Coordinator, Pink – Inmate
FINAL DISTRIBUTION – White – Inmate, Canary – Grievance File

REC 7-24-19
PWB

802-7P
2/14/00

(3)

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance

Note: You may appeal the Grievance Coordinator's decision to the Warden/Deputy Warden/Administrator by filing form 802-3, within 10 calendar days of receipt of this notice

**RECEIVED BY** *CO III K. MCKNIGHT*

**TITLE** *CO III*

**BADGE NUMBER** 2216

**DATE (mm/dd/yyyy)** 7-19-19

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | DATE (mm/dd/yyyy) |
|---|---|---|
| Bearup, Patrick W. | 136226 | 7-19-19 |

| INSTITUTION/FACILITY | | CASE NUMBER |
|---|---|---|
| ASPC-F-Central S-A-7 | | A01-158-019 |

TO: GRIEVANCE COORDINATOR

---

**Description of Grievance** *(To be completed by the Inmate)*

See informal for complete issue ~ The argument of the CO III does not take into consideration that the "Swamp" "Chiller" unit is completely ineffective once the dew point reaches 50%, as it maintains during the Monsoon season. Therefore, though the actual machine may function, the ~~efficiency~~ efficiency however will create an unsafe heat index, and due to my heat related medical issues, ADC knowingly and willingly endangers my life, and the lives of others

Attached: Informal, CO III Response

---

**Proposed Resolution** *(What informal attempts have been made to resolve the problem? What action(s) would resolve the problem?)*

See informal for full resolution

---

| Inmate's Signature | Date 7-19-19 | Grievance Coordinator's Signature CO III | Date 7/22/19 |
|---|---|---|---|

**Action taken by Documentation of Resolution or Attempts at Resolution.**

| Staff Member's Signature | Badge Number | Date |
|---|---|---|

DISTRIBUTION: INITIAL: White and Canary or Copies – Grievance Coordinator; Pink or Copy - Inmate
FINAL: White – Inmate; Canary – Grievance File

802-1
12/12/13

## ARIZONA DEPARTMENT OF CORRECTIONS

### Inmate Informal Complaint Response

*For Distribution: Copy of Corresponding Inmate Informal Complaint Resolution must be attached to this response.*

| Inmate Name *(Last, First M.I.)* | ADC Number |
|---|---|
| BEARUP, PATRICK W. | 136226 |

| Institution/Unit |
|---|
| ASPC/FLORENCE-CENTRAL UNIT |

| From | Location |
|---|---|
| COIII K. McKnight | CB5 Programs |

This is in response to your Informal Complaint dated, 7/18/19 in which you state that the temperature is too hot in your housing area.

Temperatures in the housing units are monitored and logged daily, the results of which are reported to administration. Maintenance also checks the swamp coolers daily to ensure that they are functioning properly. Maintenance has reported today that the cooling system is functioning at 100%.

End of response.

| Staff Signature  CO III K. McKnight | Date  7-18-19 |
|---|---|

Distribution: Original - Inmate
Copy – Grievance Coordinator File

802-12(e)
12/19/12



# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Informal Complaint Resolution

*Complaints are limited to one page and one issue.*

*Please print all information.*

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | INSTITUTION/UNIT | DATE (mm/dd/yyyy) |
|---|---|---|---|
| Bearup, Patrick W. | 136226 | Central   A12 | 7-18-19 |

| TO | LOCATION |
|---|---|
| CO III McKnight) | CB5 |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

The in cell temperature has been exceeding what Parsons V. Ryan's stipulated agreement point 16 states (85°F) I take psych drugs, have heat/solar sensitivities and have had several heat related issues at this unit. The 14th Amendment provides equal protection. This means ADOC cannot treat one class of inmates on Central Unit (or across the state) differently, unless security issues exist. ADOC is providing Air Conditioning to Staff and inmates (CB3 and 4) We have been told that we would have A.C. by last year. This obviously did not occur. ☒ I have spoken with staff who cannot resolve this, and based on recent News reports, State Congress ordered funding for the Buckeye Prison's A.C. to be fixed. They can fund this venture for my population also. In conclusion the in cell temp from 1600 hrs until the next day are unbearable and exceed 85°F!

Resolution: Add A.C. to CB5, or ANY Where Condemned Row is housed. Open Condemned Row's cell doors from 0600 - 2030 hrs (minus count times) every day to allow some in cell air circulation. Have the Parson's monitor check temperatures and record them; provide ice in pod once outside air goes past 100°F

| INMATE SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
|  | 7-18-19 |

Have you discussed this with institution staff?   ☒ Yes   ☐ No

If yes, give the staff member name: Sgt. Sendova)

Distribution:   INITIAL:  White and Canary or Copies – Grievance Coordinator; Pink or Copy – Inmate
                FINAL:  White – Inmate; Canary – Grievance Coordinator File

802-11
6/25/14

(6)

Count    6

Exhibit    C

Joint Committee on Capital Review Notice
Dated June 13, 2019
Pages 1-5



STATE OF ARIZONA

# Joint Committee on Capital Review

STATE
SENATE

1716 WEST ADAMS
PHOENIX, ARIZONA 85007

(602) 926-5491

azleg.gov

DAVID M. GOWAN
CHAIRMAN
LELA ALSTON
SEAN BOWIE
DAVID BRADLEY
- RICK GRAY
SINE KERR
.. VINCE LEACH

HOUSE OF
REPRESENTATIVES

REGINA E. COBB
VICE-CHAIRMAN
CHARLENE R. FERNANDEZ
RANDALL FRIESE
JOHN KAVANAGH —
AARON O. LIEBERMAN
WARREN PETERSEN
BEN TOMA

DATE:     June 13, 2019

TO:       Members of the Joint Committee on Capital Review

FROM:     Geoffrey Paulsen, Fiscal Analyst  GP

SUBJECT:  Arizona Department of Corrections - Review of Phase I Expenditures for Locking and Fire
          Safety Projects and Tucson HVAC Upgrade

**Request**

A.R.S. § 14-1252 requires Committee review of capital projects with estimated costs exceeding
$250,000. The Arizona Department of Corrections (ADC) requests Committee review of $17,700,000 of
non-appropriated monies in FY 2020 for Phase I of ADC's project to repair or replace locks, fire alarm
and suppression systems, and HVAC systems. Phase I would replace locks and fire alarm systems at
several units at the Lewis prison complex. ADC also requests review of $300,000 of federal grant
funding to replace the evaporative cooling system in the Tucson complex's Rincon Unit with air
conditioning.

ADC's plan has a second and third phase which would be addressed at future JLBC meetings.

**Committee Options**

The Committee has at least the following 2 options:

1. A favorable review of the request.

2. An unfavorable review of the request.

Under either option, the Committee may consider the following provisions:

A. The department shall submit quarterly updates on the status and progress of the project. Updates
   shall be submitted on or before September 1, December 1, March 1, and June 1. The Chairman will
   notify ADC whether the progress reports require JCCR review. The reports shall include the progress
   made since the last report, the current status of the project, total expenditures, and any changes to
   the scope, timeline or budget of the project.

(Continued)

 ADC shall submit to JLBC by October 1, 2019 a report on any components of fire alarm and suppression systems in state prisons that are inoperable and an estimated cost of repairing the systems by facility. The report shall also include:

    1. The current cost in terms of both dollars and full-time equivalent positions of any 24-hour fire watch personnel required by inoperable systems.

    2. A list of the state prison units that currently use "old technology" direct evaporative cooling systems and an estimated cost to replace those systems with indirect evaporative cooling.

C. A favorable review of the proposal does not constitute endorsement of any General Fund commitment to pay for any Phase I project costs beyond $17.7 million.

D. The department shall comply with American Correctional Association (ACA) standards for all locks purchased and installed as part of this project.

---

**Key Points**

1) Inmates have been tampering with locking systems at Lewis and Yuma prisons. These same issues may occur to a lesser extent at other prisons.
2) ADC proposes to replace Lewis locks and fire systems in Phase I, the Lewis evaporative cooling in Phase 2 and replace the Yuma locking/fire/evaporative cooling systems in Phase 3.
3) Total replacement cost for all 3 phases is $45.9 million.
4) ADC is requesting review of the FY 2020 Phase 1 costs of $17.7 million. Phase I of the project is estimated to cost $20.7 million.
5) In spite of the $3.0 million Phase I funding gap, ADC has identified $2.0 million of non-appropriated money for Phase 2.
6) ADC has not identified funding sources for the remaining $26.2 million of project costs.
7) ADC also plans to use $300,000 of federal monies for an HVAC replacement of the Tucson prison unit that houses the prison high school.

---

## Analysis

### Lock, HVAC, Fire Alarm and Fire Suppression System Upgrades

*Background*
ADC's central office reports that they became aware of an increase in lock tampering and cell door malfunctions in the 3 close custody units in Lewis Prison in November 2017. Those units have a total inmate capacity of 2,184 inmates. ADC has indicated that these locks are nominally functional, but inmates have been able to tamper with the locking system so that it cannot fully engage. As a result, inmates are able to open the doors freely in some cases.

In January 2018, ADC began to add a pin and latch to the outside of the doors to further secure them from opening. The Buckeye Fire Marshal approved the pinning of the cell doors as a temporary fix until a permanent solution could be evaluated and implemented. ADC was required to put in place procedures for unpinning doors in the event of an emergency.

In April 2019, news reports indicated the door pinning was not sufficient as video of door tampering and staff assaults surfaced. ADC transferred more than 700 inmates out of the affected units, and ADC then ordered the emergency padlocking of the doors. The State Fire Marshal indicated the fix was not ideal,

<div align="right">(Continued)</div>



but that it would accept the padlocking on a temporary basis. Additional procedures were put into place, including additional fire protection devices, adequate personnel with keys to open padlocks, and alternative methods to open the padlocks (bolt cutters).

On April 30, 2019, the Governor's Office announced that former Arizona Supreme Court Justices Rebecca Berch and Ruth McGregor would be hired to conduct an independent investigation into the security issues in the Department of Corrections. According to the news release, the investigation will assess the cause of the locking problem at Lewis and the actions taken by ADC to address it, and make recommendations for changes in policy, procedure and operations as appropriate.

ADC has indicated that the same locking system is also in place at the Yuma prison.

*Project Overview*
ADC has identified locks, HVAC systems, and fire alarm and suppression systems in the Lewis and Yuma prisons complexes that need replacement. The total project cost is estimated at $45.9 million. ADC plans to complete the entire project by May 2021.

ADC plans to utilize a Construction Manager at Risk (CMAR) delivery method, which requires a construction manager to deliver a project within a Guaranteed Maximum Price (GMP). The CMAR contract will cover the purchase and installation of locks, fire systems and HVAC. Due to the scope of the contract, the CMAR is expected to include multiple GMPs. The CMAR is expected to be awarded in early July. This will allow for the purchasing of materials to begin at that time. ADC will then negotiate with the selected contractor on GMP contracts.

ADC has divided the project into 3 phases:

- Phase 1 - Lewis Prison - Replace locks, fire alarm and suppression systems ($20,651,100) - ADC has identified $17.7 million from non-appropriated funds for Phase I. (See *Table 1* below for detail.)

- Phase 2 - Lewis Prison – Upgrade evaporative cooling system ($11,330,100) - ADC has identified $2.0 million from non-appropriated funds for Phase 2.

- Phase 3 - Yuma Prison - Replace locks, fire alarm system and HVAC systems ($13,888,300)

Prison doors have a number of "locking points" which secure the door to the frame. The current locking system in place at Lewis and Yuma is a pneumatic system with 3 locking points, which over time have been manipulated by inmates. The new systems being evaluated by ADC are 4-point locking rack and pinion systems, which ADC believes to be more secure.

ADC and ADOA report that they surveyed 47 states on locking issues. The responding states provided several potential solutions. ADC also conducted a Request for Information (RFI) in May 2019 to determine the best locking solutions available. Three vendors responded to the RFI, and ADC determined that 2 of the vendors may meet the current need. Both vendors are expected to install a demonstration of their solution at Lewis prison and ADC and ADOA will evaluate the solution before signing a contract.

(Continued)



- 4 -

ADC also plans to replace the fire systems at Lewis and Yuma. ADC reports that the current fire systems have been inoperable for approximately 10 years. This includes both smoke detection and smoke evacuation. To achieve fire and life safety standards, ADC employs 24-hour fire watch personnel.

ADC proposes to replace current evaporative coolers at the prisons with "indirect evaporative cooling," which does not produce the humidity of the current system and eliminates the long-term damage created by the humidity. ADC has installed these indirect cooling systems in other complexes.

Due to the size and scope of the issue, the Committee may consider Provision A, which would require ADC to provide quarterly reports to the Committee on the status and progress of the project. The Chairman would decide whether the report required Committee review.



Given the potential need for additional fire alarm and evaporative cooling upgrades at other state prisons, the Committee may also consider Provision B, which would require ADC to report by October 1, 2019 on the potential cost and timeline for these fire alarm and evaporative cooling upgrades.

The basis of the overall project cost is still unclear. ADC has also not identified funding sources for the remaining $26.2 million of funding to complete the project. ADC has indicated that these project costs may be included in future budget requests. As a result, the Committee may consider Provision C, which states that a favorable review does not constitute endorsement of any General Fund commitment to pay for any Phase I projects costs beyond $17.7 million.

| Table 1 | | | |
|---|---|---|---|
| Locks, HVAC, Fire Alarm and Suppression System Expenditure Plan | | | |
| | Cost | Funding Identified | Funding Still Needed |
| Phase 1 (May 2019 – October 2020) | $20,651,100 | $17,700,000 | $ 2,951,100 |
| Phase 2 (March 2020 – February 2021) | 11,330,100 | 2,000,000 | 9,330,100 |
| Phase 3 (July 2020 – May 2021) | 13,888,300 | - | 13,888,300 |
| **Project Total** | **$45,869,500** | **$19,700,000** | **$26,169,500** |

*Current Request*
ADC is requesting review of $17.7 million, which represents the FY 2020 Phase 1 costs. ADC has allocated $19.7 million from 3 non-appropriated funds in FY 2020 for project costs: Inmate Store Proceeds Fund ($5.2 million), Arizona Correctional Industries Revolving Fund ($10.5 million), and the Special Services Fund ($4.0) million. These funds currently have sufficient balances to fund these expenditures (see *Table 2* below for detail). ADC will return to the Committee in FY 2020 for review of the remaining $2.0 million of funding allocated for Phase 2.

(Continued)



Table 2

## Proposed Fund Sources for FY 2020 Project Expenditures

| Fund Source | Revenue Source | Projected FY 2020 Balance [1] | Proposed Expenditure |
|---|---|---|---|
| Inmate Store Proceeds Fund | Profit resulting from the privatization of inmate stores | $ 7,996,500 | $ 5,200,000 |
| Arizona Correctional Industries Revolving Fund | Sale of Arizona Correctional Industries goods and services | 13,506,300 | 10,500,000 |
| Special Services Fund | Revenues generated by the inmate use of technology, including telephone systems, kiosks and tablets. | 8,589,900 | 4,000,000 |
| Total | | $30,092,700 | $19,700,000 |

[1] Prior to ADC proposal

ADC has identified Phase I costs of $17.7 million – approximately $800,000 for the design, $15.7 million for replacement locks (approximately $12,000 to $13,000 per lock), and $1.2 million for fire systems. The remaining $3.0 million of costs will be identified at a later date.

ADC has said that the new locks would meet the standards set by the American Correctional Association (ACA). ADC reports that given its status as a governmental entity, it is not required to be a member of the ACA and does not adopt their standards for Arizona prisons, however it does follow most of the recommended ACA guidelines. As a result, the Committee may consider Provision D, which would require any locks purchased and installed as part of this project to comply with the ACA locking standards.

## Tucson Rincon Unit HVAC Upgrade

The Tucson complex's Rincon Unit houses minors who have been tried and sentenced as adults. Because these inmates are still minors, they attend attend high school within the prison. ADC reports that the current building which houses the school has insufficient heating in the winter and cooling in the summer. ADC proposes to upgrade the heating and cooling systems to a modern HVAC system at a cost of $300,000. ADC has identified $300,000 of Federal Title I Education Funds for this project. ADC reports that the U.S. Department of Education has not yet approved the use of the funding for this purpose.

GP:kp

Count 7


Exhibit A

Grievance Exhaustion
Pages 1 - 14

# GRIEVANCE RESPONSE

**DATE: July 24, 2019**
**INMATE NAME: Bearup, Patrick**
**ADC # and UNIT: 136226 Central**
**GRIEVANCE NUMBER: A01-171-019**
**ASPC FLORENCE**
**FROM: Trina Randall, Assistant Facility Health Administrator**

This letter is in response to the Formal Grievance dated 7/23/2019 and received by Corizon Medical Administration on 7/23/2019.

Summarization of inmate Complaint:
Patient is requesting a special needs orders (SNO) and pain medication.

Description of action taken to investigate the complaint:
Review the patient medical record,
Review grievance information

Summary of Findings:
You are requesting SNOs for a TENs unit, foam mattress and pain medication. You were seen by the provider on 4/11/2019, and they did not issue SNOs for the TENs unit nor the foam mattress. The provider did not order pain medication at the appointment and did recommend for you to lose weight, avoid sugar and carbohydrate snacks. The decision to order SNOs and pain medication is a clinical decision based on the practitioner's medical judgement. This is not an administrative decision based on the dictates of the patient. If you feel you are still having issues, please submit an HNR requesting to be seen for the issue.

Decision:
Mr. Bearup,
    Currently, you are receiving treatment. At this time, if you have any further follow up issues specific to this grievance, please follow up with an inmate letter to the ADON of your unit. At this time I find this matter RESOLVED and closed.

**\*Per Policy 802.05 1.2: The decision of the Contract Facility Health Administrator is final and constitutes exhaustion of all remedies within the Department. In accordance with current policy, this response is final, and constitutes exhaustion of all remedies within the Department.**

Thank you

Trina Randall
Assistant Facility Health Administrator

7/24/19
Date

(1)

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance

Note: You may appeal the Grievance Coordinator's decision to the Warden/Deputy Warden/Administrator by filing form 802-3, within 10 calendar days of receipt of this notice

**RECEIVED BY** CO III K. McHugh

**TITLE** CO III

**BADGE NUMBER** 2216

**DATE (mm/dd/yyyy)** 7-22-19

**INMATE NAME** (Last, First M.I.) (Please print) Bearup, Patrick W.

**ADC NUMBER** 136226

**DATE (mm/dd/yyyy)** 7-20-19

**INSTITUTION/FACILITY** ASPC-F-Central 5-A-7

**CASE NUMBER** A01-171-019

**TO:** ~~GRIEVANCE COORDINATOR~~ F.H.A.

### Description of Grievance (To be completed by the Inmate)

The ADON is incorrect! TENS units Are specifically listed as approved medical items in the ADC Medical Technical Manual, they with a medical mattress are able to improve my "quality of life", reduce pain, and keep my back from getting worse. Exhibit D, shows the first "plan" for treatment from 2014, it hardly differs from Exhibit A, Your new treatment plan. My back has gotten worse, the pain has increased, the nerve pain in my legs has worsened, and at times I cannot get out of bed, or my bowels cannot hold themselves. (Nerve related!) I plan to litigate this issue, so a resolution now will save needless expenses. I did years of TENS treatment for other back issues with great results. Also, Exhibit A's plan is NOT for people with my issue (scoliosis) see underlined sections. ∇
Attached Informal, ADON Resp., Exhibits A, B, C, D

### Proposed Resolution (What informal attempts have been made to resolve the problem? What action(s) would resolve the problem?)

Resolution: See exhibits B, C - I will purchase a Prostim 2000 unit and foam mattress and sign the 909-7 forms. I also need some pain management treatment via meds. Gabapentin has worked for me in the past for my back pain and migraines. If this is done I will forego the MRF consult. — Also, I can obtain sworn statements from other inmates who have their own T.E.N.S. units, so equal treatment is requested

**Inmate's Signature** **Date** 7-20-19

**Grievance Coordinator's Signature** CO III Cerdee #2538 **Date** 7/23/19

### Action taken by Documentation of Resolution or Attempts at Resolution.

**Staff Member's Signature** **Badge Number** **Date**

DISTRIBUTION: INITIAL: White and Canary or Copies – Grievance Coordinator; Pink or Copy - Inmate
FINAL: White – Inmate; Canary – Grievance File

802-1
12/12/13

②

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Informal Complaint Resolution

Complaints are limited to one page and one issue. Please print all information.

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | INSTITUTION/UNIT | DATE (mm/dd/yyyy) |
|---|---|---|---|
| Beamp, Patrick W. | 136226 | Central ATZ | 7-13-19 |

| TO AFHA | LOCATION Medical Centurion |
|---|---|

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

On 7-11-19 @ 1130 hrs I was seen by the Centurion H.C.P. for several issues. For this informal, the issue is only for Chronic Back Pain. At issue: On 1-5-19 at 0930 hrs I saw H.C.P. Eze, during this consult a referral for an M.R.I. and Outside Consult was given. Due to unknown issues Corizon denied my referral. Probably due to them losing the Arizona Healthcare contract. Now, in order to start the MRI referral over, or to receive SOME type of relief from my chronic, worsening back pain, I sought help from my new medical vendor. My request was outright denied for all possible aid, and instead was given a printout for stretching manuvers that I have done for years without ANY positive results. Over the last five years of this worsening issue, Providers have had me 1. Drugged out on psych drugs to possibly help 2. Do dozens of stretching exercises 3. Hang from my cell door 4. Do 1 year of Yoga 5. Write grievances 6. Get X-rays — Now, Centurion instead of treating me by reviewing my FULL 20 year record, starts me over with Stretching! Which having done this for years, I have only had more curves in my spine develop!

My resolution is: 1. Schedule an MRI and Outside Consult 2. Allow me to purchase a T.E.N.S device and Medical mattress 3. Prescribe me ~~with~~ a script for Gabapentin 200mg twice per day to allieve nerve pain and muscle spasms.

| INMATE SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
| | 7-13-19 |

Have you discussed this with institution staff?  ☑ Yes  ☐ No

If yes, give the staff member name: Medical



ARIZONA DEPARTMENT OF CORRECTIONS

Inmate Informal Complaint Response

For Distribution: Copy of Corresponding Inmate Informal Complaint Resolution must be attached to this response.

| INMATE NAME *(Last, First M.I.)* (Please print) | ADC NUMBER |
|---|---|
| Bearup, Patrick | 136226 |

| INSTITUTION/ UNIT |
|---|
| ASPC Florence Central IPC |

| FROM | LOCATION |
|---|---|
| ADON Central IPC | Central IPC Health Services Administration |

This is in response to your Inmate Informal Complaint received on 7/16/19, and reviewed on 7/19/19. Your primary area of concern is regarding: Back Pain Treatment

Your concern has been researched including a review of your Medical Records. I am providing you with the following response:

The MRI was denied due to the following:

ATP: Medical necessity criteria for MRI not met at this time. Symptoms and physical exam are negative for neurologic findings that would require surgical intervention. Consider activity modification and educating patient on an exercise regimen based on AAOS' spinal conditioning program

TENS units and medical mattresses are not permitted for use on the yards.

Per the plan from your last provider visit on 7/11/19 the plan of care states:

1. back pain (meds, mri, tens, med. mattress)-previous imaging shows scoliosis, TENS unit is not proven to provide relief for low back pain, needs to stretch and exercise daily, HEP AAOC spine conditioning exercises, needs to lose weight, low fat, low salt diet, avoid sugar, carbohydrate snacks

If you have any additional questions, please do not hesitate to contact medical via HNR. Thank you for your time. End of response.

| STAFF SIGNATURE | DATE *(mm/dd/yyyy)* |
|---|---|
| K. Henry, RN, ADON Central IPC | 7/19/19 |

Distribution:   INITIAL: White and Canary or Copies - Grievance Coordinator; Pink or Copy - Inmate          802-12
FINAL: White – Inmate; Canary - Grievance Coordinator File          10/16/16







**AAOS**
AMERICAN·ACADEMY·OF
ORTHOPAEDIC·SURGEONS

**OrthoInfo**
*Our knowledge of orthopaedics. Your best health.*

Prepared for: _____

Prepared by: _____

# Spine Conditioning Program

## Purpose of Program

After an ~~injury or surgery, an exercise c~~onditioning program will help you return to daily activities and enjoy a more active, healthy lifestyle. Following a well-structured conditioning program will also help you return to sports and other recreational activities.

This is a general conditioning program that provides a wide range of exercises. To ensure that the program is safe and effective for you, it should be performed under your doctor's supervision. Talk to your doctor or physical therapist about which exercises will best help you meet your rehabilitation goals.

**Strength:** Strengthening the muscles that support your spine will help keep your back and upper body stable. Keeping these muscles strong can relieve back pain and prevent further injury.

**Flexibility:** Stretching the muscles that you strengthen is important for restoring range of motion and preventing injury. Gently stretching after strengthening exercises can help reduce muscle soreness and keep your muscles long and flexible.

**Target Muscles:** The muscle groups targeted in this conditioning program include:

- Cervical spine (neck)
- Trapezius (neck and upper back)
- Latissimus dorsi (side and middle back)
- Back extensors and erector spinae (middle and lower back)
- Quadratus lumborum (lower back)
- Abdominals
- External oblique rotators (side and lower back)
- Internal oblique rotators (side and lower back)
- Piriformis (buttocks)
- Gluteus maximus (buttocks)
- Gluteus medias (buttocks)
- Hamstrings (back of thigh)

**Length of program:** This spine conditioning program ~~should be continued for 4 to 6 weeks~~, unless otherwise specified by your doctor or physical therapist. ~~After your recovery,~~ these exercises can be continued as a maintenance program for lifelong protection and health of your shoulders. Performing the exercises ~~two to three days a week~~ will maintain strength and range of motion in your back.

## Getting Started

**Warm up:** Before doing the following exercises, warm up with 5 to 10 minutes of low impact activity, like walking or riding a stationary bicycle.

**Stretch:** After the warm-up, do the stretching exercises shown on Page 1 before moving on to the strengthening exercises. When you have completed the strengthening exercises, repeat the stretching exercises to end the program.

**Do not ignore pain:** ~~You should not feel pain during an exerc~~ise. Talk to your doctor or physical therapist if you have any pain while exercising.

**Ask questions:** If you are not sure how to do an exercise, or how often to do it, contact your doctor or physical therapist.

*AAOS does not endorse any treatments, procedures, products, or physicians referenced herein. This information is provided as an educational service and is not intended to serve as medical advice. Anyone seeking specific orthopaedic advice or assistance should consult his or her orthopaedic surgeon.*



## OrthoInfo
*Our knowledge of orthopaedics. Your best health.*

# Spine Conditioning Program
## STRETCHING EXERCISES

## 1. Head Rolls

| Repetitions |
| --- |
| 3 sets of 3 |

| Days per week |
| --- |
| Daily |

**Main muscles worked:** Cervical spine muscles, trapezius
You should feel this stretch all around your neck and into your upper back

**Equipment needed:** None



**Step-by-step directions**

- Sit in a chair or stand with your weight evenly distributed on both feet.
- Gently bring your chin toward your chest.
- Roll your head to the right and turn so that your ear is over your shoulder (1). Hold for 5 seconds.
- Gently roll your head back toward your chest and to the left. Turn your head so that your ear is over your left shoulder (2). Hold for 5 seconds.
- Slowly roll your head back and in a clockwise circle three times (3).
- Reverse directions and slow roll your head in a counterclockwise circle three times (4).

| Tip | Do not shrug your shoulders up during this exercise. |
| --- | --- |

## 2. Kneeling Back Extension

| Repetitions |
| --- |
| 10 |

| Days per week |
| --- |
| Daily |

**Main muscles worked:** Quadratus lumborum, erector spinae
You should feel this stretch in your lower back and your abdominals

**Equipment needed:** None



**Step-by-step directions**

- Begin on your hands and knees with your shoulders positioned over your hands.
- Rock forward onto your arms, round your shoulders and allow your low back to drop toward the floor. Hold for 5 seconds.
- Rock backward and sit your buttocks as close to your heels as possible. Extend your arms and hold for 5 seconds.

| Tip | Look down on the floor to keep your neck in alignment with your spine. |
| --- | --- |

*AAOS does not endorse any treatments, procedures, products, or physicians referenced herein. This information is provided as an educational service and is not intended to serve as medical advice. Anyone seeking specific orthopaedic advice or assistance should consult his or her orthopaedic surgeon.*
© *American Academy of Orthopaedic Surgeons*


AAOS
AMERICAN ACADEMY OF
ORTHOPAEDIC SURGEONS

OrthoInfo
*Our knowledge of orthopaedics. Your best health.*

# Spine Conditioning Program
## STRETCHING EXERCISES

### *3. Sitting Rotation Stretch*

| Repetitions |
|---|
| 2 sets of 4 |

| Days per week |
|---|
| Daily |

**Main muscles worked:** Piriformis, external oblique rotators, internal oblique rotators
You should feel this stretch in your buttocks, as well as at your sides

**Equipment needed:** None

**Step-by-step directions**

- Sit on the floor with both legs straight out in front of you. Cross one leg over the other.
- Slowly twist toward your bent leg, putting your hand behind you for support.
- Place your opposite arm on the side of your bent thigh and use it to help you twist further.
- Look over your shoulder and hold the stretch for 30 seconds. Slowly come back to center.
- Repeat on the other side. Repeat the entire sequence 4 times.

| Tip | Sit up tall and keep your sit bones pressed into the floor throughout the stretch. |
|---|---|

### *4. Modified Seat Side Straddle*

| Repetitions |
|---|
| 10 each side |

| Days per week |
|---|
| Daily |

**Main muscles worked:** Hamstrings, extensor muscles, erector spinae
You should feel this stretch in the back of your thighs and into your lower and middle back

**Equipment needed:** None

**Step-by-step directions**

- Sit on the floor with one leg extended to the side and the other leg bent.
- Keep your back straight and bend from your hips toward the foot of your straight leg. Reach your hands toward your toes and hold for 5 seconds.
- Slowly round your spine and bring your hands to your shin or ankle. Bring your head down as close to your knee as possible.
- Hold for 30 seconds and then relax for 30 seconds.
- Repeat on the other side. Repeat the sequence 10 times.

| Tip | Keep your extended leg straight as you bring your head down. |
|---|---|

*AAOS does not endorse any treatments, procedures, products, or physicians referenced herein. This information is provided as an educational service and is not intended to serve as medical advice. Anyone seeking specific orthopaedic advice or assistance should consult his or her orthopaedic surgeon.*
© *American Academy of Orthopaedic Surgeons*

# Spine Conditioning Program
## STRETCHING EXERCISES

### *5. Knee to Chest*

| Repetitions |
| --- |
| 3 sets of 10 |

| Days per week |
| --- |
| Daily |

**Main muscles worked:** Quadratus lumborum
You should feel this stretch in your lower back, as well as in the front of your hip and inner thigh

**Equipment needed:** None

**Step-by-step directions**

- Lie on your back on the floor.
- Lift one leg and bring your knee toward your chest. Grasp your knee or shin and pull your leg in as far as it will go.
- Tighten your abdominals and press your spine to the floor. Hold for 5 seconds.
- Repeat on the other side, then pull both legs in together. Repeat the sequence 10 times.

| Tip | Keep your spine aligned to the floor throughout the sequence. |
| --- | --- |

*AAOS does not endorse any treatments, procedures, products, or physicians referenced herein. This information is provided as an educational service and is not intended to serve as medical advice. Anyone seeking specific orthopaedic advice or assistance should consult his or her orthopaedic surgeon.*

© *American Academy of Orthopaedic Surgeons*



# OrthoInfo
*Our knowledge of orthopaedics. Your best health.*

## Spine Conditioning Program
### STRENGTHENING EXERCISES

### 6. *Bird Dog*

| Repetitions |
|:---:|
| 5 |

| Days per week |
|:---:|
| Daily |

**Main muscles worked:** Back extensors, erector spinae, gluteal muscles
You should feel this exercise in your lower back and into your buttocks

**Equipment needed:** None



Start

Finish

**Step-by-step directions**

- Begin on your hands and knees with your shoulders positioned over your hands and your hips directly over your knees.

- Tighten your abdominal muscles and raise one arm straight out to shoulder-height and level with your body. Hold until you feel balanced.

- Slowly lift and extend the opposite leg straight out from your hip.

- Tighten the muscles in your buttocks and thigh, and hold this position for 15 seconds.

- Slowly return to the start position and repeat with the opposite arm and leg.

| Tip | Keep your stomach muscles tight and your back flat to stay balanced. |
|---|---|

### 7. *Plank*

| Repetitions |
|:---:|
| 5 |

| Days per week |
|:---:|
| Daily |

**Main muscles worked:** Back extensors, erector spinae, quadratus lumborum, abdominals
You should feel this exercise in your middle to lower back, abdominals, and gluteal muscles

**Equipment needed:** None



**Step-by-step directions**

- Lie on your stomach with your forearms on the floor and your elbows directly below your shoulders.

- Tighten your abdominal muscles and lift your hips off of the floor.

- Squeeze your gluteal muscles and lift your knees off of the floor.

- Keep your body straight and hold for 30 seconds. If you cannot hold this position, bring your knees back to the floor and hold with just your hips lifted.

- Slowly return to the start position and rest 30 seconds. Repeat.

| Tip | Do not let your pelvis sag toward the floor. Keep your stomach muscles tight. |
|---|---|

*AAOS does not endorse any treatments, procedures, products, or physicians referenced herein. This information is provided as an educational service and is not intended to serve as medical advice. Anyone seeking specific orthopaedic advice or assistance should consult his or her orthopaedic surgeon.*
© *American Academy of Orthopaedic Surgeons*



**OrthoInfo**
*Our knowledge of orthopaedics. Your best health.*

## Spine Conditioning Program
### STRENGTHENING EXERCISES

### 8. Modified Side Plank

| Repetitions |
|---|
| 5 |

| Days per week |
|---|
| Daily |

**Main muscles worked:** Quadratus lumborum, external oblique rotators, internal oblique rotators
You should feel this exercise in your lower back, waist, and abdominals

**Equipment needed:** None

**Step-by-step directions**

- Lie on your side on the floor with your bottom leg slightly bent and top leg straight. Your elbow should be directly under your shoulder with your forearm extended on the floor in front of you.

- Tighten your abdominal muscles and raise your hip off of the floor.

- If you can, straighten your bottom leg and lift your knee off of the floor as shown.

- Keep your body straight and hold this position for 15 seconds.

- Slowly return to the start position and repeat on the other side.

| Tip | Keep neck in alignment with your spine and do not shrug your shoulder up to your ear. |
|---|---|

### 9. Hip Bridge

| Repetitions |
|---|
| 5 |

| Days per week |
|---|
| Daily |

**Main muscles worked:** Lower back extensor, erector spinae, gluteal muscles, hamstrings
You should feel this exercise in your lower back, buttocks, and back of your thigh

**Equipment needed:** None

**Step-by-step directions**

- Lie on your back on the floor with your arms at your sides, your knees bent, and your feet flat on the floor.

- Tighten your abdominal and gluteal muscles and lift your pelvis so that your body is in a straight line from your shoulders to your knees.

- Hold this position for 15 seconds.

- Slowly return to the start position and repeat.



| Tip | Center your weight over your shoulder blades. Do not tense up in your neck. |
|---|---|

*AAOS does not endorse any treatments, procedures, products, or physicians referenced herein. This information is provided as an educational service and is not intended to serve as medical advice. Anyone seeking specific orthopaedic advice or assistance should consult his or her orthopaedic surgeon.*
© *American Academy of Orthopaedic Surgeons*



## OrthoInfo
*Our knowledge of orthopaedics. Your best health.*

# Spine Conditioning Program
## STRENGTHENING EXERCISES

## 10. *Abdominal Bracing*

| Repetitions |
|---|
| 5 |

| Days per week |
|---|
| Daily |

**Main muscles worked:** Abdominals
You should feel this exercise in your stomach muscles

**Equipment needed:** None



**Step-by-step directions**

- Lie on your back on the floor with your knees bent and arms at your sides.

- Tighten your abdominal muscles so that your stomach pulls away from your waistband.

- Hold this position for 15 seconds.

| Tip | Flatten your lower back into the floor. |
|---|---|

## 11. *Abdominal Crunch*

| Repetitions |
|---|
| 2 sets of 10 |

| Days per week |
|---|
| Daily |

**Main muscles worked:** Abdominals
You should feel this exercise in your stomach muscles

**Equipment needed:** None



**Step-by-step directions**

- Lie on your back on the floor with your knees bent and hands at the back of your head with your elbows open wide.

- Tighten your abdominal muscles and lift your head and shoulder blades off of the floor.

- Keep your back flat to the floor and hold for 2 seconds.

- Slowly lower and repeat.

| Tip | Relax your neck and do not pull on your head with your hands. |
|---|---|

*AAOS does not endorse any treatments, procedures, products, or physicians referenced herein. This information is provided as an educational service and is not intended to serve as medical advice. Anyone seeking specific orthopaedic advice or assistance should consult his or her orthopaedic surgeon.*
© *American Academy of Orthopaedic Surgeons*

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Specialized Personal Medical Property Information/Agreement**

| INMATE NAME *(Last, First, M.I.) (Please print)* | ADC NUMBER | UNIT |
|---|---|---|
| Beavup, Patrick W. | 136226 | Central A72 |

The contracted medical vendor has recommended the following specialized personal medical property to be sent in for consideration for possible issue to you during your incarceration with ADC:

1. T.E.N.S. Unit

You must agree to the conditions outlined in this document to be authorized to have the above specialized personal medical property sent into the Contract Facility Health Administrator for review/consideration.

**CONDITIONS:**

- You or sender will be responsible for all costs to have the specialized personal medical property sent to the Contract Facility Health Administrator. The specialized personal medical property must have all components and be in sound physical and operational condition.

- The specialized personal medical property must be inspected and approved by the Contract Facility Health Administrator and unit Chief of Security prior to issue to you.

- If the specialized personal medical property is disapproved for issue to you due to security concerns or poor physical/operational condition as determined by the unit Chief of Security and/or the Contract Facility Health Administrator you will be responsible for the cost of returning the specialized personal medical property back to the sender.

- If the specialized personal medical property should require repair or replacement during you incarceration, you will be responsible for all costs involved in the specialized personal medical property replacement or repair to include shipping.

- The approval for you to possess specialized personal medical property may be terminated at any time if the item is misused in any manner.

**NOTE:** Additional medical items specifications will be attached by the Contract Facility Health Administrator as necessary, i.e. no full metallic braces, etc.

**I have read and agree to the above conditions:**

| INMATE SIGNATURE | | DATE *(mm/dd/yyyy)* |
|---|---|---|
| | | |

| WITNESS NAME *(Last, First, M.I.) (Please print)* | SIGNATURE | DATE *(mm/dd/yyyy)* |
|---|---|---|
| | | |

*Exhibit C*

# ARIZONA DEPARTMENT OF CORRECTIONS

## Specialized Personal Medical Property Information/Agreement

| INMATE NAME *(Last, First, M.I.) (Please print)* | ADC NUMBER | UNIT |
|---|---|---|
| Bearup, Patrick W. | 136226 | Central AZ |

The contracted medical vendor has recommended the following specialized personal medical property to be sent in for consideration for possible issue to you during your incarceration with ADC:

1. Medical All Foam Mattress

You must agree to the conditions outlined in this document to be authorized to have the above specialized personal medical property sent into the Contract Facility Health Administrator for review/consideration.

## CONDITIONS:

- You or sender will be responsible for all costs to have the specialized personal medical property sent to the Contract Facility Health Administrator. The specialized personal medical property must have all components and be in sound physical and operational condition.

- The specialized personal medical property must be inspected and approved by the Contract Facility Health Administrator and unit Chief of Security prior to issue to you.

- If the specialized personal medical property is disapproved for issue to you due to security concerns or poor physical/operational condition as determined by the unit Chief of Security and/or the Contract Facility Health Administrator you will be responsible for the cost of returning the specialized personal medical property back to the sender.

- If the specialized personal medical property should require repair or replacement during you incarceration, you will be responsible for all costs involved in the specialized personal medical property replacement or repair to include shipping.

- The approval for you to possess specialized personal medical property may be terminated at any time if the item is misused in any manner.

**NOTE:** Additional medical items specifications will be attached by the Contract Facility Health Administrator as necessary, i.e. no full metallic braces, etc.

I have read and agree to the above conditions:

| INMATE SIGNATURE | | DATE *(mm/dd/yyyy)* |
|---|---|---|
| | | |

| WITNESS NAME *(Last, First, M.I.) (Please print)* | SIGNATURE | DATE *(mm/dd/yyyy)* |
|---|---|---|
| | | |

Exhibit D

Exercises with an "X" — Perform on week 4

# YOUR 15-MINUTE WORKOUT

By doing your 15-minute workout 3–5 times a week, you can condition the muscles and joints that support your back and keep it in healthy balance throughout the day. Strengthening exercises help build strong muscles, while stretching exercises increase flexibility. Begin each group of exercises from the starting position indicated, and follow the sequence shown.

Try not to rush or strain. Relax and enjoy the feeling!

*Before beginning a new exercise program, be sure to check with your health care professional.*



| LYING | | | PRONE |
| STARTING POSITION | 6 Single Leg Pull | 7 Straight Leg Raise | STARTING POSITION |

| LYING | | | |
| STARTING POSITION | 1 Pelvic Tilt | 2 Lower Back Rotation | 3 Double-Leg Pull | 4 Hip Lift | 5 Partial Sit-Ups |

| HANDS & KNEES | | | | | |
| STARTING POSITION | 9 Back Press | 10 Back Release | 11 Arm Reach | 12 Leg Reach |

8 Elbow Press

(14)

Count ___7___

Exhibit ___B___

DO 909   pages 2,3 and 4
        Pages 1-3

## 2.0 PROPERTY RESTRICTIONS

2.1 Inmates shall not possess any property item in excess of the total amount allowed. All property items, in the inmate's possession and in storage, shall equal the total amount of property allowed.

    2.1.1 When property items are received in excess of the total amount allowed, inmates shall arrange to dispose of the excess item(s) as outlined in this Department Order.

    2.1.2 Inmates shall not obtain or purchase at the inmate store or any other source any item, including consumable and food products (such as candy, etc.), in a quantity that, when added to the quantity currently possessed, exceeds the total allowed by Attachment A.

2.2 Inmates shall not trade, loan, barter or sell any item of property to staff, a visitor, contractor, volunteer, or another inmate.

    2.2.1 Inmates wishing to dispose of any item shall do so through assigned staff at their own expense.

    2.2.2 Inmates wishing to donate property items to outside charitable organizations or to the Department may do so by completing an Inmate Property/Contraband /Disposition Tracking, Form 909-6.

    2.2.3 Inmates shall not be permitted to designate a specific person to whom an item is to be donated.

2.3 Intake Property

    2.3.1 At intake, inmates are not authorized to bring in any property (including crime scene photos) other than the following:

        2.3.1.1 Legal papers and legal documentation

            2.3.1.1.1 Legal documentation shall be placed in an envelope and secured in the inmate's Institution File until release from custody.

        2.3.1.2 Plastic frame prescription eyeglasses, to include reading glasses

        2.3.1.3 Contact lenses (hard and soft) and carrying/storage case

        2.3.1.4 Wedding ring meeting Attachment A requirements if they are married

        2.3.1.5 Wristwatch in accordance with Attachment A requirements

    2.3.2 Inmates shall mail property out at their own expense or the Department will arrange to have it destroyed.

2.4 Specialized Personal Medical Property

    2.4.1 Authorization Procedure

2.4.1.1    Medically necessary equipment/items, including but not limited to: prescription eyeglasses, medical shoes, prosthesis, and wheelchairs, shall be provided by the Contract Medical Vendor. *[Revision – September 17, 2019: Sections 2.4.1.1 thru 2.4.1.3]*

2.4.1.1.1    In the event the Contract Medical Vendor cannot supply specific Durable Medical Equipment (DME), the Health Services Contract Monitoring Bureau (HSCMB) Physician shall review the request for approval, and consult with security staff.

2.4.1.2    Inmates may be authorized to keep in their possession specialized personal medical equipment or items sent from an outside source to the Department that are:

2.4.1.2.1    Not provided by the Contracted Medical Vendor.

2.4.1.2.2    Deemed clinically indicated for their medical condition(s).

2.4.1.3    For approved specialized personal medical equipment or items, the Contract Facility Health Administrator shall have nursing initiate the Specialized Personal Medical Property Information/Agreement, Form 909-7, outlining the inmate's conditions for receiving the specialized personal medical equipment or item(s).

2.4.1.3.1    If the inmate agrees to the conditions outlined in the Specialized Personal Medical Property Information/ Agreement form, the specialized personal medical equipment or item(s) shall be sent in to the Contract Facility Health Administrator.

2.4.2    Receipt, Final Approval and Issue

2.4.2.1    Upon delivery, the Contract Facility Health Administrator shall notify the inmate's unit Chief of Security so they can jointly inspect the specialized personal medical equipment or item(s) for final approval/disapproval to allow the inmate to possess the medical equipment or item(s) on his/her unit.

2.4.2.2    If the specialized personal medical equipment or item(s) are approved, the Contract Facility Health Administrator and the unit Chief of Security shall jointly sign the Duty/Special Needs Order form and distribute the form as outlined on the form's distribution listing.

2.4.2.2.1    The unit Chief of Security shall bring the item(s) to the unit Mail and Property Office.

2.4.2.2.2    The Mail and Property staff shall add the specialized personal medical equipment or item(s) to the inmate's Property File as authorized specialized personal medical property, prior to issuing it to the inmate.

2.4.2.3    If specialized personal medical equipment or item(s) are denied:

2.4.2.3.1 The Contract Facility Health Administrator shall notify the inmate of the denial.

2.4.2.3.2 The inmate shall arrange for the items to be returned to the sender at his/her expense, as agreed upon in the Specialized Personal Medical Property Information/Agreement form.

2.4.3 Medical Property Repair

2.4.3.1 Repairs to state-issued medical property shall be completed as outlined in section 3.0 of this Department Order.

2.4.3.2 Inmates requiring repair to specialized personal medical property or item(s) authorized in accordance with this section may elect to return the items to a third party (i.e., family member, etc.) for coordination of the repair and subsequent return of the items in accordance with the procedures outlined in this Department Order.

2.4.3.2.1 Costs associated with the transfer of specialized personal medical property or item(s) in need of repair shall be borne by the inmate.

2.4.3.2.2 The Department shall not pay for the repair of specialized personal medical property or item(s).

2.4.3.3 If unable to coordinate the repair through an outside source, inmates may, if clinically indicated, submit an Inmate Property/Contraband/ Disposition Tracking form to forfeit their specialized personal medical property or item(s) in favor of receiving a state-issued substitute.

2.4.3.3.1 The Contracted Medical Vendor shall note the forfeitures of authorized specialized personal medical equipment or items in need of repair in the Subjective; Objective Assessment; Plan; Education (SOAPE) portion of the inmate's Medical Record.

2.5 <u>Wedding Rings</u> – Inmates who become married while incarcerated or those who did not have a wedding ring at Reception Center Intake or at another institution if a Release Violator may have one mailed in as long as the sender encloses a certified copy of a marriage certificate and the ring meets the requirements of Attachment A.

2.6 <u>Religious Items</u> – Inmates shall be authorized to possess religious property consistent with the practices of the inmate's chosen religion. Religious property shall be approved and maintained as outlined in Department Order #904, <u>Inmate Religious Activities/Marriage Requests</u>.

2.7 All authorized property shall be stored neatly in the inmate's assigned living area or in approved storage boxes as outlined in this Department Order and shall comply with Department Order #704 <u>Inmate Regulations</u>.

2.8 The total value of an inmate's authorized property shall not exceed $800, excluding specialized personal medical property authorized by the Contracted Medical Vendor as outlined in this section. No single item of non-medical property shall exceed $300.

Count    7

Exhibit    C

Secondary Resolution Attempt
Pages 1-3



# ARIZONA DEPARTMENT OF CORRECTIONS

## Health Needs Request (HNR)

Date : _____

Time: _____

Initials: _____

## SECTION/SECCIÓN I

| INMATE NAME/NOMBRE *(Last, First M.I.) (Apellido, Nombre, Inicial)* | ADC NUMBER/NÚMERO DE ADC | DATE/FECHA *(mm/dd/yyyy)* |
|---|---|---|
| Bearup, Patrick W. | 136226 | 8-23-19 |

| CELL/BED NUMBER/CELDA/ NÚMERO DE CAMA | UNIT/UNIDAD | P.O. BOX/APARTADO POSTAL | INSTITUTION/INSTALACIÓN: ADC |
|---|---|---|---|
| 5-A-7 | Central | 8200 | Florence |

You are required to be truthful. Failure to be cooperative and any abuse of the health care system or its staff could cause a delay in delivery of care to you and others, and may result in disciplinary action. [Se le exige diga la verdad. La falta de cooperación y cualquier abuso del sistema del cuidado de la salud o del personal podría retrasar la asistencia de este cuidado para usted y para otros y puede dar lugar a una acción disciplinaria.]

## SECTION/SECCIÓN II

| AREA OF INTEREST *(Check only one block below)*/AREA DE INTERES *(Marque Un Espacio Solamente)* | ☐ Medical/Médico | ☐ Dental | ☐ FHA |
|---|---|---|---|

☐ Pharmacy/Farmacia    ☐ Mental Health/Salud Mental    ☐ Eyes/Ojos    ☑ Other *(specify)/Otros (especifique)*   ADON

PLEASE PRINT! Describe your medical/dental treatment issue need in the space below. Be clear and specific. NO ADDED PAGES. [POR FAVOR, ESCRIBA EN IMPRENTA! Describa su tratamiento o necesidad médica/dental en el espacio de abajo. Describa claramene y sea específico. ¡NO USE MAS HOJAS!]

Please forward attached for my second Attempt to reach
the Centurion ADON — My first was Never responded
to in violation of DO 916

I understand that, per ARS 31-201.01, I will be charged a $4.00 Health Services fee *(excluding exemptions granted by statute)* for the visit that I am herein requesting. I further understand that by paying this fee I do not have the right to dictate treatment or who provides treatment. [Entiendo que de acuerdo con ARS 31-201.01 se me cobrará una cuota por el servicio médico de $4.00 por la cita que aquí estoy pidiendo *(excluyendo las exenciones otorgadas por la ley)*. Además entiendo que al pagar esta cuota no tengo el derecho a imponer el tratamiento o quien lo proporcione.]

INMATE SIGNATURE/FIRMA DEL PRISIONERO

**REMOVE THE GOLDENROD COPY AND PLACE THE REMAINDER IN THE HEALTH NEEDS REQUEST DROP BOX [SEPARE LA COPIA DE COLOR AMARILLO OBSCURO Y DEJE LAS DEMAS EN EL BUZON PETICION DE NECESIDADES MÉDICAS.]**

## SECTION III/SECCION III

| REFERRAL BY MEDICAL STAFF/REFERENCIA MEDICA | ☑ Medical/Médico | ☐ Dental | ☐ Pharmacy/Farmacia | ☐ FHA |
|---|---|---|---|---|

☐ Pharmacy/Farmacia    ☐ Mental Health/Salud Mental    ☐ Eyes/Ojos    ☐ Other *(specify)/Otros (especifique)* _____

| STAFF SIGNATURE STAMP/FIRMA DEL EMPLEADO | DATE/FECHA *(mm/dd/yyyy)* | TIME/HORA |
|---|---|---|

## SECTION/SECCIÓN IV

PLAN OF ACTION/PLAN DE ACCION

This is not what this form is for. Will forward
to ADON

| STAFF SIGNATURE STAMP/FIRMA DEL EMPLEADO | DATE/FECHA *(mm/dd/yyyy)* | TIME/HORA |
|---|---|---|

*This document is a translation from original text written in English. This translation is unofficial and is not binding on this state or a political subdivision of this state. [Éste documento es una traducción de texto original escrito en inglés. Esta traducción no es oficial y no compromete a este estado ni una subdivisión política de este estado.]*

Distribution/Distribución:    White/Blanca – Health Unit/Unidad de Salud                     1101-10ES
                         Canary, Pink & Goldenrod – Inmate/Amarillo Canario, Rosa y Amarillo Obscur - Prisonero      12/13/16

SECTION 4, HNR



I/m COPY

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Letter

Requests are limited to one page and one issue. NO ATTACHMENTS PERMITTED. Please print all information.

5-A-7

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | INSTITUTION/UNIT | DATE (mm/dd/yyyy) |
|---|---|---|---|
| Bearup, Patrick W | 136226 | Central  A1Z | 8-23-19 |

| TO | LOCATION |
|---|---|
| ADON | Centurion Medical |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

As per AFHA Trina Randall - Grievance # A01-171-019 (Exhibit A) Please respond in writing per DO 916
I have "follow up" issues specific to the grievance cited above.
This is my second attempt to receive a response. My back issue has been a solid 7/8 out of 10 in pain. I am requesting to see HCP Eze to continue the treatment plan HE was working towards. He has the best data to deal with my 5 year issue that continues to worsen.
Please respond with copies of all the attached
Thankyou (i.c. file)

| INMATE SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
| | 8-23-19 |

Have You Discussed This With Institution Staff?  ☒ Yes   ☐ No

If yes, give the staff member's name: Centurion via Nurse Taylor

Note: Using profanity, insulting, obscene, or abusive language and/or addressing staff with inappropriate names or making inappropriate remarks in this written correspondence (or verbal communication to staff concerning this correspondence), will not be tolerated and may result in no response to the correspondence and/or discipline pursuant to Department Order 803, Inmate Disciplinary Procedure.

Distribution:  Original – Master File
Copy - Inmate

②

916-1
5/10/17

**ARIZONA DEPARTMENT OF CORRECTIONS**

5 -A- 7

**Inmate Letter Response**

| Inmate Name (Last, First)<br>**Bearup, Patrick** | ADC Number<br>**136226** |
|---|---|
| Institution / Unit<br>**ASPC-Florence Central IPC** | Date<br>**8/26/19** |

| From<br><br>**ADON Central IPC** | Location<br><br>**ASPC Central IPC Health Services Administration** |
|---|---|

This is in response to your Inmate Letter received on 8/26/19, and reviewed in the Florence Central IPC Unit Health Services Office on 8/26/19. Your primary area of concern is regarding: Back pain

    Your concern has been researched, including a review of your Medical Records. I am providing you with the following response:

Per ARS 31-201.01 you do not have the right to dictate treatment or who provides treatment. If you would like to be seen by a provider please submit a HNR requesting this.

If you have any additional questions, please do not hesitate to contact medical via HNR.  Thank you for your time and take care.

End of response

| Staff Signature<br>**K. Henry RN, ADON Florence Complex, Central IPC** | Date<br>**8/26/19** |
|---|---|

Computer Electronic Version
Distribution:     Inmate
                Health Services File

Count 7

Exhibit D

Health Services Technical Manual
Chapter 7 Sec. 11.0
Pages 1-3

| | Orthotic and Prosthetic Aids | OPR: |
|---|---|---|
| Arizona Department of Corrections | | HS Contract Vendor Regional Medical Director<br>HSCMB Medical Program Administrator<br><br>Auth: rr |
| Health Services Technical Manual | HSTM<br>Chapter 7<br>Section 11.0. | SUPERSEDES: 08/15/2018<br>EFFECTIVE DATE: 07/01/2019 |

**REFERENCES**:    NCCHC STANDARD P-G-11

**PURPOSE**: Medical and Dental orthoses, prostheses, and other aids to impairment will be provided when the health of the inmate would otherwise be significantly adversely affected, as determined and ordered by the responsible Vendor Practitioner or Dentist and approved by the appropriate Vendor Approving Authority. Inmates will not be denied prostheses, orthoses, or other aids that are medically necessary because of lack of funds. This procedure specifies the method to provide these aids to inmates.

**RESPONSIBILITY**: It is the responsibility of the Vendor Facility Health Administrator to develop and monitor systems to support provision of medically necessary orthotics and prosthetics.

**PROCEDURE**: Orthotics and Prosthetics

1.0. Definitions and Standards for Aids: Orthoses/ Prosthetic Devices/ Mechanical Aids are specialized mechanical devices used chronically to support or supplement joints or limbs, or are artificial devices to replace missing body parts.

1.1. Appropriate but elective orthoses, prostheses, and aids to impairment are those services/devices which are not essential to prevent significant deterioration in the essential health of the patient, but nevertheless are reasonably expected to significantly improve the quality of life for the patient as it relates to a proven chronic or ongoing medical condition. These items are generally for chronic use and become the personal property of the patient. These items include, but are not limited to; dentures, dental prosthetics such as partials, flippers, etc., glasses, contact lenses, artificial eyes, artificial limbs, certain knee/ankle/foot braces, hernia support belts, hearing aids, special support hose, TENS units, non-institution issue shoes, suspenders, batteries for hearing aids and other battery operated devices, and include maintenance and/or repair of any such device.

1.2. There are certain items that though they may be available in the community, or are used for certain conditions, are of minimal proven medical value, requests to health services to authorize special items must be weighed against the concerns of running a safe and secure institution, and appropriate institution routine. There are many items in this category that are not generally considered or approved by the Vendor Health Services as rising to a level of need to create a

medical exception to institution rules, policies, and standards, some examples are; high top tennis shoes, soft pillows, heating pads, knee sleeves for sports, etc.

1.3. Medical aids issued by Vendor Health Services as part of acute treatment for a limited medical condition such as casts, splints, ace wraps, short-term usage of canes/crutches/braces, etc., are routinely authorized and not generally charged to the inmate.

1.4. Hardware that is an essential part of a medically necessary procedure such as, heart valves, cardiac stent at time of angioplasty, intraocular lens implants at time of cataract surgery, etc., are routinely authorized and not generally charged to the inmate.

1.5. Inmates may also in certain circumstances obtain prostheses that the Practitioner or Dentist has determined are elective, which are medically appropriate, but are not medically necessary. This procedure establishes the mechanism for inmates to obtain these prostheses, orthoses, or other aids.

1.6. Most aids, prostheses, orthoses become the personal property of the inmate to emphasize the inmate's responsibility to care for the item(s) properly.

2.0. Footwear: The institution is responsible for the style, quality and fitting of standard issue clothing and footwear. Inmates with medical disorders for which special, non-standard footwear is a recognized and appropriate part of the medical treatment program and for which no reasonable treatment alternative exists will be prescribed special footwear. Footwear prescribed as "medically necessary" will be provided regardless of the inmate's ability to pay.

2.1. Patients with medical disorders, which may require special foot care, may be scheduled with a Vendor Practitioner for evaluation of the medical problem.

2.2. Inmates with a complaint about shoes and the complaint is not clinically related to an existing medical disorder, should be directed to appropriate operations staff for assistance. A complaint of shoes being uncomfortable is not, in and of itself, a medical problem.

2.3. The Vendor Practitioner doing the examination is to determine and document by history and objective examination: whether an inmate has a formal medical disorder for which non-standard or modified footwear is a recognized and appropriate part of the medical treatment plan, and without which there is likely to be serious deterioration in, or significant risk to, the inmate's basic health, and for which no appropriate alternative exists.

2.4. A Vendor Practitioner order for specialty shoes must be supported in the progress notes including diagnosis and treatment plan according to the criteria above.

2.5. After authorization, the order for modified or specialty shoes will be implemented by the Vendor Facility Health Administrator or designee and sent to the appropriate purchasing agent.

2.6. Shoes authorized by the above process and deemed "medically necessary" will not be denied due to inmate indigence.

2.7. Requests for specialty athletic shoes are not a medical issue and should not be scheduled for practitioner examination.

3.0. The Vendor Reviewing/Approving Authority shall consider the following in determining the relative need of a prostheses, orthoses, or other aid; urgency of need, time left on sentence, overall necessity, morbidity, mortality, functional disability and expected improvement, alternatives, risk/benefit, cost/benefit, and security concerns. Based on these factors a decision is then made as to whether the exception for the elective item should be allowed for the patient.

4.0. Glasses: The lack of vision correcting eyewear does not cause deterioration in a person's general state of health. Health Services Contract Vendor does, however, recognize that corrected vision may promote participation in education, programming, or work assignments, it

may increase comfort, or otherwise contribute to quality of life, therefore, Vendor Health Services will offer support on an as needed and as requested basis.

4.1. Unless there is a clear clinical indication to do otherwise, Vendor Health Services will offer refractive eye examinations for each inmate a maximum of once every three (3) years. Eyeglasses become the inmate's real property and are handled according to the procedure outlined by Department Order 909. Medical eye examinations will not be denied due to indigence. Willful destruction or mistreatment of glasses will be responded to in accordance with Department guidance regarding destruction of state provided or state owned property.

4.2. Specialty optical aids, such as photo gray glasses, sunglasses, or contact lenses are considered medically optional unless ordered by an ophthalmologist as part of a medical treatment plan and not based on the inmate's desire.

4.3. Eyeglass frames will be provided in accordance with the styles and material described by individual optician contract. Inmates may not choose different styles of frames beyond that offered by the optician in accordance with the ADC contract.

4.4 Bone Stimulators, when ordered by a specialist as part of a treatment plan, shall be made available to the inmate. The device shall be the property of ADC Health Services Vendor. The ordered treatments shall occur in the Health Unit. If the inmate is released while utilizing the bone stimulator, Health Services Vendor shall supply the device to the inmate upon release.

Count 7

Exhibit E

Supplemental Grievance in Support of
Corruption and Records Altering
Pages 1-4

# GRIEVANCE RESPONSE

**DATE: November 19, 2019**
**INMATE NAME: Bearup, Patrick**
**ADC # and UNIT: 136226 Central**
**GRIEVANCE NUMBER: A01-362-019**
**ASPC FLORENCE**
**FROM: Trina Randall, Assistant Facility Health Administrator**

This letter is in response to the Formal Grievance dated 11/14/2019 and received by Corizon Medical Administration on 11/14/2019.

Summarization of inmate Complaint:
Patient is requesting a TENS unit.

Description of action taken to investigate the complaint:
Review the patient medical record,
Review grievance information

Summary of Findings:
On 11/19/19, the provider reviewed your order for a TENS unit. In a systematic review of the TENS unit, it was found it is not for the treatment of skeletal issues. This is not a recommended therapy due to the lack of high quality data demonstrating benefit and/or the possible risk of harm. Due to the new information, the TENS unit has been discontinued today. If you feel you are still having issues, please submit an HNR requesting to be seen for the issue.

Decision:
Mr. Bearup,
   Currently, your TENS unit has been discontinued. At this time, if you have any further follow up issues specific to this grievance, please follow up with an inmate letter to the ADON of your unit. At this time, I find this matter RESOLVED and closed.

**\*Per Policy 802.05 1.2: The decision of the Contract Facility Health Administrator is final and constitutes exhaustion of all remedies within the Department. In accordance with current policy, this response is final, and constitutes exhaustion of all remedies within the Department.**

Thank you

Trina Randall
Assistant Facility Health Administrator

11/19/19
Date

①

# ARIZONA DEPARTMENT OF CORRECTIONS

**Inmate Grievance**

*Note:* You may appeal the Grievance Coordinator's decision to the Warden/Deputy Warden/Administrator by filing form 802-3, within 10 calendar days of receipt of this notice

| RECEIVED BY |  |
|---|---|
| ARUN, L |  |
| **TITLE** COIII |  |
| **BADGE NUMBER** 5498 | **DATE** (mm/dd/yyyy) 11-08-19 |

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | DATE (mm/dd/yyyy) |
|---|---|---|
| Bearup, Patrick W. | 136226 | 11-7-19 |

| INSTITUTION/FACILITY | CASE NUMBER |
|---|---|
| ASPC-F - Central | A01-362-019 |

TO: GRIEVANCE COORDINATOR

**Description of Grievance** (To be completed by the Inmate)

I'm not sure what property has to do with this issue. HCP Powell ordered me a TENS Unit, An ADC EMPLOYEE, TOLD CENTURION that I can not allowed a TENS Unit, So ADC had my medically necessary item order cancelled. However CURRENT POLICY - Health Services Tech. manual clearly shows TENS Units are allowed on ALL prison yards See Ch 7 Sec. 1.1.0 Procedure 1.1

**Proposed Resolution** (What informal attempts have been made to resolve the problem? What action(s) would resolve the problem?)

See resolution on informal, I tried to resolve with Medical

| Inmate's Signature | Date 11-7-19 | Grievance Coordinator's Signature COIII | Date 11/14/19 |
|---|---|---|---|

Action taken by Documentation of Resolution or Attempts at Resolution.

| Staff Member's Signature | Badge Number | Date |
|---|---|---|

DISTRIBUTION: INITIAL: White and Canary or Copies – Grievance Coordinator; Pink or Copy - Inmate
FINAL: White – Inmate; Canary – Grievance File

802-1
12/12/13

②

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Inmate Informal Complaint Response**

| Inmate Name *(Last, First M.I.)* | ADC Number |
|---|---|
| BEARUP, PATRICK W. | 136226 |

| Institution/Unit |
|---|
| ASPC/FLORENCE-CENTRAL UNIT |

| From | Location |
|---|---|
| COIII K. McKnight | CB5 programs |

This is in response to your Informal Complaint dated 10/30/19. You state that you have been denied to purchase your own medical tens device.

Property Sgt. Arndt said that you did not follow the proper procedure for this per policy.

Per DO 900 2.4.1.1.1, "In the event the Contract Medical Vendor cannot supply specific Durable Medical Equipment (DME), the Health Services Contract Monitoring Bureau (HSCMB) Physician shall review the request for approval, and consult with security staff.

Additionally, per DO 900 2.4.1.3, "For approved specialized personal medical equipment or items, the Contract Facility Health Administrator shall have nursing initiate the Specialized Personal Medical Property Information/Agreement, Form 909-7, outlining the inmate's conditions for receiving the specialized personal medical equipment or items(s).

These procedures were not followed. End of response.

| Staff Signature | Date |
|---|---|
| CO III K. McKnight | 11-7-19 |

Distribution:   Original - Inmate
                Copy – Grievance Coordinator File

802-12(e)
12/19/12

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Informal Complaint Resolution

5-A-7

Complaints are limited to one page and one issue. Please print all information.

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | INSTITUTION/UNIT | DATE (mm/dd/yyyy) |
|---|---|---|---|
| Bearup, Patrick W. | 136226 | Central  A72 | 10-30-19 |

| TO | LOCATION |
|---|---|
| CO II McKnight | CB5 |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

On 10-8-19 I was seen by HCP Powell, she wrote an order for a T.E.N.S. device In accordance with: Health Services Technical Manual Chapter 7 Sec. 11.0 Procedure 1.1 Today I was advised that "Someone" in ADOC refused my order (and medically necessary item). This violates Policy, Parsons v. Ryan's stipulation, and my 8th Amendment.

Resolution: 1. Allow the HCP's order to be processed and my TENS Device delivered

2. If not that, allow me to purchase my own TENS Device as per DO 909 2.4

3. If not those, then allow me to go to medical for weekly TENS Treatments.

This Grievance is AGAINST ADOC, NOT CENTURION, because it is ADOC who is acting outside of the color of LAW.

| INMATE SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
| | 10-30-19 |

Have you discussed this with institution staff?  ☒ Yes  ☐ No

If yes, give the staff member name: Medical HCP Powell

Distribution:  INITIAL: White and Canary - Inmate
FINAL: White – Inmate; Canary – Grievance Coordinator File

802-11
6/25/14


④

Count    8

Exhibit    A

Historical Support of Claim
Pages 1-2

not repeat any part of the *Shemoneh esreh*. If we have forgotten to say...
ten *podedho* (now, therefore, bestow Thy awe) and concluded to say...
bers with *Hammelech hakkadosh*, even if we have only said, *Baruch attah*
at (blessed art Thou, O Lord), we conclude *Hammelech hakkadosh*, and...
...say *Sitah vedartanu* (Thou hast chosen us), etc.

6. Some people conclude the *Shemoneh esreh*, with *Oseh hashalom* (who
...*"the" peace*), while others conclude it as usual with, *Hamevarech et*
...*ha-yisroel bashalom* (who blessest His people Israel with peace), and only...
...the *kaddish* do they say, *Oseh hashalom* (He who maketh the...
...in His high places).

7. If *Rosh Hashanah* occurs on the Sabbath, in some communities they
...*Levi neramemd* (O come, let us sing), for the same as on any other Sabbath;
...inserted and sealed for a happy year), and to a woman it is said in the
feminine form, *tikatevi vetikatemi*; but these greetings are not exchanged in...
...the daytime, because the writing had been finished in the forenoon. Some
...accustomed to refrain from eating any nuts or almonds, because the nu-
...value of the Hebrew word אגוז (nut) is 17, the same as that of the
brew word חטא (sin), not counting the א of חטא. Also, nuts increase the
...fortune, like carrots in our country, called *mehren* (meaning "increase").

8. After the *Maariv* service, on the first night of *Rosh Hashanah*, it is
...tomary to exchange greetings by saying *Leshanah tovah tikkatev vetikhatem*
...we say: "May it be Thy will that our merits increase." It is also merito-
...ous to procure for this occasion, fish which symbolizes fertility. But it
should not be cooked in vinegar, for no sour or bitter foods are eaten on *Rosh*
*Hashanah*. Also meat and confectioneries should be partaken of. It is also
...tomary to refrain from eating any puts or almonds...

9. At the evening meal, it is customary to perform symbols as omens
...of a good year; we dip in honey a portion of the *hallah* over which we have
...said the *Hamotzi* (who bringeth forth), and after eating a piece the size of an...
...we say: "May it be Thy will to renew for us a happy and pleasant year."
...then we dip a piece of sweet apple in honey and after eating it, we say:
*Bore peri haetz* (who createth the fruit of the tree), and after reciting it, "we
...also customary to eat the head of some animal, and say: "May it be Thy
...that we be a head (master)." It is preferable to obtain the head of a ram
...by which we call to serve as a reminder of the ram substituted for Isaac.
...also eat some vegetables, the names of which have the connotation of an...
...venly judgment is occasionally also passed on the second day.

---

breasts as on a weekdays and on *Yom Kippur*, because no con...
be recited on *Rosh Hashanah*, which is a festival. Hence, we in...
Father, our King, we have sinned before Thee," thus: "Our F...
before Thee because they worshiped idols, but as for us, we h...
king, but Thee;" therefore, "Our Father, our King, deal with u...
of Thy name."

12. When the Scrolls of the Law are taken from the Holy...
tomary to recite the "thirteen attributes" (*Adonoi, adonoi, et ra*...
And it is proper to begin with *Vayaavor* (and He passed), and w...
"And the Lord passed on before him, and He called," etc., t...
munities, neither the "thirteen attributes" nor *Ribbono shel ola*...
the universe) is recited when the festival occurs on the Sabbat...

13. The *shofar* should be preferably sounded as follows...
consists of nine short sounds; the *Shevarim* is of three successiv...
being as long as three *Teruah* sounds so that the *Shevarim* is...
sounds. One should be very careful not to protract the *Sheva*...
one equals nine sounds, for in such an event the precept is not...
post facto. The *Tekioi* are simple sounds. In the order of *Teki*...
*Teruah, Tekiah*, the sound of each *Tekiah* should be as long as...
and the *Teruah*, that is, the length of eighteen sounds. In the or...
*Shevarim, Tekiah*, each *Tekiah* should be as long as the *Shevar*...
length of nine sounds; the same in the order of *Tekiah, Teru*...
the *Tekioi* preceding the *Musaph* service, the *Shevarim* and the...
they follow one another, should be sounded in one breath;...
should, therefore, announce them together: *Shevarim-teruah*. I...
*kioi* during the repetition of the *Tekioi*, they should be made in...
two breaths. Nevertheless, no undue pause should be made b...
but they should be sounded in immediate succession, and the pr...
likewise announce them at one time.

14. When the one sounding the *shofar* pronounces the be...
congregation should not respond, *Baruch hu uboruch shemo* (bless...
blessed be His name) but merely listen attentively and after e...
tion respond *Amen*. (See chapter 6.9, above.) From there on...
to make any interruption till after the *Tekioi* during the *Shem*...
Therefore, the sexton should not announce, *Shtikah yafeh b*...
(silence is proper when praying), although he customarily do...
times.

15. After each set of the *shofar* blasts during the repetiti...
*moneh esreh*, people generally recite, *Yehi ratzon* (may it be Th...
printed in the festival prayer books. Care should be taken not...
the names of the angels given there. In many communities thi...
recited at all, and this is preferable. The principal reason fo...
*shofar* is to exhort the people to wholehearted repentance. A...
of blessed memory, said: "Although the blowing of the *shofar*...

shofar to fulfill it. Likewise, Messiah Yeshua, when asked about the future of Israel, confirmed this as a latter day promise in his own teaching:

> He (the Son of Man) will send out his angels with a great shofar; and they will gather together his chosen people from the four winds, from one end of heaven to the other" (Matthew 24:31).

Believers in Yeshua HaMashiach should have a fond appreciation for this rich holy day, Rosh HaShanah! It has served historically as a time of spiritual preparation and repentance, both themes we can learn from. Prophetically, we are reminded of God's promise to regather and restore his chosen people, Israel, in the last day. The sound of the shofar is also a reminder of the blessed hope every messianic believer possesses: we could enter Messiah's presence at any time (Titus 2:13). Let us give heed to the sound of the shofar and all that Rosh HaShanah has to teach.



## A PRACTICAL GUIDE FOR BELIEVERS IN MESSIAH

There are a number of practical ways to observe Rosh HaShanah. In synagogues, preparation starts the preceding Hebrew month, Elul, by sounding the shofar on Shabbat. Special prayers to cultivate repentance, called *selikhot*, are offered. For Messianic Jews and Gentiles this season could be observed in the same kind of spirit. Perhaps one might desire to purchase a shofar and sound it every morning during the month preceding Rosh HaShanah. This could be used to enhance the true spirit of this holy day—focusing on repentance and a pure walk with God.

A special evening observance can be planned upon reaching the first day of Tishri. As with most Jewish holy days, much of the preparation revolves around a holiday meal. The table is set with the best dinnerware, tablecloth and two candlesticks. White is a common color for the holy days based on the promise that God will turn our scarlet sins as white as snow (Isaiah 1:18). This may include the tablecloth, and often, personal clothing. To believers it is a beautiful statement of our cleansing in Yeshua! It is traditional to light the holiday

candles with the appropriate blessing which is slightly different from the standard Shabbat blessing.

> Barukh atah Adonai Elohenu melekh ha-olam, asher kidshanu b'mitzvohtav, v'tzi-vanu l'hadleek ner shel yom tov.

> Blessed art thou, O Lord Our God, King of the universe, who has set us apart by your commandments and has commanded us to kindle the holiday light.

After the candles, we bless the sweet wine and the special round raisin challah bread. Both remind us of an important theme of Rosh HaShanah—that we will experience a sweet and full New Year in God's blessing.

The foods of the dinner also make this statement. We may have the traditional *tzimmes* (carrots with honey), as well as honey cake for dessert. In one of the more graphic customs, we dip sliced apples in honey to taste the incredible sweetness that comes from our heavenly father. It should be noted that the traditional greeting of the holiday season is *l'shana tova u-metukah* (may you have a sweet and good new year). Main dishes might be turkey or brisket. A symbolic dish is a cooked fish served with its head. This illustrates God's promise that there will be a time when Israel will no longer be the tail, but the head (Deuteronomy 28:13)!

After the dinner it is time to celebrate in worship and in meditation. Normally, this takes place in the synagogue service. The purchase of tickets ahead of time is usually necessary since Jews do not ordinarily pass a plate at services. Membership fees and individual tickets for the high holy days are charged.

Believers in Yeshua might attend Rosh HaShanah services at a local messianic congregation. Here you will celebrate the various customs of the holy day among fellow believers. What a joy to hear the sound of the shofar, to experience the corporate prayers, and to worship in music in the fulness of Messiah! If there is no messianic group nearby, perhaps a home service is in order. This could

Count ___8___

Exhibit ___B___

Senior Chaplain Communication
Pages 1-2

## ARIZONA DEPARTMENT OF CORRECTIONS

### Inmate Letter

S-A-7

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | INSTITUTION/UNIT | DATE (mm/dd/yyyy) |
|---|---|---|---|
| Bearup, Patrick W. | 136226 | Central AZ | 8-30-19 |

| TO | LOCATION |
|---|---|
| Senior Chaplain A. Miser | Florence Chaplaincy |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

I have been advised that your office has denied donations of needed items for a Special Religious Event. (Rosh HaShanah) I have provided Chaplaincy with Commands/directions from Literature; "God's Appointed Times" by Barney Kasdan - Specifically pages 68, 69, and 70. (apples, honey cakes, honey, raisin Challah, wine/grape juice) I also have "Code of Jewish Law" by Rabbi Solomon Ganzfried. In Talmud book 3 Chapter 129 pages 76, 77 the Ritual is described for Rosh HaShanah (apples, honey, hallah, veggies, meat, confectionaries (honeybuns) and No bitter foods or nuts are allowed) Per: DO 904.4.1.1.1.3 I am not to be denied any religious item and 4.1.1.8.3.3 allows "other items to be authorized for special religious events. Therefore, I request the ability to have all the items requested (AND Previously Approved in 2017 and 2018) be donated for Condemned Row Messianic Rosh HaShanah services.

| INMATE SIGNATURE | DATE (mm/dd/yyyy) | rec'd |
|---|---|---|
| | 8-30-19 | SEP 03 2019 |

Have You Discussed This With Institution Staff? ☐ Yes ☐ No

If yes, give the staff member's name:

*Note: Using profanity, insulting, obscene, or abusive language and/or addressing staff with inappropriate names or making inappropriate remarks in this written correspondence (or verbal communication to staff concerning this correspondence), will not be tolerated and may result in no response to the correspondence and/or discipline pursuant to Department Order 803, Inmate Disciplinary Procedure.*



**ARIZONA DEPARTMENT OF CORRECTIONS**

For distribution: Copy of corresponding Inmate Letter must be attached to this response.

**Inmate Letter Response**

| INMATE NAME *(Last, First M.I.) (Please print)* | ADC NUMBER |
|---|---|
| Bearup, Patrick | 136226 |

| INSTITUTION/UNIT |
|---|
| ASPC-Florence / Central Unit / 5-A-7 |

| FROM *(Last, First M.I.) (Please print)* | LOCATION |
|---|---|
| Miser, Allen | ASPC-F / Chaplaincy |

Concerning your request to receive donated apples for Rosh Hashanah:

The denial of apples is a security decision made at Central Office for the whole state. I recognize that apples are used in your celebration but I cannot approve them based on this decision by security.

| STAFF SIGNATURE *Allen Miser* | DATE *(mm/dd/yyyy)* 09/24/2019 |
|---|---|

Distribution: Original – Master File
Copy - Inmate

916-2(e)
5/14/12

Count     8

Exhibit     C

Ken Herman Communications
Pages 1-2

ARIZONA DEPARTMENT OF CORRECTIONS
Inmate Letter

5-A-7

Requests are limited to one page and one issue. NO ATTACHMENTS PERMITTED. Please print all information.

| Inmate Name *(Last, First M.I.)* | ADC Number | Institution/Unit | Date |
|---|---|---|---|
| Bearup, Patrick W. | 136226 | Central) A72 | 9-18-19 |

| To: K. Herman | Location: Central Office Pastoral Activities |
|---|---|

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

I have been advised that you will not allow apples, in any form, to be used in Messianic Rosh HaShanah Services. If this is true, please see the following:

I am a Messianic believer and have a "Sincerely Held Religious Belief" that I am to observe the Holy Days given by the Lord in Scripture, and the rituals attached. Issues at hand:

1. In 2017 and 2018 I was authorized apples for Rosh Hashanah services
2. In 2019 I was forbidden apples for services (by Senior Chaplain Miser)
3. In 2017, 2018, 2019 I provided literature "God's Appointed Times" and in 2019 "Code of Jewish Law" (the Talmud) which direct the REQUIRED items for services. Apples are required. I also provided a previous won RLUIPA lawsuit against ADC.
4. In 2019 I provided Chaplain Harrison, for Senior Chaplain Miser, cites of ADC Policy ALLOWING "Other items" that can be authorized for services - See DO 904 § 1.1.3 and 1.8.3.3

—ARGUMENT—

ADC, and the Chaplaincy, falls under the governance of "The Religious Land Use and Institutionalized Persons Act." I have met my burden for a "Sincerely held religious belief" to obtain an apple for my service. The Chaplaincy, while might meet the first prong of the R.L.U.I.P.A. test. It has FAILED the second prong to provide, or offer, a "Least Restrictive Means", which I DID offer (i.e. freeze dried apples/apple chips) and was denied without any Due Process. To further injury, the Chaplaincy has ignored: 1. I am Close Custody - NOT MAX. 2. I receive fruit (canned and fresh) twice per day on my KOSHER diet. 3. I receive fresh veggies every day. 4. I receive real fruit juice every day. - To deny my request will result in litigation to correct ADC's denial/error.

Inmate Signature

RECEIVED
9-18-19
OCT 02 2019
BY:

| Have You Discussed This With Institution Staff? ☒ Yes ☐ No |
|---|
| If yes, give the staff member's name: Chap Harrison, COTT McKnight |

Distribution: White - Master Record File    Canary - Inmate

①

918-1
4/15/04



**ARIZONA DEPARTMENT OF CORRECTIONS**

**Inmate Letter Response**

For distribution:    Copy of corresponding Inmate Letter must be attached to this response.

| INMATE NAME *(Last, First M.I.) (Please print)* | ADC NUMBER |
|---|---|
| Bearup, Partrick | 136226 |

| INSTITUTION/UNIT |
|---|
| ASPC - Florence |

| FROM *(Last, First M.I.) (Please print)* | LOCATION |
|---|---|
| Herman, Kenneth | Central Office |

There is no documentation which supports your assertion that Apples where permitted in the past at Florence. Your request to possess Apples during a specific time, that is, Rosh Hashanah will be reviewed by the Religious Advisory Review Committee and you will be advised of the outcome.

| STAFF SIGNATURE | DATE *(mm/dd/yyyy)* |
|---|---|
| *Chaplain Herman* | 10/18/2019 |

Distribution:    Original – Master File
Copy - Inmate

916-2(e)
5/14/12

②

Count ___8___

Exhibit ___D___

Grievance Exhaustion
Pages 1 - 3

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Informal Complaint Resolution 5-A-7

*Complaints are limited to one page and one issue. Please print all information.*

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | INSTITUTION/UNIT | DATE (mm/dd/yyyy) |
|---|---|---|---|
| Bearup, Patrick W. | 136276 | Central A72 | 9-13-19 |

TO CO III McKnight

LOCATION CB5

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

On 9-17-19, I was advised that I am being denied apples of any type for my Rosh Hashanah service on 9-29-19.

I am a Messianic believer and hold a "Sincerely Held Religious Belief" to observe God's assigned Holy Days and rituals. To comply with my religious mandate, apples are required. I have provided Chaplaincy with literature and policy to obtain access to apples.

The Religious Land Use and Institutionalized Persons Act is the federal law that governs my civil rights. ADC has refused my "least Restrictive Means" of freeze dried apples/apples chips. Especially since I receive canned/fresh fruit every day for my Kosher diet. Therefore NO compelling governmental interest even exists to deny my requests.

Therefore, my only solution is for ADC to allow me access to apples by 9-29-19 @ 1800 hrs. ADC/Trinity can provide, or I can have donations provided.

| INMATE SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
| | 9-13-19 |

Have you discussed this with institution staff? ☑ Yes ☐ No

If yes, give the staff member name: Chap, Haven, Mills, You

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance

Note: You may appeal the Grievance Coordinator's decision to the Warden/Deputy Warden/Administrator by filing form 802-3, within 10 calendar days of receipt of this notice

**RECEIVED BY** Co III K. McKylit

**TITLE** CO III

**BADGE NUMBER** 2216

**DATE (mm/dd/yyyy)** 10-3-19

**INMATE NAME** (Last, First M.I.) (Please print): Bearup, Patrick W.

**ADC NUMBER** 136226

**DATE (mm/dd/yyyy)** 10-1-19

**INSTITUTION/FACILITY** ASPC-F-(Entra) A72

**CASE NUMBER**

**TO: GRIEVANCE COORDINATOR**

**Description of Grievance** (To be completed by the Inmate)

ADC is in violation of the Religious Land Use and Institutionalized Persons Act. I did a written request for apples, honey, hallah bread, and grape juice. All allowed per policy and Federal Law. ADC has decided to "outright ban" apples for no real penal interest. ADC also failed "RLUIPA" by not allowing a least restrictive means to practice my mandated, and sincerely held, religious rite. I provided Chaplaincy two well known books for instructions on observation of Rosh Hashanah. So I have met my burden. ADC has failed. - Especially when services are watched by security and all items are accounted for. Especially fruit and honey

Attached: Informal, COII Response

**Proposed Resolution** (What informal attempts have been made to resolve the problem? What action(s) would resolve the problem?)

I tried to resolve via ICS letter, e-mail, and oral conversation with Chaplaincy. My resolution is to be allowed all required Holy Day products as my Religion demands. Which includes Apples, hallah bread, grape juice, honey to be donated for religious use.

**Inmate's Signature**

**Date** 10-1-19

**Grievance Coordinator's Signature**

**Date**

**Action taken by Documentation of Resolution or Attempts at Resolution.**

**Staff Member's Signature**

**Badge Number**

**Date**

DISTRIBUTION: INITIAL: White and Canary or Copies – Grievance Coordinator; Pink or Copy - Inmate
FINAL: White – Inmate; Canary – Grievance File

②

802-1
12/12/13

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance Appeal

The inmate may appeal the Warden's, Deputy Warden's or Administrator's decision to the Director by requesting the appeal on this form.

Please type or print in black or blue ink. (To be completed by staff member initially receiving appeal)

| | |
|---|---|
| Received By: | _Ariel L_ |
| Title: | _COIII_ |
| Badge #: | _975_ |
| Date: (mm/dd/yyyy) | _11-14 2019_ |

**Please Print**

| INMATE'S NAME (Last, First M.I.) (please print) | ADC NUMBER | DATE (mm/dd/yyyy) |
|---|---|---|
| Begrup, Patrick W. | 136226 | 11-13-19 |

| INSTITUTION | CASE NUMBER |
|---|---|
| ASPC-Central (S-A-7) A72 | A01-320-019 |

TO: Director David Shinn

I am appealing the decision of _DW Monson_ for the following reasons:

The harm was still here regardless of "future termination" as the D.W. seems to believe. I was not afforded a "Least Restrictive Means" as the R.L.U.I.P.A. requires. So unless a settlement is reached, harm continues to exist that I would avoid the color of law, show cost/return of ADX and toe employers.

(Attach: Original, A.D.P Response, Grievance, Work part

| INMATE'S SIGNATURE | DATE (mm/dd/yyyy) | GRIEVANCE COORDINATOR'S SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|---|---|
| _[signature]_ | 11-13-19 | | |

| RESPONSE TO INMATE BY | LOCATION |
|---|---|
| | |

| STAFF SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
| | |

DISTRIBUTION: INITIAL: White & Canary – Grievance Coordinator
Pink – Inmate
FINAL: White – Inmate
Canary – Grievance File

③

802-3
12/12/13

Count     8


Exhibit     E


E-Mail Transcripts  9-12-19
9-17-19 Response
Pages 1-2

| Ref# AZA720000002613 | Housing:CB-5A007 | Date Created:09/25/2019 |
| ID#: 136226 | Name:BEARUP,PATRICK W. | |
| Form:Inmate Letter | Subject:Religion | Description:See Subject Above |
| Urgent:No | Time left:n/a | Status:Closed |

Original Form

*9/25/2019 11:43:57 AM : ( 136226 ) wrote*

Senior Chaplain Miser, I need to find out what the status of my Holy day service is i.e. supplies, donations, approved inmates.

People have been trying to contact the chaplain's office to schedule donation drop-off times with no return phone calls or email responses. I was advised that Chaplain Bennett would be supervising the service so I would like to coordinate with whomever is running this event so I can observe my service as best as security will allow

Thank you and God Bless- Dr. Patrick Bearup D.Th.

①

| Ref# AZA720000001235 | Housing:CB-5A007 | Date Created:09/12/2019 |
|---|---|---|
| ID#: 136226 | Name:BEARUP,PATRICK W. | |
| Form:Inmate Letter | Subject:Religion | Description:See Subject Above |
| Urgent:No | Time left:n/a | Status:Closed |

Original Form
*9/12/2019 9:28:11 PM : ( 136226 ) wrote*
Chaplain Miser I have spoken with Chaplain Harrison about the security concerns with the apples for Rosh Hashana. In the past I was able to utilize apples that were freeze dried. If this will help over come the secutity concerns I will gladly have those donated. Please let me know how to proceed. Thank you and be blessed

Communications / Case Actions
*9/12/2019 9:28:11 PM : ( 136226 ) wrote*
Form has been submitted

*9/17/2019 12:08:16 PM : ( Kelly McKnight ) wrote*
I spoke with Chaplain Harrison on 9/17/19. He has discussed this issue with Chaplain Miser. I have been informed that apples, including ones that are freeze dried, are not an approved item.
End of response.

*9/17/2019 12:08:35 PM : ( Kelly McKnight ) wrote*
Closed inmate form

Admin Log
*9/12/2019 10:02:06 PM : ( Luis Ovando ) wrote*
Form was viewed by Luis Ovando and the status was changed to Pending.

*9/17/2019 12:08:16 PM : ( Kelly McKnight ) wrote*
Responded to inmate

Count 9

Exhibit A

Grievance Exhaustion
Pages 1-10

# ARIZONA DEPARTMENT OF CORRECTIONS
# INMATE GRIEVANCE APPEAL RESPONSE



| Log # | Inmate Name | ADC# | Case # | Complex | Unit |
|-------|-------------|------|--------|---------|------|
| 1,025 | Bearup | 136226 | A01321019 | Florence | Central |

In your grievance filed at Central Unit, you claim Department staff opened your legal mail outside of your presence. Furthermore, you state Department policy was not followed as it relates to the handling of legal mail. Your resolution is to have stamped envelopes from the court and to receive monetary compensation.

Your grievance has been reviewed at Central Office and the Deputy Warden's response is modified. The Department's Legal Access Monitor has reviewed your grievance and provides the following response:

After reviewing documents provided it was determined that Department procedures were not followed appropriately. The Unit Administration will follow up with Department staff to ensure policy is followed as it relates to the handling of legal mail.

No further action is warranted in this matter.

cc: Warden, Florence Complex

RK

*R. Kepney*
**Appeals Officer**

*CRGlynn for*
**David Shinn, Director**

11/21/2019
**Date**

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance Appeal

The inmate may appeal the Warden's, Deputy Warden's or Administrator's decision to the Director by requesting the appeal on this form.

*Please type or print in black or blue ink. (To be completed by staff member initially receiving appeal)*

| Received By: | ARUN, L |
| Title: | CO III |
| Badge #: | 5498 |
| Date: (mm/dd/yyyy) | 11-14-2019 |

*Please Print*

| INMATE'S NAME (Last, First M.I.) (please print) | ADC NUMBER | DATE (mm/dd/yyyy) |
|---|---|---|
| Bearup, Patrick W. | 136226 | 11-13-19 |

| INSTITUTION | | CASE NUMBER |
|---|---|---|
| ASPC-F-Central A72    5-A-7 | | A01-321-019 |

TO: Director David Shinn

I am appealing the decision of DW Monson for the following reasons:

I am UTTERLY appalled that ADC staff and their legal access monitor believe they can read mail to and from the court because they allege Public Records Law, the letter in question did NOT have public accessible information in it! Regardless, Wolff v. McDonald 418 U.S. 539 (1979) has been solid Supreme Court precedent disallowing reading of legal communications. ADC admits to wrong doing by knowingly opening and reading legal mail, this can NEVER be excused and this is exactly the illegal behavior that causes harm to inmates, myself specifically. When ADC employees believe they are ABOVE THE LAW! To ignore this means you act with agreement of the illegal intrusion into court communications and the actors evil intent. New resolution $1,000.00 for harm, a written policy change, and written apology!

| INMATE'S SIGNATURE | DATE (mm/dd/yyyy) | GRIEVANCE COORDINATOR'S SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|---|---|
| [signature] | 11-13-19 | CO III [signature] 2538 | 11/15/19 |

| RESPONSE TO INMATE BY | LOCATION |
|---|---|
| | |

| STAFF SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
| | |

DISTRIBUTION: INITIAL: White & Canary – Grievance Coordinator
                          Pink – Inmate
              FINAL:    White – Inmate
                          Canary – Grievance File

②

802-3
12/12/13

ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance Response

| Inmate Name (Last, First M.I.) | ADC Number | Institution/Facility | Case Number |
|---|---|---|---|
| BEARUP, PATRICK | 136226 | ASPC-F/Central | A01-321-019 |

In your grievance dated 10/10/19 and received by this office on 10/15/19, you claim that your legal mail was opened by complex mailroom staff without your presence. Furthermore; you claim that staff were able read your case information and are seeking monetary compensation.

Per D.O. 902.11.5;

    11.5 Designated staff who process incoming mail shall attempt to make a determination, based on an inspection of the envelope, whether the contents constitute legal mail. The return address may be indicative of whether the contents of the envelope constitute legal mail. Designated staff shall not rely solely on the words "legal mail" having been stamped on the envelope. If there is any serious doubt as to whether the contents of the envelope contain legal mail, designated staff shall contact the Legal Access Monitor for direction

Upon review of your complaint, I learned that Complex Mailroom staff received your letter and were unable to determine, based on the inspection of the envelope, whether the contents constituted legal mail. Complex Mailroom staff contacted the legal access monitor who advised them to proceed to open the letter due to security concerns.

Your case is a matter of public record and can be read by the public, therefore: your request for monetary compensation is denied

Based on the above information, this issue is resolved.

If you do not accept this decision, you may submit your appeal to the Complex Warden by filing a Grievance Appeal (form 802-3p), within 5 work days of receipt of this notice.

| Jason Monson, Deputy Warden | Date |
|---|---|
|  | 11/05/2019 |

INITIAL DESTRIBUTION – Committee Recommendation – All copies to Grievance Advisory Committee
FINAL DISTRIBUTION – White and Pink – Inmate, Canary – Grievance File

INITIAL DESTRIBUTION - GF Supplement – White and Canary – Grievance Coordinator, Pink – Inmate
FINAL DISTRIBUTION – White – Inmate, Canary – Grievance File

802-7P
2/14/00



## ARIZONA DEPARTMENT OF CORRECTIONS

**Inmate Grievance**

*Note: You may appeal the Grievance Coordinator's decision to the Warden/Deputy Warden/Administrator by filing form 802-3, within 10 calendar days of receipt of this notice*

RECEIVED BY
CO III M.McKNIGHT

TITLE
CO III

BADGE NUMBER
2216

DATE (mm/dd/yyyy)
10-10-19

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | DATE (mm/dd/yyyy) |
|---|---|---|
| Bearup, Patrick W. | 136226 | 10-10-19 |

| INSTITUTION/FACILITY | CASE NUMBER |
|---|---|
| ASPC-F-Central    A72 | A01-321-019 |

TO: GRIEVANCE COORDINATOR

**Description of Grievance** (To be completed by the Inmate)

D.I. 333 (902,11) 1.4.2.), 1.5, 1.6 Give clear guidance as to any Questionable legal mail. Did ADC staff (1.5) Contact the Legal Access Monitor or (1.6) contact ADC's General Counsel? I doubt it because General Counsel Michael Gottfried KNOWS I am in the Pinal Court! Secondly State Law and Local Rules direct me to 1. Send Original and copies to the Clerk with return envelopes. On 09-27-19 at 0641 hrs I sent legal mail to Pinal, as the Law dictates, (See logbook) The envelope attached to this grievance was inside that letter, so the Clerk would respond. Harm has occurred, as ADC staff read my legal communication with the Clerk, and now have previously unknown data about my court actions. ADC did NOT follow DI 333, and they illegally searched my letter from the Pinal Clerk of Court! See Exhibits A, B, C [Also email on 9-08-19 6:33 pm ~~where Pinal Clerk gave instructions for writing them.~~

**Proposed Resolution** (What informal attempts have been made to resolve the problem? What action(s) would resolve the problem?)

Tried to resolve with staff, wrote informal - Resolution: 1. Have staff stamp RTS envelopes from Court with legal mail stamp 2. Refund 200.00 for ACTUAL HARM for staff's will(ful), evil-intent, intrusion into my legal mail, by opening and reading it outside of my presence!
Attached: Informal, with Resp. Exhibits A, B, C

| Inmate's Signature | Date | Grievance Coordinator's Signature | Date |
|---|---|---|---|
|  | 10-10-19 | CO III    2538 | 10/15/19 |

**Action taken by Documentation of Resolution or Attempts at Resolution.**

| Staff Member's Signature | Badge Number | Date |
|---|---|---|
|  |  |  |

DISTRIBUTION: INITIAL: White and Canary or Copies – Grievance Coordinator; Pink or Copy - Inmate
FINAL: White – Inmate; Canary – Grievance File

(4)

802-1
12/12/13

# PROCEDURES: WHAT TO DO WITH THE MOTION
# AFTER YOU HAVE FILLED IT OUT.

**STEP 1**

**COPIES AND ENVELOPES:** Make 3 copies of the Motion. Make 2 copies of the Order. Prepare 2 addressed stamped envelopes, one addressed to you and the other addressed to the respondent. (If the Department of Economic Security is involved in your case you will need to provide a copy and an envelope for DES as well)

**FILE THE ORIGINAL MOTION** with the Clerk of Court and provide copies of the Motion to be stamped. These are called conformed copies and are proof that the original was filed.

**PROCESSING YOUR MOTION:** Give the following documents to Family Court Administration and tell them it is for the Judge assigned to the case, or put the documents in the Judge's box, or mail the documents to the Judge.

- The original Order and 2 copies (3 copies if DES is involved).
- One Conformed Copy of the Motion
- The 2 (or 3 if DES is involved) addressed & stamped envelopes

**MAIL OR DELIVER A COPY** of the Motion to the other party(s) involved in your case and keep one copy for your records.

**STEP 2**

**WAIT TO RECEIVE A NOTICE FROM THE COURT:** Once you have delivered your Motion and Order, the Judge will either sign the original Order and send you a copy in the envelopes provided or send a Minute Entry telling you whether or not your Motion has been granted. If the Judge does not grant your Motion, you will need to see a lawyer for help.

**NOTE:** Failure to follow the above procedures could result in a further delay in your case.

# PROCEDURES

## How to File a <u>Consent Decree</u> with the Court for Dissolution of a Non-Covenant Marriage (Divorce)

**IMPORTANT:** The Consent Decree must be submitted <u>61</u> days from the date of service upon the Respondent.

**STEP 1:** Complete the form – TYPE OR PRINT IN BLACK INK

Both the Petitioner and Respondent will need to sign and date the Consent Decree in front of a Notary Public.

**STEP 2:** Make 2 Copies of the document after they have been filled out and signed by a Notary Public.

**STEP 3:** SEPARATE YOUR DOCUMENTS INTO THREE (3) SETS:

<u>SET 1</u> Originals For Clerk Of Court

<u>SET 2</u> Copies For Spouse

<u>SET 3</u> Copies For You

You will need to obtain two (2) appropriate sized self-addressed stamped envelopes. One envelope will need to be addressed to the Petitioner and the additional envelope will need to be addressed to the Respondent.

**STEP 4:** SUBMIT THE PAPERS WITH THE CLERK OF THE SUPERIOR COURT:

**In Person:**
Go to the Clerk of Court filing counters at one of the following locations: The court is open from 8:00 am - 5:00 pm, Monday-Friday. **You should go to the Court at least two (2) hours before it closes.**

**Visit our website for office locations or feel free to give us a call.**

<u>Contact Information for all offices</u>
Toll Free: 888.431.1311 • Local: 520.509.3555 or 311 • Fax: 520.866.5320
www.coscpinalcountyaz.gov

**By Mail:**     **Clerk of the Superior Court**
**P.O. Box 2730**
**Florence, AZ 85132**

**STEP 5:** The Consent Decree will then be sent to the Judges office for approval. If approved you will receive your final Consent Decree in the Mail.

⑥

*Exhibit C*

|                 |                                                                                                    |
|-----------------|----------------------------------------------------------------------------------------------------|
| Casa Grande     | 820 E. Cottonwood Ln Bldg. B Casa Grande, AZ 85122<br>Open Mon-Fri 8:00 to 5:00 closing 12:00 to 1:00 for lunch |
| Apache Junction | 575 N. Idaho Rd Ste. 109 Apache Junction, AZ 85119<br>Open Mon-Fri 8:00 to 5:00 closing 12:00 to 1:00 for lunch |

## IF FILING IN PERSON TAKE THE FOLLOWING DOCUMENTS TO THE CLERK/FILING COUNTER

To submit the Motion and Affidavit for Default without a Hearing the following must be handed to the Clerk:

- ✓ Original plus (2) copies of the Motion and Affidavit for Default without Hearing
- ✓ Original plus (2) copies of the Decree of Dissolution of Marriage without Children (or) Decree of Legal Separation without Children (or) Decree of Annulment
- ✓ (2) 9 x 12 self-addressed stamped envelopes

## FILING BY MAIL

Mail documents to: Clerk of the Superior Court, P.O. Box 2730 Florence, AZ 85132

## IF FILING BY MAIL THE FOLLOWING DOCUMENTS MUST BE SENT TO THE CLERK

Mail in the following:

- ✓ Original plus (2) copies of the Motion and Affidavit for Default without Hearing
- ✓ Original plus (2) copies of the Decree of Dissolution of Marriage without Children (or) Decree of Legal Separation without Children (or) Decree of Annulment
- ✓ (2) 9 x 12 self-addressed stamped envelopes

## STEP 4: REVIEW PROCESS/WHEN WILL I RECEIVE MY FINAL DECREE IN THE MAIL

When a Petitioner submits the Motion and Affidavit for Default without a Hearing (60) days must have passed since the service of process. If the Motion and Affidavit for Default without a Hearing is submitted prior to the (60) days from the date of service, the Clerk will not forward the motion and final Decree to the Judge until the (60) days has passed from the date of service upon the Respondent.

Once the Motion and Affidavit for Default without a Hearing and final Decree are sent to the

DO_MADWOH_COSCPinal_03.20.18
Use only most current version



# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Informal Complaint Response

*For Distribution: Copy of Corresponding Inmate Informal Complaint Resolution must be attached to this response.*

| Inmate Name *(Last, First M.I.)* | ADC Number |
|---|---|
| BEARUP, PATRICK W. | 136226 |

| Institution/Unit |
|---|
| ASPC/FLORENCE-CENTRAL UNIT |

| From | Location |
|---|---|
| COIII K. McKnight | CB5 programs |

This is in response to your Informal Complaint dated 10/5/19. You state that staff opened your legal mail while you were not present.

When one examines the envelope that the mail arrived in, it is obvious that the handwriting (both to and from) is yours. This appears to be an envelope that you mailed out mailed out addressed to you. You also listed the return address as the Pinal Clerk of the Court.

This does meet the criteria of legal mail.

End of response.

| Staff Signature | Date |
|---|---|
| Co III K. McKnight | 10-8-19 |

**ARIZONA DEPARTMENT OF CORRECTIONS**

Inmate Informal Complaint Resolution  5-A-7

Complaints are limited to one page and one issue.  Please print all information.

| INMATE NAME *(Last, First M.I.)* *(Please print)* | ADC NUMBER | INSTITUTION/UNIT | DATE *(mm/dd/yyyy)* |
|---|---|---|---|
| Bearup, Patrick W. | 138226 | Central  A72 | 10-5-19 |

TO  CO III McKnight

LOCATION  CB5

State briefly but completely the problem on which you desire assistance.  Provide as many details as possible.

On Oct. 4, 2019 at 1911 hours, floor staff COII Chancca passed out incoming mail. Upon inspection, I discovered CLEARLY MARKED LEGAL MAIL from the Pinal Clerk of Court. DO 902.11.1.4.2.1 CLEARLY shows that incoming legal mail (from Judge or Court) is to be opened ONLY in the presence of the inmate. This CLEAR intrusion was brought to staff's attention, and I requested an I.R. be written concerning it. Appr. 2 hours later, ofc Chancca, advised me that her supervisor informed her that "Property is ALLOWED to open and scan incoming legal mail outside of my presence." I advised her otherwise and advised that I would be compelled to do an informal.

The Ninth Cir. Court has recently admonished ADC on their intrusion into LEGAL MAIL Nordstrom v. Ryan 762 F.3d at 910, countless prior caselaw establish our right to NO intrusion Wolff v. McDonald.

It is VERY worrisome that not only is Complex Mail so untrained that legal mail is opened, the legal contents CLEARLY shown to be LEGAL and then a shift supervisor endorsing illegal intrusion into legal mail and advising staff that scanning legal mail is ok! This is more than a lack of training issue. This shows clear contempt for legal mail and my constitutional rights of Access to the Courts.

Resolution: Bring ALL my legal mail to my door to be opened/logged 2. Retrain staff 3. Find out who opened my mail for civil prosecution, and 4. Give me a $200.00 refund for this intrusion.

| INMATE SIGNATURE | DATE *(mm/dd/yyyy)* |
|---|---|
| | 10-5-19 |

Have you discussed this with institution staff?  ☒ Yes  ☐ No

If yes, give the staff member name: Floor Staff, Property Carrier

Distribution:  INITIAL:  White and Canary - Inmate
FINAL:  White – Inmate; Canary – Grievance Coordinator File

802-11
6/25/14

(9)

final Clerk of Court
PO Box 2730
Florence, AZ 85132

＊LEGAL MAIL＊

@SA7

Patrick Beard ＃136226
ASPC-F-Central 5-A-7
PO Box 8200
Florence, AZ 85132-8200



(10)

Count      9


Exhibit      B

Communication With Clerk of Court
Pages 1-3

Clerk of the Court,                                          10-25-19

RE: AZ Rules of Court (Rule 2.2.9.4)


As you can see from the envelope, I am incarcerated. I am having issues with the mail room. So I need to know the Pinal Clerk's rules for communications.

I have always submitted to the Clerk: An original document to be filed, copies for parties involved and envelopes for file stamped copies/responses from the Court. If this is correct, can you please respond in writing that, that is the correct way to deal with court filings? A letter on Clerk letter head is greatly appreciated.
Thank you for your time in this matter.


Patrick Bearup 136226
ASPC-F-Central 5-A-7
PO Box 8200
Florence, AZ 85132-8200

                                        Sincerely,

                                        Dr. Patrick W. Bearup D.Th.

* S.A.S.E. Enc. *

# AMANDA STANFORD

CLERK OF THE SUPERIOR COURT - PINAL COUNTY



PO BOX 2730
FLORENCE ARIZONA 85132

TELEPHONE: 520.509.3555
FAX: 520.866.5320

Date: 10/30/2019

Name/ Patrick Bearup #136226
Address: PO Box 8200
Florence, AZ 85132

Case Number: Not provided

### THE ATTACHED DOCUMENTS ARE BEING RETURNED FOR THE FOLLOWING REASON(S):

You are correct. If there are no fees to be paid, the original document, copies for the parties, and self addressed stamped envelopes are needed to file documents.

AMANDA STANFORD
Clerk of the Superior Court
Brandi Argel _____ , Deputy Clerk

cc:
Return Letter File x_____

2

**b. Commonality of Claims in a Civil Action:** All persons may be joined in one civil action as defendants if any right to relief is asserted against them jointly, severally, or in the alternative, with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action. The court shall apply the standard for permissive joinder, Rule 20(a), Arizona Rules of Civil Procedure, and may order that claims be severed and, upon the payment, deferral, or waiver of all required filing fees, refiled in a separate civil action.

**c. Amended Pleadings:** Any party filing an amended pleading shall retype and submit the entire pleading and may not incorporate by reference any part of the earlier pleadings and exhibits. The amended portion shall be highlighted by either bold or italicized text.

**d. Legibility of Pleadings:** A judge who receives a hand-written pleading which is not legible may return the pleading to the party with instructions that it be redone so it is readable by the court and the parties.

**e. Sanctions:** The clerk may discretionarily refuse to file any pleading, document, or paper which fails to conform to this rule, but must provide the filing party with an explanation consistent with Rule 5.1(b)(1), Arizona Rules of Civil Procedure. Adopted Aug. 30, 2017, effective Jan. 2, 2018.

### Rule 2.2. Motions; Requirements

**a. Motions in Writing:** All motions and pleadings in civil, criminal, family, juvenile, or other cases filed with the clerk, shall be in writing and shall comply with the applicable Arizona rules of procedure for the case type.

**b. Copies to Judge:** At the time of the filing of the original with the clerk, a copy of each motion, petition, response, reply, or memorandum shall be presented to the judge of the division to which the case is assigned or to the Court Administrator if the case has not been assigned. The original of all motions and notices must reflect that a copy has been presented to the assigned judge.

**c. Length of Motions and Memoranda:** Unless otherwise permitted by the court, a motion and its supporting memorandum, and the response and its supporting memorandum, must comply with the page limit of the applicable Arizona rules of procedure for the case type.

**d. Submission and Oral Argument:** All motions shall be deemed submitted upon memoranda, unless the motion or response contains in the caption the words "Oral Argument Requested". Subject to Rule 56(c)(1), Arizona Rules of Civil Procedure, the court may, in its discretion, order, allow, or deny oral argument on any motion consistent with the applicable Arizona rules of procedure for the case type. Oral argument for all motions shall be limited to 10 minutes for each side and shall not be exceeded without advance permission of the court in accordance with these rules.

**e. Telephonic Argument and Conference:** The court may, in its discretion, order or allow oral argument for any motion or other proceeding telephonically by conference call, provided that all conversations are audible to all participants. Any request to appear telephonically must be filed at least 10 business days before the hearing and shall include a statement

regarding whether the other parties join in, object, or, take no position on said request. Upon request of any party, oral argument may be recorded by court reporter or other lawful method under conditions the judge deems practicable. Counsel shall schedule conference calls at a time convenient for all parties and the judge. The judge may direct which party shall pay the cost of the call.

**f. Motions to Continue, Vacate or Extend Time:** In any motion to continue or vacate a hearing, or motion to extend a deadline, the motion must indicate whether the opposing party objects. If the movant is unable to contact the opposing party or parties, the motion must demonstrate contact.

**g. Stipulations and Notices of Settlement; Proposed Forms of Orders:**

(1) All stipulations shall be accompanied by a proposed form of order. If the order is signed, no minute entry shall issue.

(2) All stipulations to dismiss or for the entry of judgment shall indicate whether stipulation disposes of the entire case.

(3) All notices of settlement shall indicate whether the settlement disposes of the entire case.

(4) All motions or stipulations accompanied by a proposed form of order shall also include copies and envelopes stamped and addressed to each party who has entered an appearance in the case. If the order is signed, no minute entry shall issue.

**h. Filing, Copies, and Service:** When any motion or pleading is submitted, the original shall be filed with the clerk, a duplicate shall be delivered to the assigned judge, and service shall be made on counsel or parties not represented by counsel as provided by the applicable Arizona rules of procedure.

**i. Additional Duties of Counsel/Party—Case Assigned to Visiting Judge:** When a matter is assigned to a visiting judge, in addition to the above, the party or counsel of record shall provide copies by mail or electronic means of all applicable pleadings, motions, affidavits and exhibits to the assigned visiting judge.

**j. Post-Trial Motions:** All post-trial motions shall specify in the caption the name of the judge who presided over trial, and shall, if possible, be heard by that judge. Adopted Aug. 30, 2017, effective Jan. 2, 2018.

### Rule 2.3. Ex Parte Presentations; Duty to Court

In the event that any ex parte matter or default proceeding has been presented to any judicial officer and the requested relief denied for any reason, such matter shall not be presented to any other judicial officer without making a full disclosure of the prior presentation. Counsel are governed by the provisions of ER 3.3, Arizona Rules of Professional Conduct, and Rule 42, Arizona Rules of the Supreme Court. For a failure to comply with the provisions of this local rule, the order or judgment made on such subsequent application may be vacated at any time as a fraud upon the court. Adopted Aug. 30, 2017, effective Jan. 2, 2018.

### Rule 2.4. Sealing or Redacting Court Records

**a. Request to Seal or Redact Court Records; Service:** Any person may request that the court seal or allow the filing of a redacted court record for a case subject to these rules by filing a written motion, or the court may, upon its own motion, initiate proceedings to seal or allow the filing of a redacted

Count    10


Exhibit    A

Grievance Exhaustion
Pages 1 - 15

# ARIZONA DEPARTMENT OF CORRECTIONS
## INMATE GRIEVANCE APPEAL RESPONSE



| Log # | Inmate Name | ADC# | Case # | Complex | Unit |
|-------|-------------|------|--------|---------|------|
| 1,001 | Bearup | 136226 | A01333019 | Florence | Central |

In your grievance filed at Central Unit, you claim Department policy is not being followed as it relates to your medically required insoles. You state Department staff are withholding your insoles. Your resolution is to receive your medical insoles from a third party vendor.

Your grievance has been reviewed at Central Office and the Deputy Warden's response is affirmed. It has been determined you have received medical insoles and you are not entitled to request new insoles until 12/04/2019. It is recommended you submit a Health Needs Request to Centurion staff in order to receive new insoles. Furthermore, it is recommended you review Department Order 909, Inmate Property, to be better informed of Department policy concerning the issuance of medical property.

No further action is warranted in this matter.

cc: Warden, Florence Complex

RK

*R. Kepney*
**Appeals Officer**

*CRGlynn for*
**David Shinn, Director**

11/21/2019
**Date**

# ARIZONA DEPARTMENT OF CORRECTIONS

**Inmate Grievance Appeal**

Please type or print in black or blue ink.
(To be completed by staff member initially receiving appeal)

The inmate may appeal the Warden's, Deputy Warden's or Administrator's decision to the Director by requesting the appeal on this form.

| | |
|---|---|
| Received By: | ARUN, L |
| Title: | C O I Ṻ |
| Badge #: | 5498 |
| Date: (mm/dd/yyyy) | 11 − 08 − 19 |

**Please Print**

| INMATE'S NAME (Last, First M.I.) (please print) | ADC NUMBER | DATE (mm/dd/yyyy) |
|---|---|---|
| Bearup, Patrick  W, | 136226 | 11-7-19 |

| INSTITUTION | CASE NUMBER |
|---|---|
| AsPC-F Central | A01-333-019 |

TO: Director David Shinn

I am appealing the decision of _DW Monson_ for the following reasons:

The DW COMPLETELY ignored the issue! 1. I owned personal custom insoles, 2. I sent the insoles out Per DO 909.2,4.3.2 (and Unit Property) 3. DW Monson required a DO 909-7 form to issue my repaired insoles, Exhibit 6 shows HCP Gaye signed the form, Denial of this property violates the 4, 5, 14 Amendments. I followed policy to repair my own items! DW Monson simply does not want me to have them.

| INMATE'S SIGNATURE | DATE (mm/dd/yyyy) | GRIEVANCE COORDINATOR'S SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|---|---|
| | 11-7-19 | CO''' ___ #2538 | 11/14/19 |

| RESPONSE TO INMATE BY | LOCATION |
|---|---|
| | |

| STAFF SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
| | |

DISTRIBUTION: INITIAL: White & Canary – Grievance Coordinator
Pink – Inmate
FINAL: White – Inmate
Canary – Grievance File

802-3
12/12/13

②

ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance Response

| Inmate Name (Last, First M.I.) | ADC Number | Institution/Facility | Case Number |
|---|---|---|---|
| BEARUP, PATRICK | 136226 | ASPC-F/Central | A01-333-019 |

In your grievance dated 10/10/19 and received by this office on 10/18/19, you are requesting to receive insoles sent to you from a third party vendor.

I have reviewed your complaint. On November 06, 2019, I contacted the Assistant FHA and learned that you received new insoles on 12/31/18. You are not eligible to request new insoles until 12/04/19. At that time you must go through the proper procedure to request new insoles; to include submitting an HNR to medical on the issue.

Based on the above information, this issue is resolved.

To appeal this decision, file Grievance Appeal (form 802-3p), within 5 work days of receipt of this notice.

Jason Monson, Deputy Warden

Date

11/06/2019

INITIAL DISTRIBUTION – Committee Recommendation – All copies to Grievance Advisory Committee
FINAL DISTRIBUTION – White and Pink – Inmate, Canary – Grievance File

INITIAL DESTRIBUTION - GF Supplement – White and Canary – Grievance Coordinator, Pink – Inmate
FINAL DISTRIBUTION – White – Inmate, Canary – Grievance File

802-7P
2/14/00

DEC
11-7-19
PNGB

(3)

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance

Note: You may appeal the Grievance Coordinator's decision to the Warden/Deputy Warden/Administrator by filing form 802-3, within 10 calendar days of receipt of this notice

5-A-7

**RECEIVED BY** CO III K. McKNIGHT

**TITLE** CO III

**BADGE NUMBER** 2216

**DATE (mm/dd/yyyy)** 10-14-19

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | DATE (mm/dd/yyyy) |
|---|---|---|
| Bearup, Patrick W. | 136226 | 10-10-19 |

| INSTITUTION/FACILITY | | CASE NUMBER |
|---|---|---|
| ASPC-F-Central A72 | | A01-333-019 |

TO: GRIEVANCE COORDINATOR

---

**Description of Grievance** (To be completed by the Inmate)

Withholding property: The CO III's response would normally be correct. However, in this case DO 909.2.4.3.2 states "Inmates requiring repair to specialized personal medical property or items) ... MAY ELECT TO RETURN ITEMS TO A THIRD PARTY (i.e. FAMILY MEMBER) FOR COORDINATION OF THE REPAIR AND SUBSEQUENT RETURN ...," (Emphasis mine) I followed policy and now am being withheld my property without Due Process or Cause. I DO NOT agree to forfeit my insoles. But ask for policy to be followed. Especially Med. Tech. man Ch 7 Sec. 11.0 (1.1 and 1.5) For understanding of DO 909.2

Attached Informal, with Resp, Exhibits A, B, C, D, E, E.1, E.2, F, G

---

**Proposed Resolution** (What informal attempts have been made to resolve the problem? What action(s) would resolve the problem?)

I tried to resolve with staff - Process Res. Process my insoles to FHA with 909-7 Form attached with Due Process followed DO 909.2.4.1.3.1

---

| Inmate's Signature | Date 10-10-19 | Grievance Coordinator's Signature CO III | Date 10/18/19 |
|---|---|---|---|

| Action taken by Documentation of Resolution or Attempts at Resolution. | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

| Staff Member's Signature | Badge Number | Date |
|---|---|---|

DISTRIBUTION: INITIAL: White and Canary or Copies – Grievance Coordinator; Pink or Copy - Inmate
FINAL: White – Inmate; Canary – Grievance File

802-1
12/12/13

(14)

## ARIZONA DEPARTMENT OF CORRECTIONS

### Inmate Informal Complaint Response

*For Distribution: Copy of Corresponding Inmate Informal Complaint Resolution must be attached to this response.*

| Inmate Name *(Last, First M.I.)* | ADC Number |
|---|---|
| BEARUP, PATRICK W. | 136226 |

Institution/Unit

ASPC/FLORENCE-CENTRAL UNIT

| From | Location |
|---|---|
| COIII K. McKnight | CB5 programs |

This is in response to your Informal Complaint dated 10/10/19. You are requesting to receive and item (insoles for shoes) that came in 3rd party vendor. You state that you need these for medical reasons.

Per Sgt. Arndt in property, these insoles came in from a 3rd party vendor. Proper procedure was not followed. These items have been contrabanded and you will have to decide what you want done with them.

End of response.

| Staff Signature | Date |
|---|---|
| CO III K. McKnight | 10-10-19 |

Distribution: Original - Inmate
Copy – Grievance Coordinator File

802-12(e)
12/19/12

⑤

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Inmate Informal Complaint Resolution**

*Complaints are limited to one page and one issue.*

*Please print all information.*

5-A-7

| INMATE NAME *(Last, First M.I.) (Please print)* | ADC NUMBER | INSTITUTION/UNIT | DATE *(mm/dd/yyyy)* |
|---|---|---|---|
| Bearup, Patrick W. | 136226 | Central ARZ | 10-10-19 |

| TO | LOCATION |
|---|---|
| CO III McKnight | CB5 |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

This is against ADC - NOT MEDICAL - I have personal property (insoles for shoes)(exhibit A) These were provided to me per. Security, medical, and Policy. On 7-16-19, As per direction from Property Sgt. Arndt, I sent my personal property out for repair (exhibit B). On 9-24-19 ADC contraband my insoles, that were repaired, (exhibit C) My repairs were done per policy and similar to Grievance A01-377-018 (Exhibit D) Where my sun-glasses were sent out, repaired, and returned. On 10-8-19 Sgt. Arndt responded electronically that I need to send my insoles out.

                    - ARGUMENT -

Health Services Tech. Manual Ch 7 Sec. 11.0 (1.1) Clearly shows that my insoles are allowed, and the last 2 lines clearly show it is MY responsibility to repair my orthoses! (1.5) CLEARLY shows items that are medically Appropriate, but NOT medically necessary can still be obtained [by me] (Exhibits E, E.1, E.2) Exhibit F clearly shows my insoles are Necessary, as I have an ACTIVE S.N.O. for them Even IF, we disregard the instructions above, Exhibit G, Clearly shows that Centurion's H.C.P. signed a 909-7 form, as did I, allowing me my insoles. ADC refuses to issue them to me, even going as far as to suggest I file a grievance and go to the courts! I'm sure ADC general counsel would disagree to that action.

My resolution is to receive my repaired insoles, the Capt. of Security can look them over, as they contain no metal or security issues.

I tried to resolve via e-mail, and verbally with Property and Admin.

| INMATE SIGNATURE | DATE *(mm/dd/yyyy)* |
|---|---|
| *(signature)* | 10-10-19 |

Have you discussed this with institution staff? ☑ Yes ☐ No

If yes, give the staff member name: Sgt. Arndt, DW Monson

Distribution: INITIAL: White and Canary or Copies – Grievance Coordinator; Pink or Copy – Inmate
FINAL: White – Inmate; Canary – Grievance Coordinator File

802-11
6/25/14

(b)

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Property/Contraband/Disposition Tracking

| LOCATION/UNIT ASPC-FLORENCE/ Central | DATE (mm/dd/yyyy) 01/26/2018 | TIME 1652 |
|---|---|---|
| INMATE NAME (Last, First M.I.) (Please print) Broyle | ADC NUMBER 130226 | PROPERTY SEIZED BY COMPLEX MAIL & PROPERTY |

### SEIZED PROPERTY RECEIPT

| # | Description | Reason |
|---|---|---|
| 3 | PR. Insoles (2) Athlete Mens 9-10.5 (1) Aire Orthota m. 9-10.5 | CONTRABAND |
| | | |
| | | |
| 2 | PR Insoles Approved by Capt Wallace | |

*The above described contraband was seized from the suspect/inmate when he/she knowingly took said contraband into a correctional facility, or was found in possession of said contraband in violation of A.R.S. 13-2505.*

## CONTRABAND CONTROL / CHAIN OF EVIDENCE

Evidence Control Number:

| From | Date (mm/dd/yyyy) | Time | To | Initials |
|---|---|---|---|---|
| Implus LLC | 1/26/2018 | 1400 | Central M+P | PA |
| Central M+P | 1/27/2018 | 12.00 | Given to I/M (2) | PA |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## PROPERTY RELEASE

| INMATE SIGNATURE | DATE OF NOTIFICATION (mm/dd/yyyy) 1-27-18 |
|---|---|
| CONTRABAND CONTROL NUMBER A01-18-052 | NOTIFIED BY (Staff Signature and Badge Number) Beckhart 11674 |

☐ I wish to donate the property listed above to the Department of Corrections
☐ I wish to have the property listed above destroyed by the Department of Corrections
☐ HOLD FOR: Appeal *(This option applies only for publications excluded under Department Order 914, Inmate Mail).* Inmate must timely submit Inmate Letter, Form 916-1 to initiate appeal process per Department Order 914, Inmate Mail.

| ☐ SEND TO: | ☑ HOLD FOR: Medical or Grievance |
|---|---|
| Name _____ | Name _____ |
| Address _____ | Address _____ |
| _____ | _____ |

| SIGNATURE OF PERSON PICKING UP PROPERTY | DATE PROPERTY PICKED UP |
|---|---|

| CONTRABAND CONTROL OFFICER (Last, First M.I.) (Please print) | BADGE NUMBER | DISPOSAL DATE (mm/dd/yyyy) |
|---|---|---|
| DESTRUCTION COMMITTEE MEMBER (Last, First M.I.) (Please print) | BADGE NUMBER | DISPOSAL DATE (mm/dd/yyyy) |
| DESTRUCTION COMMITTEE MEMBER (Last, First M.I.) (Please print) | BADGE NUMBER | DISPOSAL DATE (mm/dd/yyyy) |

⑦



**ARIZONA DEPARTMENT OF CORRECTIONS** Exhibit B

## Inmate Property/Contraband/Disposition Tracking

| LOCATION/UNIT Central A72 | DATE (mm/dd/yyyy) 7-14-19 | TIME 0853 |
|---|---|---|
| INMATE NAME (Last, First M.I.) (Please print) Bearup, Patrick W. | ADC NUMBER 136226 | PROPERTY SEIZED BY Zambrano |

### SEIZED PROPERTY RECEIPT

| # | Description | Reason |
|---|---|---|
| 2 pair | Insoles | Medical repair item |
| | | |
| | | |
| | | |
| | | |

*The above described contraband was seized from the suspect/inmate when he/she knowingly took said contraband into a correctional facility, or was found in possession of said contraband in violation of A.R.S. 13-2505.*

### CONTRABAND CONTROL / CHAIN OF EVIDENCE

Evidence Control Number:

| From | Date (mm/dd/yyyy) | Time | To | Initials |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

### PROPERTY RELEASE

| INMATE SIGNATURE | DATE OF NOTIFICATION (mm/dd/yyyy) 7-15-19 |
|---|---|
| CONTRABAND CONTROL NUMBER | NOTIFIED BY (Staff Signature and Badge Number) |

☐ I wish to donate the property listed above to the Department of Corrections
☐ I wish to have the property listed above destroyed by the Department of Corrections
☐ **SEND TO:**    ☒ **HOLD FOR:** Monti Bearup
  Name _____    Name _____
  Address _____    Address ~~██████████████~~
        ~~██████~~, AZ

| SIGNATURE OF PERSON PICKING UP PROPERTY Monti Bearup | DATE PROPERTY PICKED UP 7-16-19 |
|---|---|

| CONTRABAND CONTROL OFFICER (Last, First M.I.) (Please print) Zambrano | BADGE NUMBER 4894 | DISPOSAL DATE (mm/dd/yyyy) |
|---|---|---|
| DESTRUCTION COMMITTEE MEMBER (Last, First M.I.) (Please print) | BADGE NUMBER | DISPOSAL DATE (mm/dd/yyyy) |
| DESTRUCTION COMMITTEE MEMBER (Last, First M.I.) (If inmate unavailable) | BADGE NUMBER | DISPOSAL DATE (mm/dd/yyyy) |

Distribution:  Original – Property Officer
             Copy – Inmate
             Copy – CIU/Disciplinary (as needed)

909-6
5/30/13

⑧

Exhibit C

# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Property/Contraband/Disposition Tracking

COPY

| LOCATION/UNIT | DATE (mm/dd/yyyy) | TIME |
|---|---|---|
| ASPC-FLORENCE COMPLEX | 09/24/2019 | 9/24/2019  0918 HRS |
| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | PROPERTY SEIZED BY (Last, First M.I.) (Please print) |
| BEARUP, P. (136226 5-A-7) | 136226 | PINA , COII 11979 |

## SEIZED PROPERTY RECEIPT

| # | Description | Reason |
|---|---|---|
| 1 BAG | 8 INSOLES WALK FIT PLATINUM 2 LARGE 6 SMALLSIZE G 98WP01DR2G | SENT 3RD PARTY |
| 1 BAG | 8 INSOLES WALK FIT PLATINUM 2 LARGE 6 SMALLSIZE G 98WP01DR2G | SENT 3RD PARTY |
|  |  |  |
|  |  |  |
|  |  |  |

*The above described contraband was seized from the suspect/inmate when he/she knowingly took said contraband into a correctional facility, or was found in possession of said contraband in violation of A.R.S. 13-2505.*

## CONTRABAND CONTROL/CHAIN OF CUSTODY

Evidence Control Number:

| From | Date (mm/dd/yyyy) | Time | To | Initials |
|---|---|---|---|---|
| Complex Mail Room | 09/24/2019 | 1340 | Central Unit Property | WP |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

## PROPERTY RELEASE

| INMATE SIGNATURE | DATE OF NOTIFICATION (mm/dd/yyyy)  09/24/2019 |
|---|---|
| CONTRABAND CONTROL NUMBER  A58-19-0550 | NOTIFIED BY (Staff Signature and Badge Number)  Sgt. Arnst #4314 |

- [ ] I wish to donate the property listed above to the Department of Corrections
- [ ] I wish to have the property listed above destroyed by the Department of Corrections
- [ ] HOLD FOR: Appeal *(This option applies only for publications excluded under Department Order 914, Inmate Mail).* Inmate must timely submit Inmate Letter, Form 916-1 to initiate appeal process per Department Order 914, Inmate Mail.
- [ ] SEND TO:           [ ] HOLD FOR:
  Name _____     Name _____
  Address _____     Address _____
  _____        _____
  _____        _____

| SIGNATURE OF PERSON PICKING UP PROPERTY | DATE PROPERTY PICKED UP |
|---|---|
|  |  |

| CONTRABAND CONTROL OFFICER (Last, First M.I.) (Please print) | BADGE NUMBER | DISPOSAL DATE (mm/dd/yyyy) |
|---|---|---|
| DESTRUCTION COMMITTEE MEMBER (Last, First M.I.) (Please print) | BADGE NUMBER | DISPOSAL DATE (mm/dd/yyyy) |
| DESTRUCTION COMMITTEE MEMBER (Last, First M.I.) (If Inmate unavailable) | BADGE NUMBER | DISPOSAL DATE (mm/dd/yyyy) |

Distribution:   Original – Property Officer
            Copy – Inmate
            Copy – CIU/Disciplinary *(as needed)*

909-6
11/19/17

(9)

Patient: BEARUP, PATRICK W.

Encounter Date: 12/04/2018               Time: 10:00:36            Type: Nurse - Verbal/Telephone Orders
Location: ASPC-F CENTRAL D/RW [A72]     Staff: Jones, Julie, RN

Category*: Medical Supplies/Special Equipment
Type*: INSOLES
Count*: 1                       Sequence Number: 01
Approximate Begin Date: 12/04/2018        Approximate End Date: 12/04/2019
Refer to Staff: Eze, Chidozie, NP
Status: Active                    As of Date: 12/04/2018      **Status History**

**Specify Comments**

Insoles

**Prepare To Update**    **Prior Page**

Show Last Updated Information

*Exhibit G*



# ARIZONA DEPARTMENT OF CORRECTIONS

## Specialized Personal Medical Property Information/Agreement

| INMATE NAME *(Last, First, M.I.) (Please print)* | ADC NUMBER | UNIT |
|---|---|---|
| Bearup, Patrick W. | 138226 | Central A-72 |

The contracted medical vendor has recommended the following specialized personal medical property to be sent in for consideration for possible issue to you during your incarceration with ADC:

1.  Personal/Custom insoles

You must agree to the conditions outlined in this document to be authorized to have the above specialized personal medical property sent into the Contract Facility Health Administrator for review/consideration.

**CONDITIONS:**

- You or sender will be responsible for all costs to have the specialized personal medical property sent to the Contract Facility Health Administrator. The specialized personal medical property must have all components and be in sound physical and operational condition.

- The specialized personal medical property must be inspected and approved by the Contract Facility Health Administrator and unit Chief of Security prior to issue to you.

- If the specialized personal medical property is disapproved for issue to you due to security concerns or poor physical/operational condition as determined by the unit Chief of Security and/or the Contract Facility Health Administrator you will be responsible for the cost of returning the specialized personal medical property back to the sender.

- If the specialized personal medical property should require repair or replacement during you incarceration, you will be responsible for all costs involved in the specialized personal medical property replacement or repair to include shipping.

- The approval for you to possess specialized personal medical property may be terminated at any time if the item is misused in any manner.

**NOTE:** Additional medical items specifications will be attached by the Contract Facility Health Administrator as necessary, i.e. no full metallic braces, etc.

**I have read and agree to the above conditions:**

| INMATE SIGNATURE | DATE *(mm/dd/yyyy)* |
|---|---|
| | 9-30-19 |

| WITNESS NAME *(Last, First, M.I.) (Please print)* | SIGNATURE | DATE *(mm/dd/yyyy)* |
|---|---|---|
| | | 09/30/19 |

Distribution:  Original – Property Office
Copy – Inmate
Copy– Inmate Medical Records File

909-7
7/16/19

*(11)*

**Arizona Department of Corrections Florence Complex Health Services**

# GRIEVANCE RESPONSE

**DATE: January 16, 2019**
**INMATE NAME: Bearup, Patrick**
**ADC # and UNIT: 136226**
**GRIEVANCE NUMBER: A01-317-018**
**ASPC FLORENCE**
**FROM: Adam Perkins, Facility Health Administrator**
This letter is in response to the Formal Grievance(s) dated 12/7/18 and received by Corizon Medical Administration on 12/12/18.

Summarization of inmate Complaint:
Patient is wanting prescription sunglasses in both grievances.
Description of action taken to investigate the complaint:
Review the patient medical record,
Review grievance information

Summary of Findings:
You state in your grievance you feel you are being denied prescription sunglasses. Deputy Warden Van Winkle, you were approved to have prescription sunglasses sent in from family.

Decision:
Mr. Bearup,
  At this time you have received treatment for your condition. You have received prescription sunglasses. At this time, if you have any further follow up issues specific to this grievance, please follow up with an inmate letter to the ADON of your unit. At this time I find this matter RESOLVED and closed.

**\*Per Policy 802.05 1.2: The decision of the Contract Facility Health Administrator is final and constitutes exhaustion of all remedies within the Department. In accordance with current policy, this response is final, and constitutes exhaustion of all remedies within the Department.**

Thank you

Adam S. Perkins
Facility Health Administrator

1-16-19
Date

(12)

| | Orthotic and Prosthetic Aids | OPR:<br>HS Contract Vendor Regional Medical Director<br>HSCMB Medical Program Administrator |
|---|---|---|
| Arizona Department of Corrections | | Auth: rr |
| Health Services Technical Manual | HSTM<br>Chapter 7<br>Section 11.0. | SUPERSEDES: 08/15/2018<br>EFFECTIVE DATE: 07/01/2019 |

**Chapter 7, Sec. 11.0    Orthotic and Prosthetic Aids**

**REFERENCES**:    NCCHC STANDARD P-G-11

**PURPOSE**:  Medical and Dental orthoses, prostheses, and other aids to impairment will be provided when the health of the inmate would otherwise be significantly adversely affected, as determined and ordered by the responsible Vendor Practitioner or Dentist and approved by the appropriate Vendor Approving Authority.  Inmates will not be denied prostheses, orthoses, or other aids that are medically necessary because of lack of funds.  This procedure specifies the method to provide these aids to inmates.

**RESPONSIBILITY**:  It is the responsibility of the Vendor Facility Health Administrator to develop and monitor systems to support provision of medically necessary orthotics and prosthetics.

**PROCEDURE**:  Orthotics and Prosthetics

1.0.    Definitions and Standards for Aids: Orthoses/ Prosthetic Devices/ Mechanical Aids are specialized mechanical devices used chronically to support or supplement joints or limbs, or are artificial devices to replace missing body parts.

1.1.    Appropriate but elective orthoses, prostheses, and aids to impairment are those services/devices which are not essential to prevent significant deterioration in the essential health of the patient, but nevertheless are reasonably expected to significantly improve the quality of life for the patient as it relates to a proven chronic or ongoing medical condition.  These items are generally for chronic use and become the personal property of the patient.  These items include, but are not limited to; dentures, dental prosthetics such as partials, flippers, etc., glasses, contact lenses, artificial eyes, artificial limbs, certain knee/ankle/foot braces, hernia support belts, hearing aids, special support hose, TENS units, non-institution issue shoes, suspenders, batteries for hearing aids and other battery operated devices, and include maintenance and/or repair of any such device.

1.2.    There are certain items that though they may be available in the community, or are used for certain conditions, are of minimal proven medical value, requests to health services to authorize special items must be weighed against the concerns of running a safe and secure institution, and appropriate institution routine.  There are many items in this category that are not generally considered or approved by the Vendor Health Services as rising to a level of need to create a

medical exception to institution rules, policies, and standards, some examples are; high top tennis shoes, soft pillows, heating pads, knee sleeves for sports, etc.

1.3. Medical aids issued by Vendor Health Services as part of acute treatment for a limited medical condition such as casts, splints, ace wraps, short-term usage of canes/crutches/braces, etc., are routinely authorized and not generally charged to the inmate.

1.4. Hardware that is an essential part of a medically necessary procedure such as, heart valves, cardiac stent at time of angioplasty, intraocular lens implants at time of cataract surgery, etc., are routinely authorized and not generally charged to the inmate.

1.5. Inmates may also in certain circumstances obtain prostheses that the Practitioner or Dentist has determined are elective, which are medically appropriate, but are not medically necessary. This procedure establishes the mechanism for inmates to obtain these prostheses, orthoses, or other aids.

1.6. Most aids, prostheses, orthoses become the personal property of the inmate to emphasize the inmate's responsibility to care for the item(s) properly.

2.0. Footwear: The institution is responsible for the style, quality and fitting of standard issue clothing and footwear. Inmates with medical disorders for which special, non-standard footwear is a recognized and appropriate part of the medical treatment program and for which no reasonable treatment alternative exists will be prescribed special footwear. Footwear prescribed as "medically necessary" will be provided regardless of the inmate's ability to pay.

2.1. Patients with medical disorders, which may require special foot care, may be scheduled with a Vendor Practitioner for evaluation of the medical problem.

2.2. Inmates with a complaint about shoes and the complaint is not clinically related to an existing medical disorder, should be directed to appropriate operations staff for assistance. A complaint of shoes being uncomfortable is not, in and of itself, a medical problem.

2.3. The Vendor Practitioner doing the examination is to determine and document by history and objective examination: whether an inmate has a formal medical disorder for which non-standard or modified footwear is a recognized and appropriate part of the medical treatment plan, and without which there is likely to be serious deterioration in, or significant risk to, the inmate's basic health, and for which no appropriate alternative exists.

2.4. A Vendor Practitioner order for specialty shoes must be supported in the progress notes including diagnosis and treatment plan according to the criteria above.

2.5. After authorization, the order for modified or specialty shoes will be implemented by the Vendor Facility Health Administrator or designee and sent to the appropriate purchasing agent.

2.6. Shoes authorized by the above process and deemed "medically necessary" will not be denied due to inmate indigence.

2.7. Requests for specialty athletic shoes are not a medical issue and should not be scheduled for practitioner examination.

3.0. The Vendor Reviewing/Approving Authority shall consider the following in determining the relative need of a prostheses, orthoses, or other aid; urgency of need, time left on sentence, overall necessity, morbidity, mortality, functional disability and expected improvement, alternatives, risk/benefit, cost/benefit, and security concerns. Based on these factors a decision is then made as to whether the exception for the elective item should be allowed for the patient.

4.0. Glasses: The lack of vision correcting eyewear does not cause deterioration in a person's general state of health. Health Services Contract Vendor does, however, recognize that corrected vision may promote participation in education, programming, or work assignments, it

Exhibit C. 2

may increase comfort, or otherwise contribute to quality of life, therefore, Vendor Health Services will offer support on an as needed and as requested basis.

4.1. Unless there is a clear clinical indication to do otherwise, Vendor Health Services will offer refractive eye examinations for each inmate a maximum of once every three (3) years. Eyeglasses become the inmate's real property and are handled according to the procedure outlined by Department Order 909. Medical eye examinations will not be denied due to indigence. Willful destruction or mistreatment of glasses will be responded to in accordance with Department guidance regarding destruction of state provided or state owned property.

4.2. Specialty optical aids, such as photo gray glasses, sunglasses, or contact lenses are considered medically optional unless ordered by an ophthalmologist as part of a medical treatment plan and not based on the inmate's desire.

4.3. Eyeglass frames will be provided in accordance with the styles and material described by individual optician contract. Inmates may not choose different styles of frames beyond that offered by the optician in accordance with the ADC contract.

4.4 Bone Stimulators, when ordered by a specialist as part of a treatment plan, shall be made available to the inmate. The device shall be the property of ADC Health Services Vendor. The ordered treatments shall occur in the Health Unit. If the inmate is released while utilizing the bone stimulator, Health Services Vendor shall supply the device to the inmate upon release.

Count 10

Exhibit B

Various Communications
Pages 1-6



# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Letter Response

*For distribution: Copy of corresponding Inmate Letter must be attached to this response.*

| INMATE NAME *(Last, First M.I.) (Please print)* | ADC NUMBER |
|---|---|
| Bearup, Patrick | 136226 |

| INSTITUTION/UNIT |
|---|
| ASPC-Florence / Central Unit |

| FROM *(Last, First M.I.) (Please print)* | LOCATION |
|---|---|
| Captain Walker, D | Central Unit |

This is in response to your inmate letter dated August 27, 2017 in regards to ordering custom insoles as per DO.909

I have spoke with Central Unit medical staff concerning your SNO for custom insoles. Your current SNO is active but was issued from ASPC Eymen Browning Unit. Central Unit medical has requested that you complete an HNR so that a SNO can be issued through Central Unit. Once the new SNO has been issued, the custom insoles will be allowed to be ordered as outlined in policy 909.

| STAFF SIGNATURE | DATE *(mm/dd/yyyy)* |
|---|---|
| *Walker* | 8/31/17 |



# ARIZONA DEPARTMENT OF CORRECTIONS

## Health Needs Request (HNR)



Date : _____

Time: _____

Initials: _CA_ 09OCT19 08

**SECTION/SECCIÓN I**

| INMATE NAME/NOMBRE (Last, First M.I.) (Apellido, Nombre, Inicial) | ADC NUMBER/NÚMERO DE ADC | DATE/FECHA (mm/dd/yyyy) |
|---|---|---|
| Bearup, Patrick W. | 136226 | 9-25-19 |

| CELL/BED NUMBER/CELDA/ NÚMERO DE CAMA | UNIT/UNIDAD | P.O. BOX/APARTADO POSTAL | INSTITUTION/INSTALACIÓN: ADC |
|---|---|---|---|
| 5-A-7 | Central | 8200 | Florence |

You are required to be truthful. Failure to be cooperative and any abuse of the health care system or its staff could cause a delay in delivery of care to you and others, and may result in disciplinary action. [Se le exige diga la verdad. La falta de cooperación y cualquier abuso del sistema del cuidado de la salud o del personal podría retrasar la asistencia de este cuidado para usted y para otros y puede dar lugar a una acción disciplinaria.]

**SECTION/SECCIÓN II**

| AREA OF INTEREST(Check only one block below)/ÁREA DE INTERES (Marque Un Espacio Solamente) | ☐ Medical/Médico | ☐ Dental | ☒ FHA |
|---|---|---|---|

☐ Pharmacy/Farmacia   ☐ Mental Health/Salud Mental   ☐ Eyes/Ojos   ☐ Other (specify)/Otros (especifique)

PLEASE PRINT! Describe your medical/dental treatment issue need in the space below. Be clear and specific. NO ADDED PAGES. [POR FAVOR, ESCRIBA EN IMPRENTA! Describa su tratamiento o necesidad médica/dental en el espacio de abajo. Describa claramene y sea específico. ¡NO USE MAS HOJAS!]

Attached is an I/m Letter form 916-1 Requesting the FHA to initalize the process to have nursing initiate the Specialized Personal Medical Property Information Agreement, Form 909-7 - For my personal insoles

I understand that, per ARS 31-201.01, I will be charged a $4.00 Health Services fee (excluding exemptions granted by statute) for the visit that I am herein requesting. I further understand that by paying this fee I do not have the right to dictate treatment or who provides treatment. [Entiendo que de acuerdo con ARS 31-201.01 se cobrará una cuota por el servicio médico de $4.00 por la cita que aquí estoy pidiendo (excluyendo las exenciones otorgadas por la ley). Además entiendo que al pagar esta cuota no tengo el derecho a imponer el tratamiento o quien lo proporcione.]

INMATE SIGNATURE/FIRMA DEL PRISIONERO

**REMOVE THE GOLDENROD COPY AND PLACE THE REMAINDER IN THE HEALTH NEEDS REQUEST DROP BOX [SEPARE LA COPIA DE COLOR AMARILLO OBSCURO Y DEJE LAS DEMAS EN EL BUZON PETICION DE NECESIDADES MÉDICAS.]**

**SECTION III/SECCIÓN III**

| REFERRAL BY MEDICAL STAFF/REFERENCIA MEDICA | ☒ Medical/Médico | ☐ Dental | ☐ Pharmacy/Farmacia | ☐ FHA |
|---|---|---|---|---|

☐ Pharmacy/Farmacia   ☐ Mental Health/Salud Mental   ☐ Eyes/Ojos   ☐ Other (specify)/Otros (especifique)

| STAFF SIGNATURE STAMP/FIRMA DEL EMPLEADO | DATE/FECHA (mm/dd/yyyy) | TIME/HORA |
|---|---|---|
| | | 09OCT19 08 |

**SECTION/SECCIÓN IV**

| PLAN OF ACTION/PLAN DE ACCION |
|---|
| This form is for medically necessary items the company cannot provide. You can purchase insoles from store, and there is no documentation or diagnosis in your chart of a need for specialized |

| STAFF SIGNATURE STAMP/FIRMA DEL EMPLEADO | DATE/FECHA (mm/dd/yyyy) | TIME/HORA |
|---|---|---|
| | | 09OCT19 08 |

This document is a translation from original text written in English. This translation is unofficial and is not binding on this state or a political subdivision of this state. [Este documento es una translación de texto original escrito en inglés. Esta traducción no es oficial y no compromete a este estado ni una subdivisión política de este estado.]

Distribution/Distribución:   White/Blanca – Health Unit/Unidad de Salud   ②
Canary, Pink & Goldenrod – Inmate/Amarillo Canario, Rosa y Amarillo Obscur - Prisionero

1101-10ES
12/13/16

SECTION 4 HNR insoles or orthotics. You personal insoles do not meet criteria for form 909-7.

ARIZONA DEPARTMENT OF CORRECTIONS

Inmate Letter

5-A-7

Requests are limited to one page and one issue. NO ATTACHMENTS PERMITTED. Please print all information.

| Inmate Name (Last, First M.I.) | ADC Number | Institution/Unit | Date |
|---|---|---|---|
| Bearing, Patrick W. | 136226 | Central A72 | 9-25-19 |

| To: Adam Perking | Location: F.H.A. Centurion |
|---|---|

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

I was advised that D.O. Jason Monson has discussed this issue with you.

Under current D.O. 909 policy, I am allowed to have my custom insoles repaired/replaced (section 2.4.3.2). However, in order to do this, I need a 909-7 form processed, something never required in the past. So I need you to have nursing initialize the process for 909-7 Special personal medical items. I asked Centurion to fix my insoles, and they failed to respond. I need insoles due to very high arches, pain in walking, neuropathy, scoliosis, and chronic back pain. The ADC Medical Technical Manual says, I am to receive medical items that can improve my quality of life. Therefore, custom insoles fit this need.

The requested action is to receive a 909-7 form to allow me to possess my repaired custom insoles, as policy allows

c.c. file

| Inmate Signature | Date: 9-25-19 |
|---|---|

| Have You Discussed This With Institution Staff? ☒ Yes ☐ No |
|---|
| If yes, give the staff member's name: Dr Monson, Sgt. Bardt |

**ARIZONA DEPARTMENT OF CORRECTIONS**

5-A-7

**Inmate Letter Response**

| Inmate Name (Last, First) | ADC Number |
|---|---|
| **Bearup, Patrick** | **136226** |
| **Institution / Unit** | **Date** |
| **ASPC-Florence Central** | **10/28/19** |

| From | Location |
|---|---|
| **ADON Central IPC** | **ASPC Central IPC Health Services Administration** |

This is in response to your Inmate Letter received on 10/24/19, and reviewed in the Florence Central IPC Unit Health Services Office on 10/28/19. Your primary area of concern is regarding: Medical Supplies

   Your concern has been researched, including a review of your Medical Records. I am providing you with the following response:

All medical supplies are supplied and repaired by the contracted medical vendor which is currently Centurion. Per DO policy 909 specialized personal medical equipment is outlined as equipment or items that are not provided by the contracted medical vendor. If your insoles were provided by the contracted medical vendor then Centurion will be responsible for the repair/replacement of them if deemed necessary.

If you have any additional questions, please do not hesitate to contact medical via HNR. Thank you for your time and take care.

End of response

| Staff Signature | Date |
|---|---|
| **K. Henry RN, ADON Florence Complex, Central IPC** | **10/28/19** |

**Computer Electronic Version**
**Distribution:** Inmate
       Health Services File

(4)

 

# ARIZONA DEPARTMENT OF CORRECTIONS

## Health Needs Request (HNR)

Date : _____

Time: _____

Initials: _____

SECTION/SECCIÓN I

| INMATE NAME/NOMBRE (Last, First M.I.) (Apellido, Nombre, Inicial) | ADC NUMBER/NÚMERO DE ADC | DATE/FECHA (mm/dd/yyyy) |
|---|---|---|
| Begay, Patrick | 138226 | 10-30-19 |

| CELL/BED NUMBER/CELDA/ NÚMERO DE CAMA | UNIT/UNIDAD | P.O. BOX/APARTADO POSTAL | INSTITUTION/INSTALACIÓN: ADC |
|---|---|---|---|
| 5-A-7 | Central | 8200 | Florence |

You are required to be truthful. Failure to be cooperative and any abuse of the health care system or its staff could cause a delay in delivery of care to you and others, and may result in disciplinary action. [Se le exige diga la verdad. La falta de cooperación y cualquier abuso del sistema del cuidado de la salud o del personal podría retrasar la asistencia de este cuidado para usted y para otros y puede dar lugar a una acción disciplinaria.]

SECTION/SECCIÓN II

| AREA OF INTEREST(Check only one block below)/AREA DE INTERES (Marque Un Espacio Solamente) | ☐ Medical/Médico ☐ Dental ☐ FHA |
|---|---|

☐ Pharmacy/Farmacia   ☐ Mental Health/Salud Mental   ☐ Eyes/Ojos   ☑ Other (specify)/Otros (especifique)  AIXN

PLEASE PRINT! Describe your medical/dental treatment issue need in the space below. Be clear and specific. NO ADDED PAGES. [POR FAVOR, ESCRIBA EN IMPRENTA! Describa su tratamiento o necesidad médica/dental en el espacio de abajo. Describa claramene y sea específico. ¡NO USE MAS HOJAS!]

Please forward the attached to K.Henry AIXN — 11 pents with
the 909-7 issues Not received this far — for Medical repair
or returned Medical Items not supplied by Central in any order!

I understand that, per ARS 31-201.01, I will be charged a $4.00 Health Services fee (excluding exemptions granted by statute) for the visit that I am herein requesting. I further understand that by paying this fee I do not have the right to dictate treatment or who provides treatment. [Entiendo que de acuerdo con ARS 31-201.01 se me cobrará una cuota por el servicio médico de $4.00 por la cita que aquí estoy pidiendo (excluyendo las exenoiones otorgadas por la ley). Además entiendo que al pagar esta cuota no tengo el derecho a imponer el tratamiento o quien lo proporcione.]

INMATE SIGNATURE/FIRMA DEL PRISIONERO

**REMOVE THE GOLDENROD COPY AND PLACE THE REMAINDER IN THE HEALTH NEEDS REQUEST DROP BOX [SEPARE LA COPIA DE COLOR AMARILLO OBSCURO Y DEJE LAS DEMAS EN EL BUZON PETICION DE NECESIDADES MÉDICAS.]**

SECTION III/SECCION III

| REFERRAL BY MEDICAL STAFF/REFERENCIA MEDICA | ☐ Medical/Médico ☐ Dental ☐ Pharmacy/Farmacia ☐ FHA |
|---|---|

☐ Pharmacy/Farmacia   ☐ Mental Health/Salud Mental   ☐ Eyes/Ojos   ☐ Other (specify)/Otros (especifique) _____

| STAFF SIGNATURE STAMP/FIRMA DEL EMPLEADO | DATE/FECHA (mm/dd/yyyy) | TIME/HORA |
|---|---|---|
| | | |

SECTION/SECCIÓN IV

| PLAN OF ACTION/PLAN DE ACCION |
|---|
| |
| |

| STAFF SIGNATURE STAMP/FIRMA DEL EMPLEADO | DATE/FECHA (mm/dd/yyyy) | TIME/HORA |
|---|---|---|
| | | |

*This document is a translation from original text written in English. This translation is unofficial and is not binding on this state or a political subdivision of this state. [Este documento es una traducción de texto original escrito en inglés. Esta traducción no es oficial y no compromete a este estado ni una subdivisión política de este estado.]*

Distribution/Distribución:   White/Blanca – Health Unit/Unidad de Salud
Canary, Pink & Goldenrod – Inmate/Amarillo Canario, Rosa y Amarillo Obscur - Prisionero

1101-10ES
12/13/16

SECTION 4, HNR



Requests are limited to one page and one issue. NO ATTACHMENTS PERMITTED. Please print all information.

| Inmate Name (Last, First M.I) | ADC Number | Institution/Unit | Date |
|---|---|---|---|
| Bearup, Patrick W. | 136226 | (Central) A12 | 10-30-19 |

To: K. Henry

Location: ADON Centurion

**State briefly but completely the problem on which you desire assistance. Provide as many details as possible.**

→ Dated 10-28-19

I am in receipt of your Emailed Response, You seem to have a disconnect with: 1. The Health Services Technical Manual Springically Ch.7 Sec. 11.0 and DO 909 2.4.3 Medical Property Repair — Please review before answering!

I own my own Personal Medical Property:
1. PX Sunglasses
2. PX Transition Glasses
3. Insoles (Sent out no repair - currently pending E.H.A. approval)

I wrote Centurion to repair my insoles, YOU refused! I asked Property how to repair them. I did that and had them returned per DO 909 2.4.3. I have a valid 909-7 signed by the HCP for the insoles, Centurion, Corizon, Wexford, ADC DID NOT PROVIDE ME MY CUSTOM INSOLES — I purchased them and was provided them by Capt Walker (Security). According to ADC DO Monson, I need 909-7 forms for my 3 items above in order to enact repairs, and receive my custom insoles currently held in property.

Property has receipts for my 3 Personal Medical Items listed above. We need to resolve this, as Centurion is basicly refusing Medical Treatment and everyone involved in this is then liable under laws for Civil litigation and Board of Nursing complaints. I appreciate your response per DO 916 and your help in resolving this issue.

A face to face conversation could resolve this more rapidly, versus this current back and forth.

| Inmate Signature | Date |
|---|---|
| | 10-30-19 |

Have You Discussed This With Institution Staff?  ☒ Yes  ☐ No

If yes, give the staff member's name: Unit Property, DW Monson

Count    10

Exhibit    C

Complex Warden Letter/Resolution
attempt
1 Page

**ARIZONA DEPARTMENT OF CORRECTIONS**

Inmate Letter

5-A-7

Requests are limited to one page and one issue. NO ATTACHMENTS PERMITTED. Please print all information.

| Inmate Name (Last, First M.I.) | ADC Number | Institution/Unit | Date |
|---|---|---|---|
| Bearup, Patrick W. | 136226 | (Central) A72 | 11-10-19 |

**To:** Complex Warden Van Winkle

**Location** Florence Complex Admin.

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

While you were DWCP (congrats, by the way), I wrote you to help me with the issue. My inmate letter never received a response from you. The issue is personal property repairs. You previously dealt with this concerning my sunglass repair and likewise I sought to repair my custom insoles. Please review DO 909 2.4.3.2 AND Health Services Technical Manual Chapter 7 Sec. 11.0 (specifically 1.1, 1.5, 1.6)

As with the process established when dealing with my sunglasses, cited policy, and grievance # A01-317-018, I own insoles that I had purchased from an outside vendor because my needs were not met with the insoles provided by medical. Capt. D. Walker allowed the purchase. I needed the insoles repaired, so I asked Sgt. Arndt for the correct process, he told me to send them out and have them rehemed. I did this via my wife (third party as policy allows). When the insoles arrived they were unclaimed as third party. I was then advised that DW Monson required me to obtain a 909-7 form, which HCP gave signed on 9-30-19. However, property refuses to give me my insoles - I have an active S.N.O., a 909-7, receipts for purchase, release to wife, and everything policy demands. Where I have concern is the methods between medical, specifically Adam Perkins and Jason Monson where, my understanding is that Mr. Monson instructed medical NOT to sign any 909-7 forms for myself or two others! Even though my insoles are personal property! Mr. Monson even directly told me on or around 10-8-19 appx 1000 hrs that even my personal sunglasses you approved, can never be repaired. So my only issue/request is to be approved to receive my repaired personal insoles from property. I do need a quick response, as I only have a few weeks to have property hold them. Thank you for your help.

Also see e-mails via ipay to Sgt. Arndt and DW Monson

#i # CCI-A2A72oooo 2614 / CCI-A2A72ccoooo 2630

**Inmate Signature**

**Date** 11-10-19

Have You Discussed This With Institution Staff?  ☒ Yes  ☐ No

If yes, give the staff member's name: Sgt Arndt, DW Monson, Medical

Distribution: White - Master Record File    Canary - Inmate

(1)

916-1
4/15/04

Count 10

Exhibit D

E-Mail Communication
With Jason Monson
and Sgt. Arndt
Pages 1-2

| Ref# AZA720000002630 | Housing:CB-5A007 | Date Created:09/25/2019 |
| --- | --- | --- |
| ID#: 136226 | Name:BEARUP,PATRICK W. | |
| Form:Inmate Letter | Subject:Property | Description:See Subject Above |
| Urgent:No | Time left:n/a | Status:Closed |

Original Form
*9/25/2019 2:31:14 PM : ( 136226 ) wrote*
D.W. Monson,
Thank you for your help with medical. As D.O. 909 recently changed I am asking for your help to navigate the issues surrounding my medically needed insoles.
1. SGT. Arndt advised me to get with medical to obtain a 909-7 form. Once this is accomplished, how do you want me to have my insoles sent back in? As SGT. Arndt advised me that the ones currently in property must be sent out, then returned.
2. Can you advise me as to your exact desires to maintain security, I will be sure to follow it to the letter!
3. Questions:
    A. Can my family return the insoles?
    B. What paperwork needs to be with the insoles?
    C. Is there a limit on the cost for the insoles?
    D. Will medical initiate contact with me, or do I write them?
    E. Is there anything I need to tell medical?
Thank you for your help with this matter,  Dr. Patrick Bearup D.Th.

Communications / Case Actions
*9/25/2019 2:31:14 PM : ( 136226 ) wrote*
Form has been submitted

*9/30/2019 5:17:37 PM : ( Jason Monson ) wrote*
Bearup, I have discussed this issue with medical. You are to submit an HNR to them stating your needs.
At this point the items that were sent in, need to be sent out.

*9/30/2019 5:17:50 PM : ( Jason Monson ) wrote*
Closed inmate form

Admin Log
*9/25/2019 2:47:15 PM : ( Kyle Arndt ) wrote*
Form was viewed by Kyle Arndt and the status was changed to Pending.

*9/25/2019 2:48:29 PM : ( Kyle Arndt ) wrote*
Assigned To Monson, Jason.

*9/30/2019 5:17:37 PM : ( Jason Monson ) wrote*
Responded to inmate

| Ref# AZA720000002614 | Housing:CB-5A007 | Date Created:09/25/2019 |
| ID#: 136226 | Name:BEARUP,PATRICK W. | |
| Form:Inmate Letter | Subject:Property | Description:See Subject Above |
| Urgent:No | Time left:n/a | Status:Closed |

Original Form
*9/25/2019 11:43:58 AM : ( 136226 ) wrote*
SGT. Arndt

Re:Contraband control # A58-19-0550

Since April 2015 Until recently, I have had custom insoles sent in to the units I have lived at without any major issues. I have copies of responses from DWOP Van Winkle to Capt. Walker establishing interpretation of policy i.e. D.O. 909 2.4.3.2 which reads " Inmates requiring repair to specialized personal medical property or item(s) authorized in accordance with this section may elect to return the items to a THIRD PARTY (I.E., FAMILY MEMBER, ETC) (emphasis mine) for coordination of the repair and SUBSEQUENT RETURN of the items in accordance with the procedures outlined in this Department Order."

On July 16, 2019 I sent out two pair of insoles for "MEDICAL REPAIR" I effected this event as policy allows supra. Yet on Sept 24, 2019 I received a contraband notice citing that my insoles were "sent 3rd PARTY"

I have followed the current policy and have an active S.N.O. for my insoles. I even sought repairs of my released insoles from Centurion but they refused to comply with my request. Therefore I followed policy, and even asked you directly as to this event and if there is any issue having my insoles sent out for repair.

I do not desire to drag this out via grievance etc. rather I'd appreciate your help to resolve this and keep security happy. Thank you for your help in this matter, Dr. Patrick Bearup D.Th.

Communications / Case Actions
*9/25/2019 11:43:58 AM : ( 136226 ) wrote*
Form has been submitted

*9/26/2019 7:54:12 AM : ( Kyle Arndt ) wrote*
Be advised that medical has been notified and advises you to submit an HNR regarding this issue.

*9/26/2019 7:54:38 AM : ( Kyle Arndt ) wrote*
Closed inmate form

Admin Log
*9/25/2019 12:04:55 PM : ( Kyle Arndt ) wrote*
Form was viewed by Kyle Arndt and the status was changed to Pending.

*9/25/2019 12:06:11 PM : ( Kyle Arndt ) wrote*
Assigned To Arndt, Kyle.

*9/26/2019 7:54:12 AM : ( Kyle Arndt ) wrote*
Responded to inmate

②